UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,  :  NO. 1:03-CV-00167
ex rel DR. HARRY F. FRY,  :
                           :
        Plaintiff,         :
                           :  **OPINION AND ORDER**
    v.                     :
                           :
THE HEALTH ALLIANCE OF     :
GREATER CINCINNATI, et al.,:
                           :
        Defendants.        :


        This matter is before the Court on Defendants' Joint
Motion to Dismiss the United States' Complaint in Intervention
(doc. 68), the Separate Memorandum of the Ohio Heart and Vascular
Center, Inc., ("Ohio Heart") In Support of Defendants' Motion to
Dismiss (doc. 69), the government's Response in Opposition (doc.
83), the government's Response to Ohio Heart (doc. 84), Ohio
Heart's Reply (doc. 85), and Defendants' Joint Reply in Support of
Motion to Dismiss (doc. 88).  The Court held a hearing on
Defendants' Motion on December 3, 2008.  For the reasons indicated
herein, the Court DENIES Defendants' Motion.

**I.  Background**

        Relator Dr. Harry Fry filed this qui tam action on March
7, 2003, challenging the system by which Defendants The Christ
Hospital ("TCH") and The Health Alliance of Greater Cincinnati
("THA") assigned time to cardiologists in the hospital's heart

station in proportion to the volume of referral of cardiac procedures made by cardiologists to TCH (doc. 7). In Relator's view, Defendants engaged in a "pay to play" scheme that violates the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), the Stark Statutes, 42 U.S.C. § 1395nn, and the False Claims Act, 31 U.S.C. §§ 3729-3733 (Id.). Relator alleges that Defendants' scheme favored Defendant Ohio Heart and Vascular Center ("Ohio Heart"), which was the dominant cardiology group at TCH, by ensuring a continuous flow of referrals between Ohio Heart and TCH, to the exclusion of other hospitals and cardiology groups (Id.). Relator claims after he continually complained about Defendants' system, in retaliation, TCH terminated his employment as Assistant Director of Cardiology (Id.). Relator further claims that after he challenged the legality of Defendants' system, Defendants shifted the operation of the self-referral scheme to an alter ego, Medical Diagnostic Associates, Inc. ("MDA"), a billing company under their control, so as to conceal the scheme (Id.). The government elected to intervene as Plaintiff in the this matter on April 1, 2008, and filed its Complaint in Intervention on July 29, 2008 (doc. 53).

Relator's counsel explained the basis for his Complaint at the December 3, 2008 hearing, as follows:

> The Relator. . .brought [his allegations] to the attention of Christ Hospital on December 29, 1999, in a letter, and we've cited this in Paragraph 61 of the Complaint, he says 'Because the current system is perceived by many to be unfair and probably illegal, the decision was made to establish an ad hoc committee to

propose an alternative system.' And the illegality he was talking about was the referral for referral arrangement. He was being excluded. He was being shoved to the side because he didn't have sufficient referrals to the hospital, being a sole practitioner. In fact, to get him in the door, he couldn't get in the door and get that panel station time, heart station time that would have given him additional patients, opportunities to bill for those additional patients, and that's the problem.

Counsel continued,

MDA, that organization that took over this assignment process, and the person who actually did the work and we've alleged this in the Complaint or it has been alleged by the government, is Dr. Broderick. Dr. Broderick is an officer of Ohio Heart. Dr. Broderick, and we cited this is Paragraph 68 of the Complaint, sent out a communication to everyone saying, look, although it is MDA now, the format is the same as in years past, with CABG referrals, meaning the cardiac bypass procedures, CABG referrals and gross revenue to the hospital being the two criteria for determining who gets time in the panel station. . . If you, a doctor, have referred enough of these kinds of procedures so that the gross revenues you have generated for the hospital exceed the two percent magic number set by Ohio Heart and MDA and the Christ Hospital, then you get the opportunity to participate in the heart station. And that's the problem, it is a referral for referral. It is value being received at both ends for the referrals. . .There is simply no way that any of these folks could not have been on notice that something of value for a referral was somehow improper. They knew it was improper, they were told it was improper, and they acted, and that's been alleged by the government, to cover it up.

In Count I, Plaintiff alleges Defendants knowingly presented or caused to be presented false claims, including Medicare claims for reimbursement for services rendered to patients referred to TCH under Defendants' system, in violation of the False Claims Act ("FCA") (doc. 53). In Count II, Plaintiff alleges another FCA violation under the theory that Defendants made or used

3

false records or statement to cause claims to be paid when Defendants submitted false certifications and incorrect data in Medicare and Medicaid cost reports (Id.). In Count III, the government alleges a conspiracy among the Defendants to submit false claims and in Count IV, a FCA violation in Defendants' alleged use of false records or statements to avoid an obligation to refund, a "reverse" false claim (Id.). In Counts V, VI, and VII, the government brings claims for payment under mistake of fact, unjust enrichment, and disgorgement (Id.). In addition to all of these claims, in his First Amended Complaint, Relator asserts a claim for FCA retaliation in Count V, and in Count VI, a public policy tort in violation of Ohio law (doc. 7).

The government's Complaint alleges Defendants' illegal conduct spanned from at least 1997 through 2004 (doc. 53). At the hearing the government stated their initial analysis shows that approximately 11,000 Medicare claims alone are at issue in this matter, while they are still evaluating the number of Medicaid claims. The Court expressed its concern that the number of claims at issue, each of which could be subject to a statutory penalty, in addition to the trebling of damages, could threaten the viability of the Defendant Christ Hospital.

Defendants filed their Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing the Complaint fails to state a claim upon which relief may be granted (doc. 68). In their briefing,

4

Defendants argue 1) that Counts I to IV fail to state a claim under the FCA, 2) that the Complaint fails to meet the particularity requirements of Fed. R. Civ. P. 9(b), and 3) that the statute of limitations bars at least a portion of the government's common law claims and FCA claims (Id.). At the hearing, however, Defendants focused their arguments on two theories: that Plaintiff's Complaint fails to allege facts showing that a benefit flowed to the doctors constituting "remuneration" within the meaning of the Anti-Kickback Statute, and that Plaintiff fails to allege Defendants had the intent, or mens rea, to violate the FCA (Id.). The Court will address the arguments presented at the hearing before turning to those presented in the parties' briefing. First, however, the Court will review the applicable standard in the context of a motion to dismiss, and the statutory background.

## II. The Applicable Standard

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) requires the Court to determine whether a cognizable claim has been pleaded in the complaint. The basic federal pleading requirement is contained in Fed. R. Civ. P. 8(a), which requires that a pleading "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976). In its scrutiny of the complaint, the Court must construe all well-pleaded facts liberally in favor of the party opposing the motion. Scheuer v. Rhodes, 416

U.S. 232, 236 (1974). Rule 8(a)(2) operates to provide the
defendant with "fair notice of what plaintiff's claim is and the
grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47
(1957). A court examines a complaint in light of the objectives of
Rule 8 using the standard articulated in Jones v. Sherrill, 827
F.2d 1102, 1103 (6th Cir. 1987):

> In reviewing a dismissal under Rule 12(b)(6), the court
> must accept as true all factual allegations in the
> complaint. Windsor v. The Tennessean, 719 F.2d 155, 158
> (6th Cir. 1983), cert. denied, 469 U.S. 826 (1984). The
> motion to dismiss must be denied unless it appears beyond
> doubt that the plaintiff can prove no set of facts in
> support of the claim which would entitle her to relief.
> Id. at 158; Conley v. Gibson, 355 U.S. 41 (1957).

Jones, 824 F.2d at 1103.

The admonishment to construe the plaintiff's claim
liberally when evaluating a motion to dismiss does not relieve a
plaintiff of his obligation to satisfy federal notice pleading
requirements and allege more than bare assertions of legal
conclusions. Wright, Miller & Cooper, Federal Practice and
Procedure: § 1357 at 596 (1969). A complaint must plead enough
facts to state a claim to relief that is plausible on its face.
Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). "In practice,
a complaint . . . must contain either direct or inferential
allegations respecting all of the material elements [in order] to
sustain a recovery under some viable legal theory." Car Carriers,
Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984),
quoting In Re: Plywood Antitrust Litigation, 655 F.2d 627, 641 (5th

6

Cir. 1981); Wright, Miller & Cooper, Federal Practice and Procedure, § 1216 at 121-23 (1969). The United States Court of Appeals for the Sixth Circuit clarified the threshold set for a Rule 12(b)(6) dismissal:

> [W]e are not holding the pleader to an impossibly high standard; we recognize the policies behind Rule 8 and the concept of notice pleading. A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.

Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 437 (6th Cir. 1988).

## III.  The Statutory Background

### A.  The False Claims Act

Congress passed the original False Claims Act in 1863 "to combat rampant fraud in Civil War defense contracts." S. Rep. No. 99-345, at 8, reprinted in 1986 U.S.C.C.A.N. 5266, 5273 (1986). In its current form, the FCA imposes liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States government. . .a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(2008). The statute further imposes liability on a person who "uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government;" who "conspires to defraud the government by getting a false or

fraudulent claim paid or approved by the government," or who uses "a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government." Id. at (a)(2),(3),(7). To satisfy the statute's knowledge requirement, a person must "(1) ha[ve] actual knowledge of the information; (2) act in deliberate ignorance of the truth or falsity of the information; (3) or act in reckless disregard of the truth or falsity of the information," but "no specific intent to defraud is required." Id. § 3729(b).

The government must further demonstrate that the underlying violation is material, by proving that it would not have paid the claim for reimbursement had it known about the underlying violation of the law. United States ex rel. Luckey v. Baxter Healthcare Corp., 183 F.3d 730, 732-33 (7th Cir. 1999). A false certification of compliance with the Anti-Kickback Statute and Stark Statute in a Medicare cost report is actionable under the FCA. United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997). False claims to Medicare, including Medicare cost reports (CMS-2552's) and claims for payment, (UB-92's) (also known as form HCFA-1450), are actionable under the FCA. Id. The submission of UB-92's in violation of the Stark Statute constitutes a violation of the FCA, United States ex rel. Poque v. Diabetes Treatment Centers of America, 238 F. Supp.2d 258, 266 (D.D.C. 2002), and compliance with the Anti-Kickback

Statute is a condition of payment by the Medicaid program.   42
U.S.C. § 1320a-7b(b), <u>United States ex rel. Barrett v. Columbia/HCA
Healthcare Corp</u>. 251 F. Supp.2d 28, 32 (D.D.C. 2003).   Similarly,
when a physician submits claims for payments (CMS-1500's), the
physician impliedly certifies that the claim and the underlying
transaction comply with the Anti-Kickback Statute.   <u>United States
of America ex rel. Thomas v. Bailey</u>, No. 4:06-CV-00465, 2008 U.S.
Dist. LEXIS 91221, *39, (E.D. Ark. November 6, 2008).

The FCA does not create a private cause of action, but
permits a person, designated a "Relator" to bring a civil action
"for the person and for the United States government. . .in the
name of the government." 31 U.S.C. § 3730(b).   The statute further
protects a Relator acting within the scope of the FCA from
discharge or any other sort of employment retaliation.   31 U.S.C.
§ 3730(h).

The Supreme Court has affirmed an aggressive reading of
the FCA.   <u>Cook County, Ill. V. United States ex rel. Chandler,</u> 538
U.S. 119 (2003).   The court explained that "Congress wrote
expansively, meaning to 'reach all types of fraud, without
qualification, that might result in financial loss to the
government.'" <u>Id</u>. (<u>Quoting</u> <u>United States v. Neifert-White Co.</u>, 390
U.S. 228, 232 (1968)).

**B.   The Anti-Kickback Statute**

The Anti-Kickback Statute, prohibits any person or entity

9

from offering, making or accepting payment to induce or reward any

person for referring, recommending or arranging for federally

funded medical services, including services provided under the

Medicare and Medicaid programs:

> (b) Illegal remunerations.
>
> (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . .
>
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . .
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). As the government stated at the hearing,

the statute includes no requirement of proof that a kickback

arrangement harmed patients or resulted in unnecessary procedures.

The statute imposes liability for payment practices that do not

fall within "Safe Harbor" regulations, 42 C.F.R. § 1001.952, so as

to remove financial incentives that can result in unnecessary patient care.

### C. The Stark Statute

The Stark Statute makes illegal certain physician referrals to facilities with which the physician has a financial relationship. 42 U.S.C. § 1395nn. Its provisions define a financial relationship as an ownership or investment interest in the entity by the physician or an immediate family member of such physician, or as a compensation arrangement between any such persons. 42 U.S.C. § 1395nn(B)(2).

## IV. Arguments At The December 3, 2008 Hearing

### A. "Remuneration"

Defendants argued first that Plaintiff's Complaint fails to allege facts showing that a benefit flowed to the doctors constituting remuneration within the meaning of the Anti-Kickback Statute. Defendants argue the government is attempting to impose a novel theory under the Anti-Kickback Statute, as case law on the term "remuneration" has involved the transfer of cash or cash substitute as opposed to the "opportunity to bill." Defendants further argue that none of the some 200 advisory opinions issued by the Department of Health and Human Services Office of the Inspector General ("HHS-OIG") define remuneration in accordance with the theory in Plaintiff's Complaint. Moreover, argue Defendants, because the HHS-OIG has declined to state that the granting of

staff privileges constitutes remuneration, by extension the scheduling of doctors to perform tests in the hospital's heart station does not constitute remuneration.

In their briefing, Defendants argue that the dictionary definition of remuneration[1], as well as the legislative history of the Anti-Kickback Statute, show that the term remuneration is meant to include cash and in-kind benefits, but not staff privileges or scheduling (doc. 68). At the very least, they argue, the statute is ambiguous and should be interpreted in their favor under the rule of lenity (Id.). Defendants also argue in their briefing that the Complaint fails to allege knowing and willful participation in a kickback scheme or that panel time was intended to induce referrals, as required to establish an Anti-Kickback violation (Id.).

The government responded at the hearing that the Anti-Kickback Statute uses the term "any" to modify "remuneration," and that under Defendants' scheme the doctors received both the opportunity and the billing at the heart station, not the "opportunity to bill." The government argued that a doctor in the heart station is being handed a stream of patients, which is like receiving a voucher. In its briefing, Plaintiff argues it states

---

[1]Defendants cite Webster's New International Dictionary, 1921, (1981) for the definition of remuneration as "something that remunerates: recompense, pay," and the definition of remunerate as "to pay an equivalent for (as a service, loss, expense)."

a claim under the Anti-Kickback Statute because rewarding Cardiologists with time in the heart station constitutes remuneration, which means "anything of value," and also falls within the statutory meaning of an "in kind" benefit (doc. 83). Plaintiff argues this case is not about staff privileges, but about a cross-referral scheme that violates the Anti-Kickback Statute (<u>Id</u>.). Plaintiff argues the rule of lenity is inapplicable as there is no ambiguity in the meaning of "remuneration" as defined in the HHS-OIG regulations as "anything of value in any form whatsoever" (<u>Id</u>. <u>citing</u> <u>OIG Anti-Kickback Provisions</u>, 56 Fed. Reg. 35952, 35958 (1991)). Plaintiff contends that its Complaint adequately alleges that Defendants knowingly and willfully exchanged remuneration for referrals, and thus pleads an Anti-Kickback violation (<u>Id</u>.). Plaintiff similarly argues that its Complaint shows evidence of inducement, and citing <u>Caudill Seed and Warehouse Co. Inc., v. Prophet 21, Inc.</u>, 126 F. Supp. 2d 937, 938 (E.D. Pa. 2001) notes that "magic words" are rarely, if ever, required to state a claim (<u>Id</u>.).

In their Reply, Defendants argue Congress did not mean "anything of value," when it used the terms "in cash or in kind" (doc. 88). Defendants contend Congress acts intentionally and purposely in inclusion or exclusion, showing a narrower reach that would not encompass heart station scheduling as alleged in the Complaint (<u>Id</u>.). Defendant contends that none of Plaintiff's cited

case law defines remuneration as "anything of value," and that Plaintiff misreads the HHS-OIG regulations which taken in context refer to transfers of value and not to the allocation of staff privileges (Id.). In this case, Defendants argue, there are no allegations that the hospital transferred one penny for the services the physicians provided in the heart station (Id.). Defendants contend the government also errs in attempting to distinguish the granting of staff privileges based on economic criteria, which the American Medical Association terms "economic credentialing," from the granting of heart station time in this case (Id. citing American Medical Assoc., Economic Credentialing, available at http://www.ama-assn.org/ama/pub/category/10919.html).

Defendants reply the rule of lenity should apply if the Court adopts the government's view that the Anti-Kickback Statute applies to the scheduling of physicians (Id.). Such an interpretation of the statute, argue Defendants, would demonstrate that it is ambiguous (Id.).

Although in their Reply, Defendants reiterate their position that the Complaint fails to allege knowing or willful participation in a kickback scheme or a purpose to commit a wrongful act (Id.), at the hearing Counsel for Defendants conceded that the government has indeed made such an allegation. However, Defendants further argue that where Plaintiff is inventing a "new idea" of what constitutes a kickback the government must prove

specific intent (Id.).

Having reviewed this matter, the Court finds no question that Plaintiff has adequately pleaded Defendants set up a system whereby Ohio Heart physicians received something of value, time in the heart station at TCH, in exchange for referrals. The Court must construe all well-pleaded facts liberally in favor of the party opposing the motion. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Here, the government has pleaded facts showing that time in the heart station was essentially money, and further, that Defendants' system excluded cardiologists from the benefit of heart station time when their referral levels did not qualify them for such time. The Anti-Kickback Statute uses the term "any remuneration," which suggests an expansive reading of the form of any kickback directly or indirectly, as opposed to a narrow reading that would exclude the benefit of heart station time. 42 U.S.C. § 1320a-7b(b)(1&2)(A).

One usually hears lawyers say that "time is money," as most lawyers generate income by billing for time. In this case, lawyers for Defendants are arguing that for Ohio Heart cardiologists time is not money, or at least, not "remuneration." The Court does not find such argument well-taken. The OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991) are unambiguous in offering a broad definition of the term "remuneration" as "anything of value in any form whatsoever," which

very reasonably includes the benefit of time in the heart station, as alleged in the Complaint. Defendants' arguments that the regulations refer to transfers and that the hospital did not transfer a penny fail to acknowledge that the system in place did indeed result in a transfer of a benefit in relation to the number of referrals made by cardiologists.

Although Defendants attempt to characterize Plaintiff's theory, as alleged in the Complaint, as completely novel, the Court finds that case law suggests otherwise. As early as 1989, the First Circuit Court of Appeals upheld a Medicare fraud conviction based on the Stark Act, stating, "Giving a person an opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient." United States v. Bay State Ambulance and Hospital Rental Co., 874 F.2d 20 at 26 (1st Cir. 1989). Similarly, the United States District Court for the District of Massachusetts has cited the 1991 OIG regulation as reflecting Congressional intent. United States v. Shaw, 106 F.Supp.2d 103, 114 (D. Mass. 2000)("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever. . .Moreover. . .Congress prohibited transactions where there is no direct payment at all from the party receiving referrals"). Even if the government's theory would be considered novel, the Court is not limited to precedent when faced with a

matter of first impression.

As Defendants' counsel explained at the hearing, the Anti-Kickback statute was amended to add the term "remuneration" when investigations showed kickbacks were taking the form of sham rentals for office space, rebates equal to the percentage of referral business, outright gifts of cars, TV's, and prepaid vacations. Congress enacted such amendment, explained counsel, to ensure the understanding that the Anti-Kickback Statute applied to more than just cash payments. In the light of the fact that it appears that creative ways of circumventing the statute have developed in the past, and that Congress showed its intent to stop referrals tainted by incentives other than the patient's best interest, the Court finds that however "novel" the government's theory may be, the referral scheme it alleges falls within the scope of the statute. Such conclusion is bolstered by the fact that Defendants' payment scheme does not fall within the Safe Harbor regulations, which explicitly exclude compensation arrangements that take into account the volume or value of referrals or business otherwise generated between the parties. 42 C.F.R. § 1001.952(d)(5).

The Court finds well-taken the government's position that their Complaint alleges a knowing and willing violation of the Anti-Kickback Statute, which Defendants have conceded. Clearly, the Complaint alleges that after Relator alerted Defendants about

the "probably illegal" referral system, Defendants allegedly took steps to conceal the system by shifting its implementation to MDA. Such factual allegations reflect that Defendants knowingly and voluntarily acted so as to preserve a profitable system that they knew they had to conceal from detection by the government. The Court rejects Defendants' argument that the government must prove specific intent to violate the Anti-Kickback Statute, and agrees with the government that its allegations meet the applicable standard of "purpose to commit a wrongful act." McDonnell v. Cardiothoracic & Vascular Surgical Associates, Inc., No. C2-03-79, 2004 U.S. Dist. LEXIS 29436, at *25 (S.D. Ohio, July 28, 2004).

### B. Mens Rea

Defendants' second principle argument presented at the December 3, 2008 hearing is that they lacked the requisite mens rea to violate the FCA. Defendants contend that because it is an open question whether allowing a doctor to serve in the heart station constitutes remuneration, it was objectively reasonable for Defendants to think their conduct was legal, and therefore as a matter of law the Complaint must be dismissed. Defendants base their argument on the Supreme Court's decision in Safeco Ins. Co. Of Am. v. Burr, 127 S.Ct. 2201 (2007) in which the high court found that companies did not violate the Fair Credit Reporting Act where their reading of the statute was objectively reasonable. In their briefing, Defendants argue that when faced with ambiguous

provisions, courts have followed similar logic in the context of the FCA (doc. 68, <u>citing</u> <u>United States ex rel. Wilson v. Kellogg Brown & Root, Inc.</u>, 525 F.3d 370, 378 (4th Cir. 2008), <u>United States ex rel. Lamers v. City of Green Bay</u>, 168 F.3d 1013, 1018 (7th Cir. 1999), <u>United States v. Southland Mgmt. Corp.</u>, 326 F.3d 669, 682 (5th Cir. 2003)).

The government responded at the hearing that it is no surprise to doctors that receiving remuneration for referrals is illegal, and this has been well-known in the industry since 1972. The only thing novel about the scheme, contends the government, is that Defendants have the government and insurance companies pay the kickback. The Defendants knew what they were doing here, argues the government, they were enriching themselves by charging the Medicare, Medicaid, and Tri-State systems through their scheme. In their briefing, the government further argues that the FCA standard for alleging scienter is liberal (doc. 83, <u>citing</u> <u>United States ex rel. Snapp. v. Ford Motor Co.</u>, 532 F.3d 496, 505-09 (6th Cir. 2008)). In the government's view, Defendants claim to have discovered a new standard based on the <u>Safeco</u> decision, which the government claims is inapplicable to this case (<u>Id</u>.). The government argues no court has interpreted <u>Safeco</u> to alter the pleading requirements under the FCA, that <u>Safeco</u> is limited to the particular context of the FCRA, and that at least one court has already rejected the application of the <u>Safeco</u> standard in the FCA

context (Id. citing United States v. Estate of Rogers, No. 1:97-CV-461, 2001 U.S. Dist. LEXIS 24914, *14 (E.D. Tenn., June 28, 2001)(Defendants' contentions that they made a reasonable interpretation of federal rules and regulations only goes to the scienter element of the FCA, which is a matter for the jury to determine at trial)). Finally, the government argues even if the Safeco standard does apply, the government has alleged adequate facts to show Defendants' conduct did not conform to an objectively unreasonable interpretation of the statute, as they have alleged an exchange of remuneration for referrals, conduct that unquestionably violates the Anti-Kickback Statute (Id.).

In their Reply, Defendants argue the government misses the point in relying on Snapp, as Defendants have no argument that the government's factual averments meet the particularity requirements of Rule 9(b), but rather Defendants are challenging the government's interpretation of the FCA, a threshold question of law (doc. 88). Defendants argue at least one court has cited Safeco recently in the FCA context, and that numerous courts pre-Safeco relied on rationales similar to that in Safeco in the FCA context (Id. citing K&R Ltd. P'ship v. Mass. Housing Finance Agency, 530 F.3d 980, 984 (D.C. Cir. 2008)). Defendants next contend that the government's reliance on dicta in Rogers is misplaced because the Defendants in Rogers did not make a scienter argument, and in any event Rogers predates Safeco by over six years

(Id.). Finally, Defendants reiterate their view that the dearth of apposite case law and lack of clear guidance from the HHS-OIG shows their conduct fell within a grey area, such that it cannot be deemed objectively unreasonable (Id.).

Having reviewed the parties' respective arguments concerning mens rea, the Court finds the government's position well-taken. The Court is not convinced that Safeco applies in the FCA context, but agrees that even if it does impose the requirement for the Court to make the legal determination whether Defendants' conduct was objectively reasonable, the conduct at question here simply does not pass the smell test. Defendants can argue that their referral system fell within a grey area, but the fact is the allegations show benefits were accruing to doctors in exchange for referrals, that the system was challenged by those doctors being shut out, and it has been common knowledge since 1972 that remuneration for referrals is illegal. The Court rejects the argument that Defendants' conduct fell within such an ambiguous area of the law that the Complaint against them merits dismissal. Moreover, the Court is of the opinion that the question of Defendants' intent is a factual question properly within the province of the jury. Rogers, 2001 U.S. Dist. LEXIS 24914, *14.

**V. Defendants' Additional Arguments in their Motion**

### A. FCA Arguments

Defendants raise additional arguments in their motion

that due to time limitations at the hearing they did not address orally, but which the Court shall address. Defendants contend first the Complaint fails to sufficiently allege that claims submitted were false or fraudulent as it fails to specify why each cardiologist's cardiac admissions were tainted (doc. 68). Defendants further argue Plaintiff fails to allege Defendants knew the claims involved alleged kickbacks or that they intended any claim to be material to a decision to pay any false claim (Id.).

As for the conspiracy claim in Count IV, Defendants argue the Complaint fails to allege the basic elements of an FCA claim, namely, it fails to allege "there was a single plan to get a false claim paid" (Id.). Defendants argue the Complaint fails even to specify which Defendants conspired together (Id.). To the extent that Plaintiff tries to establish a conspiracy solely between TCH and THA, Defendants argue liability is precluded by the intra-corporate conspiracy doctrine, which prevents defendants of the same collective identity from constituting two separate "people" for the purposes of forming a conspiracy (Id.).

In its final set of arguments challenging Plaintiff's FCA claims, Defendants argue FCA liability cannot attach to Medicaid claims submitted by Defendants, because Medicaid is a state run program and claims are presented to the state, and not the federal government (Id.). Defendants further argue Plaintiffs have failed to allege any Defendants intended for a false statement or record

to be used by Medicaid to get the federal government to pay its claim (Id.). Finally Defendants contend that the government fails to allege an obligation to pay back funds to the Government as required under Section 3726(a)(7) in a reverse false claims context, because the government has made no allegation that an independent legal duty existed at the time the claims were submitted to Ohio Medicaid to pay the federal government any money or property (Id.).

In its Response, Plaintiff argues its Complaint alleges Defendants' claims were false and fraudulent, and material to the government's payment (doc. 83). Plaintiff argues it only need to allege, as it has, that Defendants violated the Anti-Kickback Statute, that Defendants sought or caused reimbursement from the federal government for services referred to TCH in violation of the law, and that Defendants falsely certified compliance with the Anti-Kickback statute while seeking reimbursement (Id. citing United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997), United States v. Rogan, 459 F.Supp. 2d 692, 721-22 (N.D. Ill. 2006), aff'd 517 F.3d 449 (7th Cir. 2008)). Plaintiff argues any claim for any referral in violation of the kickback law is tainted and false (Id.). As for the question of materiality, Plaintiff contends there is consensus among the Courts that compliance with the Anti-Kickback Statute is material as a matter of law (Id. citing United States v. Rogan,

517 F.3d 449 (7th Cir. 2008)(illegal kickbacks are material to payment by federal health care programs), <u>United States ex rel. Barrett v. Columbia/HCA Health Care Corp.</u>, 251 F. Supp.2d 28, 33 (D.D.C. 2003)(finding materiality because "compliance with the [Anti-Kickback Statute] and Stark Laws would affect the government's decision to pay")).

Plaintiff argues TCH and THA should be jointly and severally liable as one actor, or should be bound by their arguments in prior litigation that they are two separate entities and can be found to have conspired with one another (<u>Id</u>.). In any event, Plaintiff argues either TCH or THA can still be found liable for conspiracy with Ohio Heart or MDA (<u>Id</u>.).

Regarding Plaintiff's Medicaid claims, it argues that all Medicaid claims must be reconciled by CMS, a federal agency, and therefore Defendants have caused a claim to be submitted to the federal government, making all false Medicaid claims actionable under the FCA (<u>Id</u>.). Plaintiff further argues that Medicaid claims are paid or approved by the federal government through the states' compliance with federal regulations (<u>Id</u>.). As such, Plaintiff argues, the alleged false claims are actionable under the FCA as false claims presented to the United States for payment and approval (<u>Id</u>.). Finally, Plaintiff argues it properly alleges that Defendants used false statements intending to obtain reimbursements for Medicaid claims, and Defendants' submission of false claims in

the course of their kickback scheme achieved concealment of their obligation to repay amounts due (Id.).

In their Reply, Defendants argue the Complaint fails to allege that heart station time was intended to induce referrals (doc. 88). As for Plaintiff's conspiracy theory, Defendants argue even if it has adequately alleged a kickback scheme, it has failed to allege a conspiracy "to defraud the government" (Id.). Without specific intent to defraud the government, Defendants argue the conspiracy claim should be dismissed (Id.). Defendants again invoke the intra-corporate conspiracy doctrine, and argue under such doctrine TCH and THA cannot be held liable for conspiring with one another (Id.).

Plaintiff's Medicaid claims fail, argue Defendants, because the Complaint does not allege that the actual claims submitted by Defendants to Ohio Medicaid were ever presented to an officer or employee of the federal government (Id.). Defendants argue Plaintiff cannot use its Response in Opposition to clarify its sparse and unsupported allegations concerning the Medicaid claims (Id.).

Having reviewed these additional arguments, the Court finds no basis to dismiss the government's Complaint. The Court finds the government has more than adequately alleged a viable theory that Defendants' claims for payment were tainted by kickback violations. Thompson, 125 F.3d 899, 902. As for the materiality

of the claims, the Court is further persuaded that violations of the Anti-Kickback Statute and Stark Laws are material as a matter of law.  Rogan, 517 F.3d 449, 452.   The claims at issue in this case involve more than compliance with regulations setting out conditions for participation in the Medicare program, see United States ex rel. Conner v. Salina Regional Health Center, Inc., 543 F.3d 1211 (10th Cir. 2008), but involve certification of compliance with the Anti-Kickback Statute, a condition of government payment. Such certification would have a natural tendency to influence the government to make payments, and therefore qualifies as material. United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 445 (6th Cir. 2005).   The Court further finds no real issue that the Complaint adequately alleges Defendants' system was put in place to induce referrals, in that it alleges Defendants "rewarded physicians with Heart Station panel time in exchange for patient referrals."

As for the allegations of conspiracy, the Court finds the government has adequately and plainly alleged a single cross referral plan where referrals were exchanged for the opportunity to bill for services rendered in the heart station.  Plaintiff alleges the Defendants designed the system to benefit Ohio Heart, and they conspired to keep the system in place after it was challenged, by shifting the scheme over to be administered by MDA.   The government's conspiracy claim is not barred by the intra-corporate

conspiracy doctrine because its allegations involve more actors than merely TCH and THA: these entities are alleged to have conspired with MDA and Ohio Heart. The specificity of the allegations satisfies the Court that the government adequately alleged a scheme to defraud the government by the submission of tainted claims. Finally, the Court need not reach the government's request that it construe Defendants' argument that TCH and THA are an integrated enterprise as a judicial admission that they are jointly and severally liable. For the purposes of the instant motion, the Court simply takes the allegations of the Complaint as true that TCH and THA are distinct entities capable of conspiracy.

The Court accepts the reasoning of the government relating to the submission of Medicaid claims. "Medicaid claims submitted to the state are also 'claims' to the federal government under the FCA." Rogan, 459 F.Supp.2d 692 at 717, citing United States ex rel. Tyson v. Amerigroup Ill. Inc. et al., No. 02-C-6074, 2005 U.S. Dist. LEXIS 24032 at *6-10 (N.D. Ill. October 17, 2005). Similarly, the Court finds Plaintiff's reverse false claims survive, as it alleges Defendants' submission of false claims in the course of their kickback scheme achieved concealment of their obligation to repay amounts due (Id.).

**B. Defendants' Arguments that the Complaint Fails to Meet the Requirements of Rule 9(b).**

Defendants argue that under Rule 9(b), "in alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake," and that in this case, Plaintiff has failed to do so (doc. 68). Defendant argues the government has not identified a single Medicare Part B claim, a single Medicaid claim, a single Tricare claim, or identified a single example of how a cardiologist or cardiology group obtained a new patient as a result of heart station assignment time (Id.). Defendants further contend the Complaint also refers to Defendants collectively, without identifying which specific Defendant to which Plaintiff is referring (Id.).

Plaintiff responds that its Complaint satisfies the particularity requirements of Rule 9(b) because its Complaint lays out in detail the parties involved in the fraud, the substance of the illegal scheme, when and where Defendants implemented a kickback scheme even when they knew it was illegal, and the false claims at issue (doc. 83). Plaintiff argues the purpose of Rule 9(b) is to provide Defendants with sufficient notice, allowing Defendants to "answer, in addressing in an informed way Plaintiff's claim of fraud" (Id.).

Defendants reply, reiterating that Plaintiff has failed to identify a single claim for a new patient obtained by any Defendant as a result of heart station time (doc. 88). Defendants contend instead, Plaintiff has only provided inpatient electronic data, UB-92 forms, submitted by the hospital for its charges (Id.). Defendants argue this data is not enough, as in their view, the

government has not provided a single example of the form used by physicians to bill Medicare, Form CMS-1500 (Id.). In Defendants' view, the government has not provided a single example of a claim submitted for a new patient obtained through the alleged fraudulent scheme (Id.). As such, Defendants argue the Plaintiff fails to comply with Rule 9(b)'s particularity requirements (Id.).

The Court disagrees that Plaintiff has not met the requirements of Fed. R. Civ. P. 9(b). United States ex rel. Repko v. Guthrie Clinic, 557 F. Supp.2d 522, 527 (M.D. Pa. 2008) ("attachment of some or all of the allegedly fraudulent claims would serve no further purpose consistent with Rule 9(b) because defendants are on notice that the basis of the alleged fraud in each claim is the relationship between the defendants, not anything unique to a particular claim, that has caused these claims to be allegedly fraudulent"). The Court further agrees the government has differentiated sufficiently among Defendants in its pleadings. Defendants here are alleged to have had a day-to-day interrelationship as co-conspirators and it is acceptable for the government to have grouped them together in the pleadings where practicable. United States ex rel. Heater v. Holy Cross Hosp., Inc., 510 F. Supp.2d 1027, 1036 (S.D. Fla. 2007).

## C. Statute of Limitations Arguments

Defendants state the government's common law and FCA claims are barred, at least in part, by the applicable statute of

limitations. Defendants reserve the right to bring a motion to dismiss on statute of limitations grounds after they have had the opportunity to review pre-intervention documents, which were unsealed by this Court's Order on September 23, 2008.

## VI.    Defendant Ohio Heart's Arguments

Defendant Ohio Heart argued briefly at the December 3, 2008 hearing, in addition to having filed separate memoranda (docs. 69, 85). The Court has also reviewed the government's Response to Ohio Heart (doc. 84).

Ohio Heart's first contention at the hearing was that the government's FCA cause of action against it fails because it never presented any claims, but rather, MDA presented all claims relating to work done at the heart station. Ohio Heart further argues it has attached documents from the Ohio Secretary of State showing it did not have control over MDA.

Ohio Heart's memoranda in great part track the arguments already addressed and rejected in this Order. Ohio Heart claims the Complaint "is devoid of any allegations that Ohio Heart solicited or received any remuneration," (doc. 69), which the Court addressed in part IV. A. of this Order, as Ohio Heart was allegedly the greatest beneficiary of the stream of patients resulting from Defendants' alleged system. Ohio Heart similarly claims the government has not identified any claim upon which an FCA cause of action may be based. However, the Complaint plainly alleges that

Ohio Heart submitted CMS-1500 forms to Medicare, and corresponding Medicaid or Tricare forms, even though it knew it was out of compliance with regulations and laws due to violations of the Anti-Kickback Statute and Stark laws (doc. 53). These allegations, taken in the context of the government's allegation of a conspiracy involving all the Defendants, show Ohio Heart is a proper Defendant in this action. The Court has similarly addressed Ohio Heart's argument that the government has not adequately differentiated among the Defendants, just above. Ohio Heart has fair notice of the substance of the claims levied against it, in accordance with Fed. R. Civ. P. 9(b).

Ohio Heart's Reply argues it should escape liability for the acts of MDA because it did not legally control MDA. However the Complaint alleges that during the relevant time period, Dr. Abbotsmith was the president and CEO of Ohio Heart and the president of MDA, and that MDA's business manager, Dr. Thomas Broderick, is a member of Ohio Heart (doc. 53). The Complaint further alleges that MDA and Ohio Heart shared a single address and phone number (Id.). Taking these facts in a light most favorable to the non-moving party, the Court does not find it difficult to infer that Drs. Abbotsmith and Broderick used their positions to exercise control over MDA's actions and cause allegedly tainted claims to be filed so as to benefit Ohio Heart. As such, the Court rejects the first contention raised by Ohio Heart at the hearing.

The Court further rejects the argument in Ohio Heart's briefing that this case is strikingly similar to that filed in United States ex rel. Snapp, Inc. v. Ford Motor Co., 532 F.3d 496, 506 (6th Cir. 2008), in which the Sixth Circuit affirmed the dismissal of the relator's complaint, stating "Rule 9(b) does not permit a False Claims Act plaintiff to merely describe a private scheme in detail but then to allege simply. . .that claims requesting illegal payments must have been submitted, were likely submitted, or should have been submitted to the Government" Id. (internal citations omitted). The government in this case does more than speculate as to the possibility of claims, but rather identifies claims during the relevant time period that Defendants made or caused to be made as a part of their participation in the Medicare, Medicaid, and Tricare programs (forms CMS-2552, UB-92's, CMS-1500's, and Tricare/Champus Request for Reimbursement). The government further identifies the relevant diagnostic resource group codes ("DRG codes") so that Defendants can access each and every claim the government alleges was tainted by the alleged scheme.

Ohio Heart's challenge to Count II, that the Complaint fails to allege it made a false record or statement to get a false or fraudulent claim paid or approved similarly fails, as the Complaint can be read to indicate that Ohio Heart, through its conspiracy with the other Defendants, caused false claims to be

filed through the alleged shell company MDA, claims that were tainted by the alleged kickback arrangement. The government, therefore, contrary to Ohio Heart's argument, has sufficiently alleged "who" has allegedly presented or caused to be presented false claims, consistent with <u>United States of America ex rel. Bledsoe v. Community Health Systems, Inc.</u>, 501 F.3d 493, 509 (6th Cir. 2007).

Ohio Heart's second main contention raised at the hearing is that there can be no reverse false claim against it because it had no pre-existing obligation with the government to submit any reconciliation statements. In its briefing Ohio Heart puts great reliance on the Tenth Circuit's decision (which it attributes to the Sixth Circuit), <u>United States ex rel. Ali Bahrani v. Conagra</u>, 465 F.3d 1189, 1194-95 (10th Cir. 2006). In Ohio Heart's view, <u>Bahrani</u> requires the allegation that an independent legal duty existed with the government prior to the submission of the false claim in order for a claim under Section 3729(a)(7), the reverse false claim provision, to stand. Ohio Heart argues the Complaint alleges TCH and THA had pre-existing legal obligations to reconcile payments via the submission of Form 2552 hospital cost reports, but no such obligation existed for Ohio Heart.

The Court is not convinced that the facts of <u>Bahrani</u> are on point, first because this matter involves an alleged conspiracy among all the Defendants under which Ohio Heart allegedly caused

false claims to be submitted. Second, the Court is not persuaded that Defendants' reading of Bahrani requires it to take a narrow interpretation of the requirements of Section (a)(7), which speaks of "an obligation" to the government, not "the Defendant's independent obligation." 31 U.S.C. § 3729(a)(7). The Court notes that the Tenth Circuit actually remanded the Bahrani matter to the district court, disagreeing with the district court's decision on summary judgment concerning what constituted an "obligation" in the context of a reverse false claim. 465 F.3d 1209. Moreover, the Court finds persuasive the government's position that by allegedly accepting heart station panel time as remuneration for referrals, Ohio Heart caused TCH and THA's representations of compliance with the Anti-Kickback Statute to be false (doc. 84, citing United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242-43 (3d Cir. 2004)(medical supplier who offered product discounts to hospital system in violation of the Anti-Kickback Statute caused the hospital system to submit false claims, even though the supplier had no role in actually submitting the claims to the government)). A defendant can be liable for concealing the obligations of another. United States v. Bourseau, 531 F.3d 1159, 1169 (9th Cir. 2008). Under these circumstances, the Court is not persuaded that the reverse false claims against Ohio Heart should be dismissed.

**VII. Conclusion**

The Supreme Court has given the False Claims Act "an expansive reading," <u>Am. Textile Mfgrs. Inst., Inc. v. The Limited, Inc.</u>, 190 F.3d 729, 733 (6th Cir. 1999), observing that it "reaches all fraudulent attempts to cause the Government to pay out sums of money." <u>United States v. Neifert-White Co.</u>, 390 U.S. 228, 232-33 (1968). Having heard all of the arguments of the parties at the December 3, 2008 hearing, and having reviewed their briefing, the Court has concluded, taking the allegations in the Complaint as true, that the Plaintiff has adequately alleged Defendants operated a cross-referral scheme to cause the government to pay out sums of money. As to any claim by Defendant TCH that it did not benefit from the alleged kickback scheme, the Court finds such claim not well-taken, because certainly the TCH heart station was utilized in the scheme, for which use TCH was paid, in addition to payment made to doctors.

Plaintiff's Complaint pleads enough facts to state a claim to relief that is plausible on its face. <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007). Such conclusion, the Court believes, comports with the Supreme Court's expansive reading of the statute, and the Court's understanding of the alleged facts of this case, expressed herein.

Accordingly, the Court DENIES Defendants' Joint Motion to Dismiss the United States' Complaint in Intervention (doc. 68), and similarly REJECTS the arguments presented in the Separate

Memorandum of the Ohio Heart and Vascular Center, Inc., In Support
of Defendants' Motion to Dismiss (doc. 69).


      SO ORDERED.

Dated: December 18, 2008    <u>/s/ S. Arthur Spiegel</u>
                              S. Arthur Spiegel
                              United States Senior District Judge