**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES ex rel. HARRY F.** | : | |
| **FRY, M.D.** | : | |
| | : | **Case No. 1:03-CV-00167** |
| **Plaintiffs,** | : | |
| | : | **Judge S. Arthur Spiegel** |
| **v.** | : | |
| | : | **Magistrate Judge Timothy S. Black** |
| **THE HEALTH ALLIANCE OF** | : | |
| **GREATER CINCINNATI, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

---

**MOTION OF UNITED STATES AND RELATOR FOR SUMMARY JUDGMENT**

---

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, The United States and Relator Harry F. Fry, M.D. hereby move for summary judgment against The Christ Hospital and The Christ Hospital, Inc., The Health Alliance of Greater Cincinnati, Inc., The Ohio Heart and Vascular Center, Inc., and Medical Diagnostics Associates on all claims asserted in this action, as there is no genuine issue as to any material fact, and Plaintiffs are entitled to judgment as a matter of law.  This motion is supported by the attached memorandum in support, an appendix of exhibits, and the declarations of Kenneth Affeldt, Suzy Hartman, Christopher Turner, Michael Reynolds, and Ruben Steck.

Respectfully submitted,

/s/ Glenn V. Whitaker
Glenn V. Whitaker (0018169)
Victor A. Walton, Jr.
Michael J. Bronson
Patrick M. Hagan
VORYS, SATER, SEYMOUR, &
PEASE LLP
221 E. Fourth St.
Atrium Two, Suite 2000
Cincinnati, OH 45202
(513) 723-4000
Fax: (513) 723-4056
gvwhitaker@vorys.com
vawalton@vorys.com
mjbronson@vorys.com
pmhagan@vorys.com

*Attorneys for Relator Harry F. Fry,
M.D.*

/s/ Kenneth F. Affeldt
Kenneth F. Affeldt (0052128)
Andrew M. Malek (0061442)
Assistant United States Attorney
303 Marconi Boulevard
Suite 200
Columbus, Ohio 43215
(614) 469-5715
Fax: (614) 469-2769
ken.affeldt@usdoj.gov
andrew.malek@usdoj.gov

Joyce R. Branda
Michael Granston
George C. Vitelli
Jennifer L. Cihon (0068404)
Evan C. Zoldan
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 514-6547
Fax: (202) 514-7361
george.vitelli@usdoj.gov
jennifer.cihon2@usdoj.gov
evan.zoldan@usdoj.gov

*Attorneys for Plaintiff the United States of
America*

2

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that on November 24, 2009, a true and correct copy of the foregoing was electronically filed with the Clerk of the United States District Court for the Southern District of Ohio, Western Division, using the CM/ECF system, which will send notification of such filing to all counsel of record.


                            /s/ Kenneth F. Affeldt
                            Kenneth F. Affeldt

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES ex rel. HARRY F.** | : | |
| **FRY, M.D.** | : | |
| | : | **Case No. 1:03-CV-00167** |
| **Plaintiffs,** | : | |
| | : | **Judge S. Arthur Spiegel** |
| **v.** | : | |
| | : | **Magistrate Judge Timothy S. Black** |
| **THE HEALTH ALLIANCE OF** | : | |
| **GREATER CINCINNATI, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

---

**MEMORANDUM IN SUPPORT OF MOTION OF UNITED STATES AND
RELATOR FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ............................................................................. 1

II. THE PARTIES ................................................................................................... 3

    1. The Christ Hospital ................................................................................. 3

    2. The Health Alliance ................................................................................ 3

    3. Ohio Heart ............................................................................................ 4

    4. Medical Diagnostic Associates ............................................................... 6

  B. The Relator ................................................................................................... 6

II. BACKGROUND ................................................................................................. 7

  A. The Heart Station at TCH .............................................................................. 7

  B. Phillip Tempel, TCH's CFO, Decides to Reward Referrals With Heart
    Station Panel Time. ....................................................................................... 7

  C. TCH Admits It Was "At Risk Legally" For the Kickback Scheme But
    Compliance Was "Undesirable" ................................................................... 9

  D. Questions Regarding the Legality of the Scheduling Process Resurface ....... 11

  E. Rebuffed by the Administration, Fry Asks the Physicians to Press for Change
    ....................................................................................................................... 12

  F. Fry Documents the Illegal System in Writing ................................................ 13

  G. TCH Promises Change .................................................................................. 15

  H. Broderick And Abbottsmith Collaborate With TCH to Continue The
    Kickback Scheme ......................................................................................... 19

  I. The Assignment of Panel Time Under MDA .................................................. 21

  J. Questions Regarding the Legality of the Scheduling Process Resurface -
    Again ............................................................................................................. 26

  K. TCH Ends the Kickback Scheme .................................................................. 27

III. LAW AND ARGUMENT .................................................................................... 28

  A. Standard ....................................................................................................... 28

Summary judgment is appropriate if there is no genuine issue as to any material fact. High Concrete Technology, LLC v. Korolath of New England, Inc., --- F.Supp.2d ----, 2009 WL 2708107, at *1 (S.D. Ohio August 25, 2009) (Spiegel, J.) (citing Fed. R. Civ. P. 56). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "If the nonmoving party cannot provide enough evidence that a reasonable jury could find for it, the motion for summary judgment should be granted." Geiger v. Tower Automotive, 579 F.3d 614, 620 (6th Cir. 2009).

**B. False Certification of Compliance with the Anti-Kickback Statute Leads to Violation of the False Claims Act** ....................................................................... 30

Because the defendants allocated Heart Station panel time based on the volume of cardiologists' referrals of certain procedures to The Christ Hospital (TCH), they were in violation of the Anti-Kickback Statute (AKS), 42 U.S.C. §1320a-7b, from 1997-2004. Compliance with the AKS is a condition of payment for federal healthcare programs, and defendants' false certifications rendered their claims for payment "false or fraudulent" within the meaning of the False Claims Act (FCA). (Order Denying Motions to Dismiss at 25). Under the FCA, the United States need only establish the elements of this case, including the elements of an AKS violation, by a preponderance of the evidence. See 31 U.S.C. § 3731(c); United States v. Rogan, 459 F. Supp. 2d 692 (N.D. Ill. 2006).

**C. Defendants Violated the Anti-Kickback Statute** ............................................... 31

    **1. Heart Station panel time was valuable and constitutes "remuneration" under the AKS.** ............................................................................................ 32

        **a. "Remuneration" means "anything of value."** ..................................... 32

"Remuneration" is broadly defined to include "anything of value." (Order Denying Motions to Dismiss at 15-16). Time in the Heart Station provided the opportunity to bill for services, which constitutes "remuneration." (Id. at 16 (citing United States v. Bay State Ambulance and Hosp. Rental Serv., Inc., 874 F.2d 20, 30 (1st Cir. 1989). Defendants' own compliance documents from 1999 confirm they were aware that "remuneration" means "anything of value."

        **b. Heart Station panel time was valuable to the cardiologists who received it.** ................................................................................................ 33

Panel time was valuable because (1) it generated significant income for cardiologists based on their billings for tests they supervised or interpreted; and (2) it helped cardiologists gain new patients. Between $750,000 and $1.5 million was paid out each year to cardiologists for tests performed in the Heart Station. Dr. Toltzis testified that he believed that Heart Station panel time at TCH led to 25 to 50 new patients a year. Panel time also offered indirect benefits to cardiologists looking to develop or expand their practice. The Court's prior metaphor that "time is money" for physicians is correct. (Order Denying Motions to Dismiss at 16).

    **2. Defendants exchanged Heart Station panel time for referrals.** ................ 37

It is undisputed that Heart Station panel time was allocated on the basis of cardiologists' referrals to TCH. Each year prior to 2001, TCH calculated panel time for physicians based upon the prior year's volume statistics. Memoranda and notes to and from TCH's senior executive officers confirm that panel time was allocated "based on [cardiologists'] percentage of contribution to revenue" and was "predicated on revenue generation." When MDA began allocating panel time in 2001, the basic premise remained exactly the same – panel time was allocated based on coronary artery bypass graft surgery referrals and gross revenue generated at TCH.

    **3. Ohio Heart solicited panel time** .................................................................. 39

Because Ohio Heart "knowingly and willfully solicited" and "received" Heart Station panel time in exchange for referrals, it violated the AKS.  See 42 U.S.C. §1320a-7b(b)(1).  There is no requirement under this prong of the AKS for Ohio Heart "to induce" remuneration to violate the AKS, and summary judgment can be granted against Ohio Heart on this basis alone.

**4.   TCH/THA had a purpose to induce referrals. ........................................... 39**

Defendants violated 42 U.S.C. §1320a-7b(b)(2) because Heart Station panel time was offered to induce cardiologists to perform certain lucrative cardiac procedures at TCH.  Because "any amount of inducement is illegal," U.S. ex rel. Jamison v. McKesson Corp., 2009 WL 3176168, at *9 (N.D. Miss. 2009) (citing Bay State, 874 F.2d at 30), if "one purpose" of defendants' methodology was to induce referrals, then the element of inducement is present.  See U.S. v. McClatchey, 217 F.3d 823, 834-35 (10th Cir. 2000) to induce referrals.  Here, defendants' purpose is clear.  Ohio Heart's Dr. Broderick informed some cardiologists that if they wanted more panel time, they would have to perform more procedures at TCH.  The architect of the scheme, TCH's former CFO Phil Tempel, testified that if cardiologists wanted panel time, they had to generate volume for TCH.  And that is what happened.  Cardiologists testified that this "quid pro quo" arrangement produced the desired effect.

**5.   Defendants acted knowingly and willfully................................................... 44**

Defendants knowingly and willfully violated the AKS if they had a "purpose to commit a wrongful act."  (Order Denying Motions to Dismiss at 18 (citing McDonnell v. Cardiothoracic & Vascular Surgical Assoc., Inc., No. C2-03-79, 2004 WL 3733402 (S.D. Ohio 2004)); see also United States v. Jain, 93 F.3d 436, 441 (8th Cir. 1996).  The evidence demonstrates an even greater level of knowledge – defendants knew their methodology was illegal.  A 1996 memorandum to TCH's senior executive officer notes that the method for allocating panel time "potentially could put [TCH] at risk legally" but that changing the system "has been an undesirable alternative."  In 1999, TCH's senior executive officer wrote in his personal notes that the system was "illegal."  At the same time, Relator publicly challenged the legality of the system.  So, as Ohio Heart's Dr. Broderick explained in an email, TCH decided to outsource responsibility for allocating panel time to MDA to avoid a violation.  After MDA nominally took over the allocation of panel time, TCH continued to provide the referral and financial data used to allocate panel time, even though Dr. Abbottsmith observed that this was "dangerous."  His successor as Chief of Cardiology ultimately concluded that the allocation of panel time was an "illegal op[eration]."  Defendants' repeated documentation of their knowledge of outright illegality is more than sufficient evidence of knowledge under the AKS.

**D.  Defendants Violated the False Claims Act........................................................ 49**

Each and every claim submitted to the federal government for payment by TCH and THA during the years 1997 through 2004 was false because payment was conditioned on compliance with the AKS.  See U.S. v. Rogan, 517 F.3d 449 (7th Cir. 2008).  Because defendants knowingly submitted and caused others to submit false claims for payment, they are liable under 31 U.S.C. §§ 3729(a)(1), (a)(2)/(a)(1)(B), (a)(3), and (a)(7).

iv

**1. Section 3729(a)(1)** .......................................................................... **51**

Defendants violated  § 3729(a)(1) of the FCA by knowingly presenting false or fraudulent claims for payment.  See  U.S. ex rel. Roby v. Boeing Co., 100 F.Supp.2d 619, 625 (S.D. Ohio 2000) (Spiegel, J.) (citation omitted); U.S. ex rel. Schell v. Battle Creek Health System, 419 F.3d 535, 538 (6th Cir. 2005).

**a.  Defendants Submitted Claims to Medicare and Medicaid.** ................ **52**

It is undisputed that defendants submitted numerous claims for payment to Medicare and Medicaid for the cardiovascular services at issue between 1997 and 2004. Defendants' claims for payment, which include Medicare cost reports (CMS-2552's), hospital claims for payment (UB-92's) (also known as form HCFA-1450), and physician claims (CMS-1500's), are all actionable under the FCA.  (Order Denying Motions to Dismiss at 8-9 (citing, *inter alia*, U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997)).

**b.  Defendants' claims were false or fraudulent.** ........................................ **55**

"Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a federally funded insurance program is actionable under the FCA."  U.S. ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (collecting cases).  Compliance with the AKS is a condition of payment for both Medicare and Medicaid.  (Order Denying Motions to Dismiss at 8-9; 26).  In each claim submitted to the government, the defendants certified compliance with the AKS.  See, e.g., U.S. ex rel. Augustine v. Century Health Services, Inc., 289 F.3d 409 (6th Cir. 2002) (adopting false implied certification theory in context of submission of claims to CMS). Because the defendants were not complying with the AKS from 1997-2004, every claim submitted during this period is false or fraudulent within the meaning of the FCA.

**c.  Defendants acted with the requisite scienter.** ........................................ **56**

Under the FCA, "knowledge" includes either actual knowledge, deliberate ignorance, or reckless disregard.  31 U.S.C. § 3729(b)).  The Court has already held that the defendants' conduct did not fall within an ambiguous area of law.  (Order Denying Motions to Dismiss at 21).  Because defendants' own documents repeatedly characterize the methodology for allocating panel time based on the volume of referrals as "illegal," the defendants' knowledge rises to the level of "actual knowledge" under the FCA.

**d.  Defendants' certifications are material.** ................................................ **57**

This Court has already held that "violations of the Anti-Kickback Statute … are material as a matter of law."  (Order Denying Motions to Dismiss at 25-26 (citing Rogan, 517 F.3d at 452)); see also U.S. ex rel. Pogue v. Diabetes Treatment Centers of America, 565 F.Supp.2d 153, 159 (D.D.C. 2008).

**2.  Section 3729(a)(1)(B) / 3729(a)(2)** .............................................................. **58**

Defendants violated 31 U.S.C. § 3729(a)(2) by falsely certifying that they complied with the AKS, and in so doing, intending to trigger payment by the government.  See Allison Engine Co., Inc. v. U.S. ex rel. Sanders, 128 S.Ct. 2123, 2130 (2008).  Without the materially false certifications that the defendants submitted or

caused to be submitted, they would not have been paid for the referrals that were awarded with Heart Station panel time, or for the work performed in the Heart Station.

**3. Defendants conduct violates 31 U.S.C. §§ 3729(a)(7)** ................................. 60

TCH and THA were legally obligated to repay Medicare and Medicaid for claims that were wrongfully paid as part of a reconciliation through the filing of a cost report. (42 U.S.C. 1395(g); 42 C.F.R. §§ 413.20, 413.64, 430.30(d)). By falsely certifying compliance with the AKS, TCH and THA avoided their obligation to repay the government, in violation of 31 U.S.C. § 3729(a)(7).

**4. Defendants conspired to submit false statements in violation of 31 U.S.C. § 3729(a)(3)** ................................................................................................. 62

Defendants violated § 3729(a)(3) by conspiring to get false claims paid and by acting in furtherance of their conspiracy. U.S. ex rel. Howard v. Lockheed Martin Corp., 499 F.Supp.2d 972, 980 (S.D. Ohio 2007); U.S. v. Murphy, 937 F.2d 1032, 1038-39 (6th Cir. 1991). Abbottsmith and Broderick, acting on behalf of Ohio Heart, and later through MDA, worked with TCH and THA to allocate panel time as a kickback for referrals and revenues. Abbottsmith assisted Tempel in his development of TCH's methodology. Acting through MDA, Broderick requested yearly referral and financial data and used it to allocate panel time. TCH knew this was the case, but provided the data anyway. Ohio Heart and TCH both benefited financially from this scheme.

**E. The United States Is Entitled To Recover Damages** ........................................ 65

"But for" the defendants' false certifications of compliance with the AKS in their claims for payment, the government would not have paid their claims. U.S. v. TDC Management Corp., Inc., 288 F.3d 421, 428 (D.C. Cir. 2002). Therefore, the United States is entitled to the full value of every false claim submitted by the defendants during the relevant time period. See U.S. ex rel. Pogue v. American Healthcorp, Inc., 914 F. Supp. 1507, 1513 (M.D. Tenn. 1996).

**1. Defendants owe damages for all federal claims regardless of whether such claims were payable were it not for the AKS violation** ............................. 66

Because the defendants' false statements caused the government to consider them eligible for reimbursement when they were not in fact eligible, damages includes the entire amount paid to these ineligible defendants. Rogan, 517 F.3d at 453; U.S. ex rel. Longhi v. Lithium Power, Inc., 575 F.3d 458, 473 (5th Cir. 2009).

**2. The United States seeks damages of $74,234,781** ........................................ 68

Although the United States is entitled to damages and penalties on every claim submitted by defendants to any federal health benefits program from 1997-2004, it seeks only damages and penalties on the Medicare and Medicaid Part A referrals that were rewarded with Heart Station panel time between 2001 and 2004. These are the 5,995 claims TCH and THA submitted to the Medicare and Medicaid programs using the 14 DRGs for which they were reimbursed $74,234,781.00. The government is entitled to treble damages plus a per-claim penalty. 31 U.S.C. § 3729(a); Rogan, 517 F.3d at 453.

**IV. CONCLUSION** ................................................................................................. 69

## TABLE OF AUTHORITIES

**Cases**

Aerel, S.R.L. v. PCC Airfoils, L.L.C.,
  448 F.3d 899 (6th Cir. 2006) ........................................................................ 30

Allison Engine Co. v. United States ex rel. Sanders,
  128 S. Ct. 2123 (2008) ................................................................................. 59

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) ...................................................................................... 29

Bank of Illinois v. Allied Signal Safety Restraint Systems,
  75 F.3d 1162 (7th Cir. 1996) ........................................................................ 30

Crane Helicopter Servs., Inc. v. United States,
  45 Fed. Cl. 410 (Fed. Cl. 1999) ................................................................... 57

Geiger v. Tower Automotive,
  579 F.3d 614 (6th Cir. 2009) ................................................................ 29, 44

High Concrete Technology, LLC v. Korolath of New England, Inc.,
  --- F.Supp.2d ----, 2009 WL 2708107 (S.D. Ohio August 25, 2009) ......... 29

In re Patch,
  526 F.3d 1176 (8th Cir. 2008) ...................................................................... 59

McDonnell v. Cardiothoracic & Vascular Surgical Assoc., Inc.,
  No. C2-03-79, 2004 WL 3733402 (S.D. Ohio July 28, 2004) ..................... 44

Moore v. Philip Morris Cos., Inc.,
  8 F.3d 335 (6th Cir. 1993) ............................................................................ 29

Personnel Adm'r of Massachusetts v. Feeney,
  99 S.Ct. 2282 (1979) ..................................................................................... 59

Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Companies,
  682 F.2d 660 (7th Cir. 1982) ........................................................................ 29

Reno v. Bossier Parish School Bd.,
  520 U.S. 471 (1997) ................................................................................ 59, 60

Scott v. Harris,
  550 U.S. 372 (2007) ...................................................................................... 29

Securities and Exchange Commission v. National Student Marketing Corp.,
  402 F.Supp. 641 (D.D.C. 1975) .................................................................... 29

U.S. ex rel. Augustine v. Century Health Services, Inc.,
  289 F.3d 409 (6th Cir. 2002) ........................................................................ 56

U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.,
  251 F.Supp.2d 28 (D.D.C. 2003) .................................................................. 58

U.S. ex rel. Bidani v. Lewis,
  264 F. Supp. 2d 612 (N.D. Ill. 2003) ............................................................ 56

U.S. ex rel. Bledsoe v. Community Health Systems, Inc.,
  342 F.3d 634 (6th Cir. 2003) ........................................................................ 57

U.S. ex rel. Compton v. Midwest Specialties, Inc.,
  142 F.3d 296 (6th Cir.1998) ......................................................................... 57

U.S. ex rel. Fry v. The Health Alliance of Greater Cincinnati, Inc., et al.,
  2008 WL 5282139 (S.D. Ohio, Dec. 18, 2008) ................................... passim

U.S. ex rel. Fry v. The Health Alliance of Greater Cincinnati, Inc., et al., 2009 WL
   485501 (S.D. Ohio, Feb. 26, 2009)............................................................ 32
U.S. ex rel. Howard v. Lockheed Martin Corp.,
   499 F.Supp.2d 972 (S.D. Ohio 2007) ................................................ 62, 64
U.S. ex rel. Jamison v. McKesson Corp.,
   No. 2:08-CV-214, 2009 WL 3176168 (N.D. Miss. Sept. 29, 2009)............................ 40
U.S. ex rel. Kosenske v. Carlisle HMA, Inc.,
   554 F.3d 88 (3d Cir. 2009)................................................................ 31, 55
U.S. ex rel. Longhi v. Lithium Power, Inc.,
   575 F.3d 458 (5th Cir. 2009) .................................................... 57, 66, 67
U.S. ex rel. Marcus v. Hess,
   317 U.S. 537 (1943)........................................................................... 50
U.S. ex rel. McNutt v. Haleyville Medical Supplies,
   423 F.3d 1256 (11th Cir. 2005) ............................................................ 55
U.S. ex rel. Ortega v. Columbia Healthcare, Inc.,
   240 F.Supp.2d 8 (D.D.C. 2003) ........................................................... 58
U.S. ex rel. Pogue v. American Healthcorp, Inc.,
   914 F. Supp. 1507 (M.D. Tenn. 1996)............................................... 66, 67
U.S. ex rel. Pogue v. Diabetes Treatment Centers of America,
   565 F.Supp.2d 153 (D.D.C. 2008) ..................................................... 52, 57
U.S. ex rel. Pogue v. Diabetes Treatment Centers of America,
   576 F.Supp.2d 128 (D.D.C. 2008) .......................................................... 51
U.S. ex rel. Roby v. Boeing Co.,
   100 F.Supp.2d 619 (S.D. Ohio 2000) .................................................... 51
U.S. ex rel. Schell v. Battle Creek Health System,
   419 F.3d 535 (6th Cir. 2005) ............................................................. 51
U.S. ex rel. Schmidt v. Zimmer, Inc.,
   386 F.3d 235 (3d Cir. 2004)............................................................. 31, 55
U.S. ex rel. Schwedt v. Planning Research Corp.,
   59 F.3d 196 (D.C. Cir. 1995) ............................................................. 65
U.S. ex rel. Thomas v. Bailey,
   No. 4:06-CV-00465, 2008 U.S. Dist. LEXIS 91221 (E.D. Ark. November 6, 2008) .. 52
U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.,
   125 F.3d 899 (5th Cir.1997) ................................................ 31, 49, 52, 55
U.S. ex rel., A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.,
   400 F.3d 428 (6th Cir. 2005) ........................................................ passim
U.S. v. Bay State Ambulance and Hosp. Rental Serv., Inc.,
   874 F.2d 20 (1st Cir.1989)............................................................. 32, 40
U.S. v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars,
   403 F.3d 448 (7th Cir. 2005) ............................................................ 30
U.S. v. TDC Management Corp., Inc.,
   288 F.3d 421 (D.C. Cir. 2002) ........................................................... 65
United States v. Davis,
   132 F.3d 1092 (5th Cir. 1998) ........................................................... 40
United States v. Greber,
   760 F.2d 68 (3d Cir. 1985)................................................................. 40

United States v. Jain,
   93 F.3d 436 (8th Cir. 1996) ...................................................................... 44
United States v. Kats,
   871 F.2d 105 (9th Cir. 1989) ..................................................................... 40
United States v. McClatchey,
   217 F.3d 823 (10th Cir. 2000) ............................................................. 40, 44
United States v. Murphy,
   937 F.2d 1032 (6th Cir. 1991) ................................................................... 62
United States v. Neufeld,
   908 F. Supp. 491 (S.D. Ohio 1995) ........................................................... 44
United States v. Rogan,
   459 F. Supp. 2d 692 (N.D. Ill. 2006) .................................................. 31, 52
United States v. Rogan,
   517 F.3d 449 (7th Cir. 2008) .............................................................. passim

**Statutes**

31 U.S.C. § 3729 .............................................................................................. passim

31 U.S.C. § 3731 ..................................................................................................... 31

31 U.S.C. § 3729 .................................................................................................. 3, 30

42 C.F.R. § 430.30 .................................................................................................. 59

42 U.S.C. §1320a-7b ...................................................................................... passim

**Other Authorities**

Fraud Enforcement and Recovery Act, PUB. L.
   NO. 111- 21, 123 Stat. 1617 (2009) ............................................... 31, 49, 58
Kickbacks Among Medicaid Providers, Report by the Senate Special Committee on
   Aging, S. REP. NO. 95-320, at 2 (1977) ....................................................... 1
OIG Supplemental Compliance Program Guidance for Hospitals,
   70 Fed. Reg. 4858 (Jan. 31, 2005) ............................................................ 40
S. Rep. No. 345, 99th Cong. 2d Sess. 9 (1986) ....................................... 57, 66
Vulnerable Payers lose Billions to Fraud and Abuse, May 1992 ...................... 1

**Rules**

Fed. R. Civ. P. 30 ............................................................................................. 4, 34

Fed. R. Civ. P. 56 .................................................................................................. 29

I.    **PRELIMINARY STATEMENT**

The facts of this case are straightforward and uncontested.  The Christ Hospital

(TCH) wanted cardiologists to perform certain lucrative cardiac procedures at its hospital.

TCH had something to offer cardiologists in return for this business -- valuable panel

time at TCH's Heart Station where cardiologists could bill for non-invasive testing

procedures and acquire new patients.  Recognizing that cardiologists "coveted" Heart

Station panel time, TCH made a trade.  A system was created whereby cardiologists were

allocated time in the Heart Station in direct proportion to the amount of cardiac business

they brought to TCH.  This arrangement proved to be lucrative and mutually beneficial

for the cardiologists and for TCH.  It also was a clear violation of the federal Anti-

Kickback Statute, 42 U.S.C. §1320a-7b (AKS).

The AKS is the embodiment of Congress's belief that the judgment of a physician

who receives something of value in return for the referral of medical procedures is *per se*

tainted by the financial incentive being offered.  (See, e.g., Kickbacks Among Medicaid

Providers, Report by the Senate Special Committee on Aging, S. REP. NO. 95-320, at 2

(1977) (observing that kickbacks "undermine the quality of services which are offered

since operators become more concerned with rebates than with care").  Accord GAO,

Vulnerable Payers lose Billions to Fraud and Abuse, May 1992, at 9 ("Because kickbacks

constitute payments to induce services, they increase insurers' vulnerability to claims for

unnecessary services.").  The basic premise underlying the AKS is the premise that

money corrupts health care decisions.

Consequently, Congress prohibits the United States from reimbursing, through

Medicare and Medicaid, health care providers who attempt to bill the United States for

services provided in violation of the AKS. In order to receive reimbursement under Medicare and Medicaid, a health care provider must certify to the United States that it is in compliance with the AKS as a condition of payment under these programs.

In submitting claims for payment to the federal government, defendants in this case falsely certified that they had complied with the AKS. Without this certification, they would not have been authorized to receive and retain payment for the referrals that were rewarded with Heart Station panel time, or for the work performed in the Heart Station.

The defendants' violation of the AKS was not an accident of ignorance, or even negligence. They knew that what they were doing was illegal. Time and time again, defendants documented that they were breaking the law. For example:

- A 1996 memo to Claus von Zychlin (TCH's Senior Executive Officer) noted that the hospital's method of panel assignment "could put us at risk legally," but added that avoiding this risk was "undesirable."

- Richard Seim (von Zychlin's successor) wrote in 1999 that the hospital's assignment of panel time was "predicated on revenue generation," and therefore, "illegal."

- TCH's current Chief of Cardiology, Charles Hattemer, M.D., wrote that the assignment of panel time was an "illegal" operation in 2003

But the legal ramifications of the AKS violation were ignored; the financial benefits to TCH and the cardiologists were simply too great. Between 1997 and 2004, TCH submitted at least 12,354 claims worth approximately $155 million to the Medicare and Medicaid programs for the lucrative cardiac services that were bought using Heart Station panel time. During this same time period, cardiologists cashed in on their reward in part by submitting 132,644 claims worth over $2 million to the federal Medicare system for services performed in the Heart Station.

Because all of these procedures and tests were performed in violation of the AKS, and because the defendants certified that they were in compliance with the AKS as part of their request for reimbursement from the United States, all of the associated claims for payment are false under the False Claims Act, 31 U.S.C. §§ 3729-33 (FCA).

Because there is no genuine dispute as to any material fact as to defendants' violation of the AKS, the attendant falsity of their claims, or the knowledge possessed by the defendants of the wrongfulness of their conduct, the Plaintiffs request that the Court GRANT summary judgment against the defendants on all counts.

## II.  THE PARTIES

### 1.  The Christ Hospital

TCH is a 555-bed acute care hospital located in Mount Auburn, Ohio.[1]  TCH offers a variety of services, including cardiac care.  It is the hospital's provision of cardiac care that is at issue in this litigation.

### 2.  The Health Alliance

The Health Alliance of Greater Cincinnati, Inc. (THA or Health Alliance) is a conglomerate of hospitals in the Cincinnati area operating under a Joint Operating Agreement (JOA).  (Deposition of Kenneth Hanover ("Hanover") at 6-8, 10-11).[2]  The participating hospitals include TCH, University of Cincinnati Hospital, St. Luke Hospital (East and West), Jewish Hospital, Fort Hamilton, Drake Hospital and West Chester

---

[1]  The Christ Hospital is owned by The Christ Hospital, Inc. (collectively, TCH or Christ Hospital).

[2]  All of the depositions and exhibits cited herein have been filed with the Court.  All of the portions of depositions and exhibits that are cited in support of this Motion are included as an Appendix to the Motion, attached hereto as Exhibit 1.  The excerpts of testimony and exhibits are organized alphabetically by deponent.  The parties have negotiated to de-designate as confidential the majority of deposition exhibits.  None of the exhibits cited herein and included in the Appendix are currently considered "Confidential" under the Stipulated Protective Order (doc. 123)).

Medical Center. (Hanover at 6-8, 10-11; Deposition of Richard Seim ("Seim") at 9 and 11).

Under the JOA, "the participating entities ceded certain rights" to THA "for the operation and management of their organizations." (Hanover at 11). The JOA specified that THA would "own all of the revenues generated by those institutions." (Hanover at 11). Moreover, all of the employees of these institutions were "Health Alliance employees," although each entity continued "to own their property, plant and equipment." (Hanover at 11). Every TCH employee was an employee of THA. (Hanover at 28). Thus, all of the TCH employees involved in the kickback scheme at issue in this case were also committing their fraud on behalf of THA.[3]

### 3.    Ohio Heart

The Ohio Heart and Vascular Center, Inc. (Ohio Heart) is a group of cardiologists practicing in the Cincinnati area, and the largest cardiology group practicing at TCH. (Deposition of Susan Croushore pursuant to Fed. R. Civ. P. 30(b)(6) ("Croushore") at 42; Hanover at 74-77; Seim at 26, 80-81; Deposition of Dr. Thomas Broderick ("Broderick") at 177). Ohio Heart's co-founder was Dr. Charles Abbottsmith, who also served as TCH's Chief of the Section of Cardiology from 1974 until the fall of 2003. (Deposition of Dr. Charles Abbottsmith ("Abbottsmith") at 7). Around 1985, Abbottsmith started a two-man cardiology group with Dr. Dean Kereiakes. (Abbottsmith at 9; McDonald Exh. 272, at 7). As their practice grew, they brought in Dr. Tom Broderick, followed by Dr. Robert Toltzis and Dr. David Whang. (McDonald Exh. 272, at 7). Dr. Toltzis was a

---

[3]      On January 12, 2006, TCH filed a lawsuit in the Hamilton County Court of Common Pleas seeking to terminate its participation in the JOA and withdraw from THA because of a default with respect to THA's duties to the University of Cincinnati Hospital. See The Health Alliance of Greater Cincinnati v. The Christ Hospital, et al., Case No. A0601969. On April 16, 2007, the court agreed with TCH and found that the JOA was properly terminated as of June 6, 2006. Id.

non-invasive cardiologist, while Drs. Broderick, Whang, Kereiakes, and Abbottsmith
were primarily interventionalists.  (Broderick at 317-18 (confirming that Broderick,
Kereiakes, and Abbottsmith were interventionalists); (Deposition of Dr. David Whang
("Whang") at 18-19).[4]

Five cardiologists were not enough -- Abbottsmith and Kereiakes wanted to create
a bigger cardiology group that "would be able to subspecialize" and produce "high
volume."  (Abbottsmith at 9).  In October 1995, five cardiology groups -- comprised of
eighteen cardiologists -- joined together to form Ohio Heart.  (McDonald Exh. 272, at 8).
Over the years, the group suffered some defections (like Whang and Toltzis), but added
other doctors until its ranks grew to more than thirty.  (See Hayes Exh. 183).

As Ohio Heart grew, Ohio Heart and TCH became dependent on one another for
their economic health.  THA's former CEO, Kenneth Hanover, testified that cardiac
services accounted for 33% of TCH's overall revenue and 74% of TCH's gain from
operations.  (Hanover at 80, citing Exh. 221).[5]  Ohio Heart accounted for 75% of the
value of the procedures performed at TCH's catheterization laboratory (Cath Lab), and
80% of the cardiac surgeries at TCH.  (McDonald Exh. 44, December 7, 2003).  Overall,
Ohio Heart was responsible for over $100 million in annual gross revenues to TCH.
(McDonald Exh. 44, December 7, 2003).  Ohio Heart was responsible for the

---

[4]      There are three relevant types of cardiologists: (1) non-invasive, (2) invasive, and (3)
interventionalist.  (Expert Report of Walter J. Unger, ("Unger Report") at 11).  Noninvasive cardiologists
conduct diagnostic tests and perform other clinical procedures that do not involve piercing the skin.  Id.
Invasive cardiologists are capable of performing diagnostic tests but also perform diagnostic cardiac
catheterization, which is an invasive procedure.  Id.  Interventional cardiologists are trained to perform the
full range of cardiac procedures, except cardiac surgery, and primarily focus on therapeutic catheterization
procedures.  Id. at 12.

[5]      (See also Hanover at 75 (testifying that Ohio Heart produced a substantial amount of the
cardiology business at TCH and was a very important source of revenue for the hospital); id. at 86-87
(characterizing Ohio Heart as "a critical component of the success" of TCH's cardiovascular program).

overwhelming majority of referrals that were rewarded with Heart Station panel time,[6]

and the overwhelming majority of tests performed in the Heart Station.  (Broderick at

177-78).  Ohio Heart also exercised a significant amount of influence and control over

TCH's Cardiology Department.  (Seim at 80-81; Hanover at 91).  Ohio Heart, in turn,

was the primary beneficiary of the illegal kickback arrangement offered by TCH.

### 4.    Medical Diagnostic Associates

Defendant Medical Diagnostic Associates, Inc. (MDA) was a corporation created

by cardiologists at TCH to provide billing services for the physicians' work at TCH's

Heart Station.  (Abbottsmith at 12-13; Deposition of Dr. Robert Toltzis ("Toltzis") at 34).

Dr. Abbottsmith served as MDA's President, while Dr. Thomas Broderick, who was

Ohio Heart's Vice President, served as MDA's business manager.  (Abbottsmith at 12;

Toltzis at 38; Broderick at 153).  MDA has not entered an appearance in this case.

Accordingly, the United States is entitled to a default judgment against MDA.

### B.    The Relator

The relator, Dr. Harry F. Fry (relator), graduated from the University of

Pennsylvania School of Medicine, served in the army, finished a residency at the

University of Michigan, and then returned to his hometown of Cincinnati to practice

cardiology in 1976.  (Deposition of Dr. Harry Fry ("Fry") at 6-8).  Upon his return to

---

[6]    For example, between July 1, 1999, through June 30, 2000, Ohio Heart referred 521 patients to TCH for coronary arterial bypass graph (CABG) procedures during this year, nearly five times more than the second largest group. (McDonald Exh. 31 at MDA_PROD_034377).  Between April 1999 and March 2000, Ohio Heart generated over $82 million for TCH for DRG codes used to reward Heart Station panel time during the analyzed year.  (HA00864).  The next closest group generated only a little under $24 million.  (HA00864).  As time passed, the disparity grew.  Between July 1, 2002, and June 30, 2003, Ohio Heart referred 517 patients to TCH for CABG, which was seven times more than its nearest competitor. (Wall Exh. 128).  For the first six months of 2003, Ohio Heart generated over $523 million for TCH for the selected DRG codes.  (Hayes Exh. 183 at MDA_PROD_012278).  The next highest group generated a little over $50 million.  (Hayes Exh. 183 at MDA_PROD_012276).

6

Cincinnati, Fry "was hired as a hospital-based physician" at TCH and as the hospital's Assistant Director of Cardiology. (Fry at 19). He retired in 2001. (Fry at 7).

## II.    BACKGROUND

### A.    The Heart Station at TCH

TCH's Heart Station is an outpatient facility where cardiologists supervise or perform non-invasive, diagnostic cardiovascular tests such as electrocardiograms (abbreviated as either "EKG" or "ECG"), echocardiograms ("echos"), including transesophageal echos, and stress echos, as well as graded exercise tests ("GXTs"). (Seim Exh. 149, at 14; Broderick Exh. 226, at 17; see also Unger Report at 14-18). Work at the Heart Station was divided into two panels -- an electrocardiogram panel for the reading of EKGs/ECGs, and a GXT panel which administered all of the other tests. (Croushore Exh. 4 at 1). TCH provides "EKG techs, cardiac techs, clerical support," and management of the Heart Station for the doctors. (Deposition of Tina Wall (Wall) at 11). For every patient seen in the Heart Station, the hospital bills a technical and facility fee, while the physician bills for his services. (Seim Exh. 149, at 14-15).

### B.    Phillip Tempel, TCH's CFO, Decides to Reward Referrals With Heart Station Panel Time

Throughout most of the 1980s, TCH let the physicians who worked in the Heart Station divide panel time amongst themselves. (Deposition of Phillip Tempel (Tempel) at 14). In 1987, TCH decided to take control of the allocation of time. (Tempel at 14). In determining how to allot panel time, TCH did not defer to the judgment of its medical staff. Rather, it turned to its Chief Financial Officer, Phillip Tempel.[7] (Tempel at 12-13). Tempel developed a system that gave panel time as a reward for "the inpatient volume of

---

[7]    Phillip Tempel was the Chief Financial Officer at TCH from 1983 to 1994. (Tempel at 7). In 1994, Tempel became CFO for the entire Health Alliance. (Tempel at 7).

service" and "the outpatient volume of service."[8]  (Tempel at 15).  As Tempel testified,

for cardiologists who wanted Heart Station panel time, the system encouraged

cardiologists to generate volume for TCH.  (Tempel at 22-23).  Under Tempel's system,

no one ever received panel time in the Heart Station without first generating volume for

TCH.  (Tempel at 19).

Although Tempel was the "head of the project" to develop this method of

allocating Heart Station panel time, others, including the President and Chief Operating

Officer of TCH, "reviewed [his] work."  (Tempel at 13).  Thus, the highest levels of

TCH's administration approved the use of panel time as a reward for physicians who

generated business for the hospital.  (Tempel at 40).

The future President and CEO of Ohio Heart also knew that referrals were being

rewarded with panel time.  Tempel explained that Dr. Charles Abbottsmith "served as a

sounding board" as he developed the system.  (Tempel at 31-32).  He testified:

> Q.  So did Dr. Abbottsmith know the methodology that was ultimately
> put in place for allocating panel time?
>
> Tempel:  Yes, he knew it and all cardiologists knew it.

(Tempel at 32).

Every year, Tempel calculated panel time for physicians based upon the prior

year's volume statistics, (Tempel at 20-21), and then Abbottsmith posted the panel

schedule for all of the cardiologists to see.  (Tempel at 33).  And every year, physicians

had to refer volume to the hospital if they wanted panel time.  (Tempel at 22-23).

Tempel's recollection concerning the genesis of his kickback scheme was

---

[8]  Tempel said that "there was an extra provision that reflected physicians who volunteered faculty
training of . . . internal medicine residents." (Tempel at 15).  But this provision never came into play;
Tempel could not name a single physician who ever received panel time based upon his teaching.  (Tempel
at 19).

confirmed by the physicians.  Dr. Toltzis explained that Abbottsmith had told him early on that "he and the administration" allocated panel time based upon the business that cardiologists brought to the hospital.  (Toltzis at 14-16).  "[Abbottsmith] told me that he wasn't allowed to discuss how the panel was allocated," Toltzis explained.  "And he told me that [Phillip Tempel] and he would get together and it would be handed down how that would be done."  (Toltzis at 16).  Abbottsmith would then "inform everyone how much" panel time they would get.  (Toltzis at 17).  Similarly, Dr. Henthorn explained that he became aware that "the general allocation was theoretically based on volume" back "when Phil Tempel was at the hospital."  (Deposition of Dr. Richard Henthorn ("Henthorn") at 47).  And the schedule itself? -- "[i]t always seemed to come down from Chuck Abbottsmith."  (Henthorn at 22).

By the early 1990s, Tempel was aware of the prohibitions of the AKS.  (Tempel at 57).  He knew that the cardiologists working at TCH were in a position to refer patients to TCH.  (Tempel at 58).  He knew that TCH was not permitted to offer or pay anything of value to physicians or others who were in a position to refer patients to the hospital.  (Tempel at 58).  And panel time was undoubtedly valuable to -- indeed "coveted by"-- the physicians who worked in the Heart Station.  (Croushore Exh. 2). Still, the kickback scheme remained in place.

### C.    TCH Admits It Was "At Risk Legally" For the Kickback Scheme But Compliance Was "Undesirable"

By 1996, Fry's cardiology practice group was expanding.  On July 8, 1996, Dr. Fry sent a letter to TCH's Senior Executive Officer,[9] Claus von Zychlin, requesting that

---

[9]    After TCH became part of THA, the Senior Executive Officer ("SEO") of TCH was the highest-ranking position at the hospital.  The SEO also served as Senior Vice President for THA.  (Seim at 10).

"all of the physicians in [his] group (Drs. Coith, Daoud, Fry, Loughery, Puleo, and Stewart) receive roster reading privileges at the Christ Hospital in the Heart Station." (Fry Exh. 51 at 1). At the time, Fry did not know that panel time was given out only in return for hospital volume. (Fry at 106).

After receiving Fry's letter, von Zychlin asked Susan Wietholter, the hospital's Chief Nursing Officer,[10] for advice. Wietholter consulted with Abbottsmith and Jerry Keller (Tempel's successor as TCH's CFO), and then drafted a memorandum for von Zychlin outlining the situation. (Croushore Exh. 2; Tempel at 37). In this memorandum, Wietholter acknowledges that Heart Station panel time was "coveted," and was "allocated to physicians . . . based on their percentage of contribution to revenue." (Croushore Exh. 2). "Dr. Abbottsmith prepares the yearly schedule based on direction regarding the time allocations from Jerry [Keller]." (Id.). "Some physicians never make the cut." (Id.). Wietholter goes on to write:

> This practice has been challenged over the years and potentially ***could put us at risk legally***. The only way to avoid the legal risk would be to open it to every cardiologist on staff which has been an undesirable alternative.

(Id., (emphasis added)).[11]

After receiving this memorandum from Wietholter, von Zychlin knew that panel time was allotted to reward referrals, and that the hospital was "at risk legally" for doing this. Yet he did not change the system -- that would have been "undesireable." Instead, von Zychlin sent Fry a letter denying his request that his partners receive panel time. (Croushore Exh. 3). As evidence of his understanding that the assignment process was

---

[10]    (Croushore at 27).

[11]    Faced with this evidence of her own illegal conduct, Wietholter denied any recollection of this document. (Deposition of Susan Wietholter ("Wietholter") at 15).

illegal, he explained cryptically that "[a]ssignment to the reading schedule is based upon each individual's previous year's ***activity***." (Id., (emphasis added)). Fry did not understand what this meant, and thought the phrase "previous year's activity" was "intentionally vague." (Fry at 89).

        **D.**      **Questions Regarding the Legality of the Scheduling Process Resurface**

By 1999, Ohio Heart was receiving the bulk of panel time in the Heart Station, while smaller groups and solo practitioners saw their allotments shrink or disappear. (Fry at 105). In August 1999, Fry was talking to the hospital's Chief of Internal Medicine, Dr. Michael Jennings, about the fact that Ohio Heart seemed to receive favored treatment at TCH. (Fry at 131; Croushore at 223). Dr. Jennings mentioned "that he had attended a meeting in which lawyers had advised the administrators at The Christ Hospital that the system of allocation of work in the heart station was illegal." (Fry at 131). This troubled Fry. (Fry at 149-50).

In October or November, Fry and some of the non-Ohio Heart physicians confronted Wietholter and Richard Seim (von Zychlin's successor as the hospital's Senior Executive Officer)[12] about the way the hospital allotted panel time. (Fry at 102-05). "[We] asked Mr. Seim and Mr. [sic] Wietholter what the formula was to determine obtaining roster time in the heart station because we considered it valuable and we were losing it to Ohio Heart and wanted to know why and what we could do about it," Fry explained. (Fry at 105). Fry also mentioned that he heard the allocation of panel time "might be illegal." (Fry at 133). After the meeting, Seim cornered Fry in the hallway

---

[12]      Seim served as both SEO for TCH and Senior Vice President of the Health Alliance. (Seim at 10).

11

and insisted that Fry disclose the identity of the person who had told him panel time was illegal.  (Fry at 132).

Both Wietholter and Seim knew that the hospital's allocation of panel time was illegal.  Wietholter had drafted the 1996 memorandum acknowledging the illegality of their methodology.  (Croushore Exh. 2).  And Seim's handwritten notes from the time state plainly that panel time was "predicated on revenue generation," and that this was "illegal."[13]  (Croushore Exh. 5, at TCH000006082).  Nevertheless, Seim and Wietholter lied to Fry, denying that they had "any knowledge about the formula."  (Fry at 109).  They must have hoped that this would quiet Fry.  It did not.

### E.   Rebuffed by the Administration, Fry Asks the Physicians to Press for Change

Cardiologists who practice at TCH held business meetings every month with hospital officials.  Dr. Fry decided that the meeting on December 14, 1999 would be a good place to raise issues concerning panel time.  As minutes reflect, the question was raised "whether the Administration's current plan for the Heart Station Panel was legal, correct and fair."  (Croushore Exh. 8).  Susan Wietholter then "presented the Hospitals [sic] methodology and criteria used to award panel time."  (Croushore Exh. 8).  "At this point of the meeting," Fry asked "all non-physicians to leave the room (except a designated secretary) to further this discussion."  (Croushore Exh. 8).  Then Fry implored his fellow physicians to demand change.  (Croushore Exh. 10.)

---

[13]     In his deposition, Seim continued to claim that he did not then know how his own hospital assigned panel time.  (Seim at 189).  He tried to find out, he claims, but he "never got an answer that was conclusive."  (Seim at 20).  Indeed, he claimed that "everyone involved" had no idea how panel time was assigned.  (Seim at 189).  (It just happened, he would have us believe, by magic.)  But when he was shown his own handwritten notes stating that panel time was "predicated on revenue generation" and "illegal," he admitted, "these were my words."  (Seim at 190).

Dr. Herzog asked, "what is the motivation for changing the system?" (Croushore Exh. 10). Fry reiterated that after "talking with Dr. Jennings," it was clear that "the current proposal is against the law." (Croushore Exh. 10). He explained, "Jennings said the lawyers told him the current system is illegal." (Croushore Exh. 10). He added, "If someone challenges this it will not stand up in court." (Croushore Exh. 10). "We need to set up an ad hoc committee," he argued. (Croushore Exh. 10). "We need legal answers." (Croushore Exh. 10).

### F.    Fry Documents the Illegal System in Writing

On December 29, 1999, Dr. Fry wrote a letter to Seim expressing his concerns about the allocation of panel time at TCH. (Wall Exh. 108). Copying Abbottsmith, Jennings, and the members of the section of cardiology, Fry explained that the "current system is perceived by many to be unfair and probably illegal," and noted that he and other cardiologists were forming "an ad hoc committee to propose an alternative system." (Wall Exh. 108). "One matter is clear," Fry wrote. "If the current system is in fact illegal and we know that it is illegal, then it must be changed quickly." (Wall Exh. 108). Fry invited Seim and other hospital administrators to participate in the ad hoc committee, and asked that "a hospital attorney attend the meeting to address the legal aspects of that matter and any other important legal issues related to the assignment of [panel] time." (Wall Exh. 108). Upon receipt of this letter, Seim summoned Fry to his office and told him that the letter was "irresponsible and outrageous." (Seim at 18). "Dr. Fry was a whiner," Seim complained. (Seim 147).

Nevertheless, Fry's letter got Seim's attention. Seim attended the first meeting of the ad hoc committee on January 11, 2000. (Fry Exh. 71). At this meeting, Fry asked if the current system was illegal. (Fry Exh. 71). "Harry was incessant with the use of the

13

word legal," Seim later complained. (Seim at 37). Seim claimed that he did not know if the current system was "illegal or not," and pledged that he was "committed to exploring the legality." (Fry Exh. 71). Fry expressed his disappointment that Seim had not brought the hospital lawyers to the meeting, and Seim responded that he had already "asked for legal discussion." (Fry Exh. 71). This was a lie -- Seim admitted in his deposition that he refused Fry's call for lawyers to formally review the legality of panel assignment.[14] (Seim at 24). Seim also promised to survey how other hospitals assigned panel time, and committed to a reevaluation of the process. (Fry Exh. 71). He promised to have answers for the committee by the end of March. (Fry Exh. 71).

Seim may not have consulted the lawyers as he promised to do, but he did survey how other hospitals assigned panel time. (Seim at 40). In his deposition, he claimed he could not recall the result of this study. (Seim at 40). Documents produced by TCH in discovery, however, show that none of the surveyed hospitals based assignment on volume. (Croushore Exh. 9).[15]

---

[14]     Ken Hanover, THA's Chief Executive Officer, notes that the TCH SEO "would have had significant flexibility…to consult counsel…." (Hanover at 43). He also explained that TCH could have requested assistance from THA's compliance office. (Id. at 42). TCH did not. (Id. at 41; 48; 50; 51-52; 55; 56; 57). Hanover said he and THA's compliance office were "very sensitive" to compliance issues relating to the AKS. (Id. at 49). Indeed, TCH had an AKS compliance policy in place beginning in January 1, 1993. (Croushore Exh. 6 at TCH000122953). The policy was originated by Jerry Keller, TCH's CFO, who oversaw the allocation of panel time. (Id.) Various revisions of the AKS compliance policy were signed by Richard Seim (Croushore Exh. 6 at TCH000122952) and Susan Croushore (Croushore Exh. 6 at TCH000122954), TCH's senior executive officers. The policy states that any activity that could be questioned needs to be evaluated by senior management and/or legal counsel. (Id.). During discovery, Hanover conceded that "a program in which panel time was allocated based upon the revenue generated by a physician would be a problem[]" under the AKS. (Id. at 55).

[15]     At St. Elizabeth, panel time is divided equally amongst the cardiologists who want it. (Deposition of Dr. D.P. Suresh ("Suresh") at 31). At Jewish, panel time was "pretty evenly distributed based on the number of physicians in each group's presence at the hospital." (Deposition of George Wietmarschen pursuant to Rule 30(b)(6) ("Wietmarschen") at 7-8). At the University, the Heart Station coverage was provided by fellows as part of their rotation. (Suresh at 10). Hanover testified that none of the other hospitals in the THA used revenue or referrals to allocate panel time; indeed, he was not aware of any hospital that did. (Hanover at 52; see also Wietmarschen at 82-83 ("Q. Are you aware of any other

## G.     TCH Promises Change

Fry had documented TCH's kickback scheme in writing, and as a result, non-Ohio Heart doctors were demanding that the assignment of panel time not be linked to volume. (Seim at 98).  "There was tension," Jenike explained, between Ohio Heart and the other doctors who worried that Ohio Heart was "running the show."  (Deposition of Dr. Thomas Jenike ("Jenike") at 38).  "Some of the guys who . . . had the smaller practices wanted to make sure that they got . . . a fair shake on panel time."  (Jenike at 30).  But it wasn't just a question of fairness; "the concern," Henthorn said, "was both fairness and legality."  (Henthorn at 60).  Seim had no choice but to offer to change the system.

Privately, Seim considered his options, drawing up a chart of four ways panel time could be assigned.  TCH could either (1) continue the present allocation method; (2) develop panel specifications and outsource assignment via a request for proposals (RFP); (3) assign time to physicians and groups based upon the percentage they comprised of active staff; or, (4) do a random drawing of active staff to allocate time:

---

hospital that allocated panel time at a heart station based upon revenue generation and percentages of revenue generation by physicians at the hospital?  Wietmarschen:  Not as directly related here, no.")).

# Heart Station Reading Panel Allocation Alternatives

| Considerations | Alternative # 1<br>Continue present allocation method. | Alternative # 2<br>Develop panel specifications and outsource via RFP. | Alternative # 3<br>Assign to physicians/groups based on % of total active staff. | Alternative # 4<br>Random drawing of active staff to determine % of allocation. |
|---|---|---|---|---|
| Assures panel coverage. | √ | √ | √ | √ |
| Not linked to physician hospital volume. | | √ | √ | √ |
| Rationalizes panel assignment (defendable). | | √ | √ | √ |
| Promotes active medical staff status. | | | √ | √ |
| Allocation derived from physician-assignment. | | √ | | |
| Perception of fairness. | | √* | √ | |
| Promotes physician collaboration. | | √ | | |

*subject to discussion        4/11/00

(Croushore Exh. 4, at TCH000006058).

Seim's separate handwritten notes reflect his analysis of these four options. (Exh. 5 at TCH000006082). Seim noted that Alternative 1, the current method that was "predicated on revenue generation," was "illegal." For Alternative 3, allocating time based on percentage of active staff, Seim noted that approach "reduces Ohio Heart." Similarly, Seim noted that Alternative 4, a random drawing, was "unacceptable to Ohio Heart." After that, Seim wrote "going back to current approach[,] Ohio Heart has 36 of 52 weeks."

16

Not surprisingly, Seim decided never to present Alternatives 3 and 4 to the section of cardiology, as they would have been unacceptable to Ohio Heart. (Seim at 69, 80-81). "Ohio Heart was important, [and] continues to be important to Christ Hospital," Seim explained. (Seim at 80-81). As Hanover noted, "If it wasn't attractive to Ohio Heart it didn't make sense approaching other cardiologists." (Hanover at 91).

At the April 11, 2000, Section of Cardiology Meeting, Seim announced that the hospital would "continue the assignment for the current calendar year," but he offered to change it for 2001.[16] (Fry Exh. 61, at TCH000006676). He presented only the first two alternatives to the doctors:

---

[16]     Or, as Fry put it: "And in spite of the fact that we had expressed concerns about continuing a possibly illegal system, Mr. Seim decided to continue it to the end of the year." (Fry at 143).

# Heart Station Reading Panel Allocation Recommendation

| Considerations | Alternative # 1<br>Continue present allocation method. | Alternative # 2<br>Develop panel specifications and outsource via RFP. |
|---|---|---|
| Assures panel coverage. | √ | √ |
| Not linked to physician hospital volume. | | √ |
| Rationalizes panel assignment (defendable). | | √ |
| Promotes active medical staff status. | | |
| Allocation derived from physician-assignment. | | √ |
| Perception of fairness. | | √* |
| Promotes physician collaboration. | | √ |

*subject to discussion          4/11/00

(Fry Exh. 61, at TCH000006683).

Seim's chart above pledged that an outsourced RFP would result in panel assignment that was "not linked to physician hospital volume" and that this option was therefore "defendable."  (Id.).  By contrast, he noted, the current allocation was linked to physician hospital volume, and that this was not defendable.  (Id.).  Abbottsmith observed that "there is no solution except" for the RFP.  (Fry Exh. 61, at TCH000006677).  Still,

18

Abbottsmith remarked, "it was a difficult issue," and "[p]hysicians would have to face each other and fight for the dollars" at stake in the Heart Station.  (Id.).

For the non-Ohio Heart cardiologists, it looked like change was actually going to happen.  But Seim's personal notes demonstrate his feelings about the prospect of change.  Under "cons" associated with the RFP alternative, he wrote "potential change from present allocation."  (Croushore Exh. 5, at TCH000006071).  Clearly, TCH liked the system the way it was, and did not want it to change.  And with Ohio Heart's help, it never did.

**H.      Broderick And Abbottsmith Collaborate With TCH to Continue The Kickback Scheme**

The RFP was a collaboration between Ohio Heart, TCH, and THA.  According to Broderick, Abbottsmith and Seim "mutually tried to work out the details of what it is that the hospital would like to see in terms of provision of services" for the Heart Station.  (Broderick Exh. 226, at 32).  Seim also turned to Mark McDonald, THA's Vice President of the Cardiovascular Service Line, to help develop an RFP for the Heart Station services.  (Deposition of Mark McDonald, September 23, 2009, ("McDonald II") at 19-20, 28).  A few months later, McDonald left THA and became the Chief Operating Officer and Vice President of Ohio Heart.  (McDonald II at 8).

TCH issued an RFP for Heart Station Panel Coverage on August 1, 2000.  (Fry Exh. 65).  The only official response to the RFP received by TCH was from MDA, managed and controlled by Broderick, on September 30, 2000.[17]  (Wall Exh. 114).  TCH

---

[17]      Although non-Ohio Heart physicians were nominally included on the board of MDA and in positions as officers, these positions were a sham, and the true power rested with Ohio Heart.  For example, although MDA's records reflect that Dr. Walter Herzog was listed as a member of MDA's board of directors from 2003-2004 and as vice president in 2003-2004 (Broderick Exh. 231 at MDA_PROD_011454-011457), Herzog was adamant that he played no role in governing MDA.  (Broderick Exh. 245 ("Nomination to that board of directors has never been sought by me and I have never

notified Broderick that it accepted the response in principle on November 15, 2000, and then sent formal confirmation of the agreement on December 18, 2000.  (Wall Exh. 115; Croushore Exh. 13).

MDA's response to the RFP promised to assign panel time based upon a variety of factors, including noble ones like "past and ongoing service to the hospital" and "participation in section governance activities and medical education."  (Wall Exh. 114). But these factors were only for show.  The record is filled with admissions that the only two factors used by MDA to allocate Heart Station panel time were Cath Lab revenues and the referral volume of coronary arterial bypass graph (CABG) procedures.[18]  Indeed, the very day after the RFP was formally issued, Broderick asked for the hospital's data concerning physician referrals and revenues.  (Wietholter at 45-46; Seim at 165). Broderick then used this data to allocate panel time in the response to the RFP, and Seim understood this when he accepted the proposal.  (Seim at 113-14).  Everyone knew this was wrong.  Abbottsmith himself noted that it was "dangerous to ask for" this data in an effort to allocate panel time.  (Croushore Exh. 10, at CH01300).  And Seim later admitted

---

run for that office or been elected to that position.")).  Dr. Richard Henthorn was named medical director of MDA, although he cannot recall having that title or having done any substantive work on behalf of MDA. (Henthorn at 14-15).  Henthorn was also named vice president of MDA in 2000, but cannot recall having that title or making any decisions.  (Henthorn at 19-20).  Dr. Mark Workman, was listed as a member of MDA's board of directors from 1996-1998 under the name "Vincent Workman."  (Broderick Exh. 231 at MDA_PROD_011438, 011440, 011442, 011444).  The fact that it took three years for MDA to get Dr. Workman's name right on its official corporate documents suggests that he was not a particularly integral part of the governance of MDA.  As Dr. Toltzis explained, "[t]he only people who were responsible for this were Abbottsmith and Broderick and the Ohio Heart Health Center people in conjunction with The Christ Hospital.  [T]he rank and file members of MDA had absolutely no say in any of these dealings."  (Toltzis at 178).

[18]    (See, e.g., Wall Exh. 129 at MDA_PROD_034430 (methodology would be "the same as in the years past with CABG referrals and gross revenue to the hospital being the two criteria."); Broderick Exh. 233 at MDA_PROD_034460 ("[t]he premise will be the same as the previous years in that the main distribution of electrocardiogram and panel will occur according to the financial information with coronary artery bypass graft surgery referral providing a cross check.")).

that it was "not appropriate" for TCH to have released this information.  (Seim at 165).

"The revenue information in my experience at Christ Hospital was always tightly held

information," he claimed.  (Seim at 165).

> ### I.     The Assignment of Panel Time Under MDA

With MDA nominally responsible for the allocation of panel time, the kickback

scheme continued through 2004.  It has been conceded that MDA assigned panel time

based on the volume of referrals[19] and that the hospital knew it.[20]  But the facts show

more than mere knowledge by the hospital -- they show that TCH continued to control

the process even after it was supposed to have been delegated to MDA.  The process

went like this:  TCH/THA identified the most "highly reimbursed" billing codes related

to cardiology.[21]  TCH gathered referral data for some of the most valuable procedures,

referrals to CABG, on a daily basis.[22]  THA provided TCH with other requested revenue

data,[23] and then TCH administrators fed the referral and revenue data to both the head of

TCH[24] and Broderick every year between 2000 through 2003.[25]  Broderick calculated the

---

[19]    "MDA assigned panel time based on volumes . . . ."  (Croushore at 139).

[20]    "The heart station team -- management team -- heart station management team certainly knew that MDA was getting information from the hospital and that assignment was based on volume . . . for panel."  (Croushore at 139).  "The hospital was aware that we were using volume activity, yes, to assign panel time."  (Croushore at 119).

[21]    "Q.      [T]hese particular DRGS would not have been selected by MDA but would have been selected by The Christ Hospital, correct? . . . Broderick:  We -- we did not specifically -- the group did not specifically request particular DRGs, that is correct."  (Broderick at 129; see also Croushore at 134 (noting that the DRG's they picked were "highly reimbursed.").

[22]    TCH undertook considerable effort to monitor the data and apportion the kickbacks.  Susan Croushore explained that a TCH employee "was on . . . a daily basis looking at the operating logs and logging that [referral] information."  (Croushore at 161).  Once TCH ended the kickback scheme, this employee was told that "it was no longer necessary for her to perform the task."  (Croushore at 161; Croushore Exh. 23).

[23]    (Wietholter at 46-52; Croushore Exh. 17; Wietholter Exh. 252).

[24]    (Seim at 106-107).

percentages,[26] and then fed the numbers back to TCH.  TCH actually drew up the

schedules for panel time[27] and distributed them.[28]  Thus, TCH continued to reward

referrals with panel time, just as it always had.  The only thing that changed was the hand

on the calculator.  "I didn't do anything beyond helping do the simple arithmetic,"

Broderick explained, and that much was true.  (Broderick at 238).

      The relationship between the referrals and the kickbacks was direct and precise.

For example, in the following excerpt, Broderick tallies[29] the percentage of CABG

referrals that were attributable to Ohio Heart between July 1, 1999 and June 30, 2000:

---

[25]    "There were requests for information from -- MDA requested information from the Christ Hospital for 2000, 2001, '01, up to '03."  (Croushore at 140).  Each set of data was used to allocate panel time for the following year, so all of time allotted in the Heart Station panel in 2004 was a kickback reward for the revenues and referrals in 2003.

[26]    "I sat down and did the calculations . . . ."  (Broderick at 70).

[27]    (Wall Exh. 123 (November 14, 2001 Memorandum from Broderick to Tina Wall requesting that she "come up with a schedule as you have in the past and distribute it to the appropriate parties" using Broderick's allocation of "weeks assigned to each group")).

[28]    (Wall Exh. 125 (October 24, 2002, memo from Wall to all reading cardiologists regarding the distribution of the 2003 ECG Reading Schedule)).

[29]    (Broderick at 71-72 ("That would appear to be my handwriting, yes.")).

**Referrals to CABG**

**July 1, 1999 – June 30, 2000**

| OHIO HEART | | GREATER CINCINNATI CARDIOVASCULAR CONSULTANTS | |
|---|---|---|---|
| Abbottsmith, Charles | 53 | Babbitt, David | 15 |
| Baker, William | 7 | Gustin, Byron | 4 |
| Behrens, Scott | 7 | Held, John | 21 |
| Broderick, Thomas | 51 | Jenike, Thomas | 9 |
| Brown, Gary | 43 | Kirkham, Mark | 42 |
| Capels, Pete | 11 | Suna, Lester | 18 |
| Clarke, Gregory | 13 | Wayne, Donald | 4 |
| Crall, Frederick | 1 | Waissbluth, Alvaro | 1 |
| Drake, David | 12 | | 114  13.2% |
| Engel, Peter | 6 | | |
| Glassman, Allen | 20 | | |
| Gupta, Sandeep | 25 | | |
| Hattemer, Charles | 5 | **COMPREHENSIVE CARDIOLOGY CONSULTANTS** | |
| Kereiakes, Dean | 85 | Bhandari, Deepak | 3 |
| Movsowitz, Herman | 4 | Erena, Roberta | |
| Murtaugh, Thomas | 3 | Hackworth, Joe | 4 |
| Roth, Eli | 32 | Hirsch, Paul | 1 |
| Runyon, John | | Jenkins, Fred | 3 |
| Saha, Madhumita | 17 | Long, Herbert | 1 |
| Schloss, Edward | 1 | Mehlman, Ned | |
| Schneider, John | 37 | Simon, Arthur | 3 |
| Shea, Patrick | 3 | Steinberg, Stuart | 4 |
| Shimshak, Thomas | 16 | | 17  2.2% |
| Smith, Michael | 25 | | |
| Stewart, Terri | 14 | | |
| Thoresen, Christopher | | **CARDIOLOGY CENTER OF CINCINNATI** | |
| Toltzis, Tobert | 12 | Colth, Robert | 3 |
| Waller, Theodore | 2 | Daoud, Fuheid | 3 |
| Whang, David | 48 | Lewis, Stephen | 4 |
| | 521  60.5% | Loughery, Edward | 4 |
| **CARDIAC ELECTROPHYSIOLOGY ASSOC.** | | Gerlinger, Brooks | 4 |
| | | | 18  2.1% |
| Burroughs, Jefferson | 1 | | |
| Fisher, Westby | | | |
| Henthorn, Richard | 6 | | |
| | 7  0.30% | | |

((McDonald Exh. 31, at MDA_PROD_034377; see also Broderick Exh. 235 at MDA_PROD_012379; Wall Exh. 128).   Because Ohio Heart had 60.5% of the CABG referrals in 2000, it was awarded 60.5% of the ECG panel time for 2001, which came out to 31 weeks:

23

**Section 4: ECG Panel Definition and Guidelines**

The ECG panel allocation is as follows:

| | |
|---|---|
| **Ohio Heart Healthcare Corporation (OHHC)** | 31 weeks |
| **Cardiac Care Associates** | 4 weeks |
| **Greater Cincinnati Cardiovascular Consultants** (TCH pod: Dr.'s Desai, Penmetsa, Haq) | 4 weeks |
| **Greater Cincinnati Cardiovascular Consultants** (Deaconess pod (3), Dr. Roth (2)) | 5 weeks |
| **Dr. H. Fry, Inc.** | 4 weeks |
| **Cardiac Electrophysiology Associates** | 3 weeks |
| **Dr. M. Workman** | 1 week |

(Croushore Exh. 13 at TCH000001619).

Similar calculations were made with respect to Cath Lab revenue. Broderick's

handwritten calculations for 2001 Cath Lab data show that Ohio Heart generated 75% of

the revenue:



(Broderick Exh. 235 at MDA_PROD_012384). Ohio Heart received a corresponding

75% of the EKG panel for the following year:

24

MEDICAL DIAGNOSTIC ASSOCIATES
EKG READING DISTRIBUTION

| | | |
|---|---|---|
| OHHC | 38 WEEKS | 75% |
| CHG | 3 WEEKS | 5% |
| HERZOG | 2 WEEKS | 3% |
| ROTH | 1 WEEK | 2% |
| DESAI/PEN/HAQ | 2 WEEKS | 4% |
| GCCC/DEAC | 3 WEEKS | 6% |
| CEPA | 1 WEEK | 2% |
| COMP CARD | 1 WEEKS | 1.5% |
| CARD ASSOC | 1 WEEK | 2% |

(Id. at MDA_PROD_012377).

The insertion of MDA into the process was nothing more than an ill-conceived

attempt to disguise the illegal kickback arrangement. As Toltzis explained:

> [Broderick said t]hat basically things will be done as they have been done
> in the past, that allocation of panel time was based on the parameters that
> had been established, which were how many patients were sent for bypass
> surgery, how many invasive procedures were performed. That there was a
> threshold below which electrocardiographic panel time would not be
> administered. If you didn't do 2 percent of the business at The Christ
> Hospital you were excluded from reading EKGs. And pretty much it
> would also -- **it was like it always was. Nothing really changed.**

(Toltzis at 79-80 (emphasis added)).[30] "MDA was the vehicle," Toltzis explained, but

"Ohio Heart and The Christ Hospital I believe were the people who were making the

decisions." (Toltzis at 204).[31] These "decisions were stated at the meetings, this is the

---

[30]  (See, e.g., Wall Exh. 129 at MDA_PROD_034430 (methodology would be "the same as in the
years past"); Broderick Exh. 233 at MDA_PROD_034460 ("[t]he premise will be the same as the previous
years")).

[31]  Ohio Heart tried to make it look as though other people were involved in MDA's governance by
doctoring the documents. In these papers, Henthorn was named Medical Director of MDA without him
ever knowing. (Henthorn at 14-15). He never recalled being an officer of the corporation, although the

way it will be." (Toltzis at 204).  "[W]ho got what and how much people got, was predetermined before the meetings ever took place." (Toltzis at 204).

      **J.**      **Questions Regarding the Legality of the Scheduling Process Resurface - Again**

      In the fall of 2003, Ohio Heart was threatening to build its own hospital that would compete with TCH.  (Abbottsmith at 7-8).  In retaliation, TCH decided to replace Abbottsmith as Chief of TCH's Section of Cardiology with a non-Ohio Heart cardiologist.  (Abbottsmith at 7-8).  The hospital chose Dr. Charles Hattemer, who was a member of a competing group, Greater Cincinnati Cardiology Consultants (GCCC), which was comprised of eighteen cardiologists.  (Abbottsmith at 7-8; Deposition of Dr. Charles Hattemer ("Hattemer") at 50).

      Immediately after his appointment, Hattemer began hearing complaints about the way panel time was allotted.  (Hattemer at 7).  "I was aware" from the start that "there probably should be a change based on what little I knew at the time."  (Hattemer at 7-8).  As he investigated further, the more he found out, the worse it seemed.  "[T]he panel was distributed by volume," he concluded, and even worse, "everybody was aware" of this -- "the hospital was aware, everyone was aware."  (Hattemer at 35).  He was worried that the whole scheme was "an illegal op[eration]."  (Hattemer at 35).  "I don't think it's good for the hospital to induce physicians to refer patients."  (Hattemer at 51).  "My understanding of it at the time was that the hospital was not permitted to do anything to

---

documents were made to show that he was.  (Henthorn at 19-20).  Similarly, Dr. Herzog was listed as a member of MDA's Board of Directors, to which he responded angrily to Dr. Broderick: "Nomination to that board of directors has never been sought by me and I have never run for that office or been elected to that position. . . .  The manufactured appearance that I have guided that corporate structure is completely false.  I have never voted on polices of the corporation, participated with legal representatives of the corporation, or been involved in the negotiations between that entity and the hospital."  (Broderick Exh. 245).

induce referrals from the physicians to the hospital," Hattemer explained. (Hattemer at 26). He fretted about "this whole issue of . . . were we legal." (Hattemer at 28).

When Hattemer discussed his concerns with his partners, they were similarly alarmed. "[A]s a group we were concerned about being involved in something that . . . may not be legal." (Hattemer at 42). As GCCC's president (Jenike at 17), Dr. Jenike shared Hattemer's concerns: "[I]t came to our attention that The Christ Hospital was supplying revenue data to MDA to make the decision to allocate panel time," explained Jenike. (Jenike at 64). Until that point, "it was my impression, and I think a lot of -- a lot of the guys' in our group, that the decision was being made by the independent MDA without consultation with the hospital." (Jenike at 66). When he found out that "the data . . . was being produced by the hospital," he was concerned; "that was clearly a red flag for us." (Jenike at 66). Once it became aware of these "red flags," GCCC began to fight against defendants' illegal system.

On July 7, 2004, GCCC's compliance committee determined that panel assignment raised AKS concerns. (Jenike at 67, Exh. 283). The following day, Jenike sent a letter on behalf of his group to TCH's senior executive officer, Susan Croushore, expressing the group's alarm about the way panel time was being allocated. (Jenike at 69, Morneault Exh. 146). Once again, cardiologists were complaining about the way the hospital was assigning panel time.

### K.    TCH Ends the Kickback Scheme

Hattemer was pressing TCH to change the way panel time was assigned from an illegal approach to a more "traditional approach." (Deposition of Deborah Hayes ("Hayes") at 199, 251-52; Morneault Exh. 142). But it took pressure from the government to finally force the change. In April 2004, the United States served a

subpoena for documents on TCH as part of its investigation of the allegations in this case. (Croushore at 158).  This subpoena was the last straw -- TCH knew it had to end the kickback scheme.[32]

 The hospital agreed to change panel allocation for 2005 so that panel time was based upon active staff membership and not referrals.[33]  (Hattemer at 31).  "We decided," Hattemer explained," to give every cardiologist on staff an opportunity to express interest in doing panel." (Hattemer at 31).  And using this method, TCH was "able to accommodate everyone . . . that was interested."  (Hattemer at 31).

 Broderick and Abbottsmith resigned from MDA.  (Broderick at 218; Abbottsmith at 12).  Toltzis replaced them as President and Business Manager and then proceeded to dissolve the corporation.  (Toltzis at 180-88).  He called the non-Ohio Heart members of MDA to make sure they approved.  (Toltzis at 187-88).  "[P]eople were grateful that it was being dissolved," Toltzis explained.  (Toltzis at 188).

## III. <u>LAW AND ARGUMENT</u>

### A. <u>Standard</u>

 Summary judgment "is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  <u>High Concrete Technology, LLC v. Korolath of New</u>

---

[32] "Q.  Do you know why the hospital decided not to renew the contract and provide panel distribution internally?  Abbottsmith: Yes.  Q.  Why was that?  Abbottsmith:  A complaint was filed by the OIG. . . .  Q.  Was that a subpoena or was it a complaint?  Abbottsmith:  I don't know."  (Abbottsmith at 73).

[33] Even though a subpoena had been served in this case in April 2004, and even though Jenike's letter had arrived in July 2004, THA/TCH decided to continue the illegal allocation of panel time through the end of the year.  (Croushore at 162).  "We had a contract with MDA and the contract would end December 31st of '04," Croushore explained.  (Croushore at 162).  Apparently, THA/TCH were more concerned about violating the MDA contract than violating the law.

England, Inc., --- F.Supp.2d ----, 2009 WL 2708107, at *1 (S.D. Ohio August 25, 2009)
(Spiegel, J.) (citing Fed. R. Civ. P. 56). "At the summary judgment stage, facts must be
viewed in the light most favorable to the nonmoving party only if there is a 'genuine'
dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ.
P. 56(c)). "When opposing parties tell two different stories, one of which is blatantly
contradicted by the record, so that no reasonable jury could believe it, a court should not
adopt that version of the facts for purposes of ruling on a motion for summary judgment."
Id. "Only disputes over facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary judgment." Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

      "Accordingly, the non-movant must present 'significant probative evidence'
demonstrating that 'there is [more than] some metaphysical doubt as to the material facts'
to survive summary judgment and proceed to trial on the merits." High Concrete
Technology, 2009 WL 2708107, at *2 (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d
335, 339-340 (6th Cir. 1993)). "If the nonmoving party cannot provide enough evidence
that a reasonable jury could find for it, the motion for summary judgment should be
granted." Geiger v. Tower Automotive, 579 F.3d 614, 620 (6th Cir. 2009) (citing
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). Judicial resources should
not be squandered on a trial where it would be a "waste of time."[34]

---

[34]    Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Companies, 682 F.2d 660, 663 (7th
Cir. 1982) ("If, after the completion of pretrial discovery, it is clear that the plaintiff will not be able to
establish at trial an essential element of his claim, the defendant is entitled to have the complaint dismissed
on summary judgment; a trial would be a waste of time."); see also Securities and Exchange Commission v.
National Student Marketing Corp., 402 F.Supp. 641, 650 (D.D.C. 1975) ("One of the purposes of the
summary judgment procedure is to conserve judicial resources by avoiding unnecessary trials.").

Importantly, a party may not "create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists." <u>Aerel, S.R.L. v. PCC Airfoils, L.L.C.</u>, 448 F.3d 899, 907 (6th Cir. 2006). As a result, defendants may not avoid summary judgment by presenting new deposition testimony or post-deposition affidavits that contradict earlier testimony. <u>Bank of Illinois v. Allied Signal Safety Restraint Systems</u>, 75 F.3d 1162, 1168-1169 (7th Cir. 1996). "Summary judgment would be meaningless if litigants could manufacture genuine issues of material fact through self-serving and unsupported 'admissions' materially different from positions taken in the past." <u>U.S. v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars</u>, 403 F.3d 448, 466 (7th Cir. 2005).

**B.**      **False Certification of Compliance with the Anti-Kickback Statute Leads to Violation of the False Claims Act**

The defendants falsely certified compliance with the AKS, 42 U.S.C. §1320a-7b, giving rise to a violation of the FCA, 31 U.S.C. §§ 3729-33. As a result, the defendants submitted false claims to numerous federal health benefit programs including Medicare and Medicaid. In order to participate in these programs, the defendants were required to adhere to and certify that medical services were performed in compliance with the dictates of the AKS. (Order Denying Motions to Dismiss at 8-9, 26).[35] Because the defendants allocated panel time based on referral volume, they were in violation of the AKS throughout the relevant time period. This non-compliance rendered their claims for cardiac services provided at TCH "false or fraudulent" within the meaning of the FCA. (Order Denying Motions to Dismiss at 26 (holding that claims for payment falsely

---

[35]      The Court's Order is available on Westlaw at <u>United States ex rel. Fry v. The Health Alliance of Greater Cincinnati, Inc., et al.</u>, 2008 WL 5282139 (S.D. Ohio, Dec. 18, 2008).

30

certifying compliance with the AKS are tainted and, therefore, actionable under the FCA).[36]

　　　As with all actions brought under the FCA, the United States need only establish the elements of this case, including the elements of an AKS violation, by a preponderance of the evidence.  See 31 U.S.C. § 3731(c)[37] ("In any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, **by a preponderance of the evidence**.") (emphasis added); see also United States v. Rogan, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006) aff'd 517 F.3d 449 (7th Cir. 2008)) (holding that the statutory language of the FCA governs and that the plaintiff must prove the essential elements of an AKS violation only by a preponderance of the evidence).

## C. 　Defendants Violated the Anti-Kickback Statute

　　　To establish that the defendants violated the AKS, the United States must show that the defendants (1) knowingly and willfully, (2) solicited or received something of value, (3) in exchange for referrals (42 U.S.C. §1320a-7b(b)(1)(A)), or (1) knowingly and willfully, (2) offered or provided something of value, (3) with a purpose to induce referrals.  42 U.S.C. §1320a-7b(b)(2)(A).

---

[36]　　See also U.S. ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) ("Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a federally funded insurance program is actionable under the FCA.") (citing United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 243 (3d Cir. 2004); United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997); United States v. Rogan, 459 F.Supp.2d 692, 717 (N.D. Ill. 2006)).

[37]　　At the time this case was filed, the provision of the FCA addressing the plaintiff's burden of proof was located at 31 U.S.C. § 3731(c).  After the recent amendments to the FCA (see Fraud Enforcement and Recovery Act, PUB. L. NO. 111- 21, 123 Stat. 1617 (2009)), that provision was moved to 31 U.S.C. § 3731(d).  The language remains unchanged.

1.     **Heart Station panel time was valuable and constitutes "remuneration" under the AKS.**

a.     **"Remuneration" means "anything of value."**

The AKS generally prohibits the exchange of remuneration for referrals.  The Court has already determined that "remuneration" under the AKS is broad and means "anything of value."  In addressing the defendants' motions to dismiss, the Court concluded that the statutory language of the AKS and the supporting regulatory guidance "are unambiguous in offering a broad definition of the term 'remuneration' as 'anything of value in any form whatsoever,' which very reasonably includes the benefit of time in the heart station…."  (Order Denying Motions to Dismiss at 15-16).  The Court observed that "time is money" (id. at 15) and that Heart Station panel time offered the opportunity to earn money, which constitutes "remuneration" within the meaning of the AKS (id. at 16 (citing United States v. Bay State Ambulance and Hosp. Rental Serv., Inc., 874 F.2d 20, 30 (1st Cir.1989)).  When the defendants challenged the Court's conclusion in their Motion to Certify an Interlocutory Appeal (doc. 98), the Court reiterated its conclusion: "[T]he Court is unconvinced there is substantial ground for difference of opinion as to its conclusion that time in the TCH heart station could constitute 'remuneration' under the Anti-Kickback Statute."  (Order Denying Motion for Interlocutory Appeal, doc. 117, at 8).[38]

The facts show that the Court was correct.  Despite having argued not once, but twice, that "remuneration," does not mean "anything of value," defendants' own documents indicate that they were aware that "remuneration" means exactly that.  On May 14, 1999, just seven months before Dr. Fry complained that the method of allocation

---

[38]     The Court's Order is available on Westlaw at United States ex rel. Fry v. The Health Alliance of Greater Cincinnati, Inc., et al., 2009 WL 485501 (S.D. Ohio, Feb. 26, 2009).

32

was illegal, THA's director of corporate compliance Christa Nordlund, issued a memo

explaining the AKS to numerous THA and TCH executives. (Tempel Exh. 225).

Included among the recipients were Richard Seim, TCH's senior executive officer, Susan

Wietholter, TCH's chief nursing officer, Phil Tempel, THA's chief financial officer,

Jerry Keller, the TCH executive responsible for calculating panel time allocations based

on referral data, and Jack Cook, THA's Chief Executive Officer. (Id.). Substantively,

the memo warns that:

> Under the [Anti-Kickback] Statute, no person (an individual or entity)
> may offer, pay, solicit, or receive ***anything of value*** (in cash or in kind)
> directly or indirectly for referrals of Medicare/Medicaid business. ***This
> prohibition is very broad*** and covers all situations in which something is
> provided either free of charge or at a reduced cost to any potential referral
> source…. This means that the Health Alliance, the Alliance Hospitals …
> may not offer, give, or pay ***anything of value*** to physicians or others who
> refer (or who are in a position to refer) patients to the Alliance, [or]
> Alliance Hospitals….

(Id. (emphasis added)). The memo instructs the recipients to bring any questionable

arrangements to the attention of the THA compliance department. (Id.). The memo also

instructs recipients to share copies with any other THA employees who deal with

potential referral sources or have a need to know about this information. (Id.). Given the

Court's prior holdings and the defendants' own internal compliance documents, the

defendants cannot seriously contend (for a third time) that Heart Station panel time does

not fall within the meaning of "remuneration" in the AKS.

### b. Heart Station panel time was valuable to the cardiologists who received it.

The fact that Heart Station panel time was valuable to cardiologists, and thus

constitutes remuneration within the meaning of the AKS, is beyond dispute. Panel time

was valuable for two primary reasons: (1) it generated significant income for

cardiologists based on their billings for tests they supervised or interpreted; and (2) it helped cardiologists gain new patients, both directly and indirectly.

The Heart Station was a way for cardiologists to make money.  (Deposition of Dr. Daniel Snavely ("Snavely") at 52).  "It was an income generating source," Toltzis explained.  (Toltzis at 144).  Time in the Heart Station gave one "the opportunity to go out and earn revenue, if you, in fact, showed up and did the work."[39]  (Broderick at 22).  According to a document prepared by a consulting firm for MDA, MDA paid out between $750,000 and $1.5 million per year to cardiologists for tests performed in the Heart Station.  (McDonald Exh. 32).  Ohio Heart's share of Heart Station revenue varied between $500,000 and $1.1 million per year.  (Id.; Broderick at 175).  According to an internal Ohio Heart email, Ohio Heart "continue[d] to participate [in the Heart Station panel] b/c it brings over half a million dollars a year in patient receipts."  (McDonald Exh. 37).

Panel time also gave cardiologists access to new patients.  As Ohio Heart's Dean Kereiakes once noted, new patients are "the life blood" of a cardiology group.  (McDonald Exh. 272, at 1266).  Dr. Toltzis testified that he believed that Heart Station panel time at TCH led to 25 to 50 new patients a year.  (Toltzis at 143).  Both Dr. Desai and Dr. Jenike noted that when a cardiologist reading a Heart Station test noticed an abnormality, it was an opportunity to call the referring physician to discuss the need for follow-up care.  (Deposition of Dr. Abhijit Desai ("Desai") at 10-11; Jenike at 73-74).  "Frequently," those conversations resulted in a referral from the primary care physician

---

[39] Of the two panels, the "echo panel" was "the most highly remunerative."  (Deposition of Mark McDonald pursuant to Rule 30(b)(6) ("McDonald I") at 47).  Doctors with panel time could read a thousand EKGs over a weekend.  (Snavely at 52).  "It was quite lucrative," Toltzis explained.  "If you were quick," in "an hour you could read easily more than 100 electrocardiograms."  (Toltzis at 170-71).

to provide the necessary follow-up care.  (Jenike at 73-74).  Dr. Snavely stated that a

cardiologist reading tests in the Heart Station would benefit by obtaining exposure to new

patients directly and by making themselves known to the primary care physicians who

were in a position to refer new patients to cardiologists.  (Snavely at 77-79).  George

Wietmarschen, the Chief Executive Officer for CCC, one of the larger cardiology groups

in Cincinnati, agreed:

> We know that happens, that the physician -- the cardiologist is observing a
> stress test and a patient has chest pain and it's a positive test, so he's going
> to call the primary care physician and report that. And the primary care
> physician may or may not say, go ahead and do whatever you need to do to
> fix the patient.
>
> . . .  Normally if the primary care physician knows you and wants you to
> care for his patients he'll ask you to do that.

(Wietmarschen at 20-21; 89-90).  So did Dr. Toltzis:

> It would happen every few hundred you would read, I would think.
> Somebody has a very abnormal finding or has something, and as a
> courtesy, you would let the physician know. You would -- I would make it
> a point to call the physician and say, I just read an electrocardiogram on
> your patient, he's got this. I don't know if you know about it but it's
> important for you to know about this.  And often they would say, would
> you see the patient for me?

(Toltzis at 141).  And because cardiac disease is a chronic condition, a new patient

provided an opportunity to perform a host of tests and procedures throughout the

patient's lifetime.[40]  (Unger Report at 30).

---

[40]      Generally, "once a person is diagnosed with heart disease, he or she will have heart disease for the
rest of his or her life."  (Unger Report at 10).  "[U]nlike having a broken bone that is diagnosed by x-ray,
then subsequently surgically repaired, coronary artery disease (CAD) is a chronic disease that is complex in
its cause, requiring a multi-tiered approach to diagnosis and treatment over the lifetime of the patient."
(Unger Report at 22).  Because heart disease is "is typically never cured," each "new patient to a
cardiologist meant a new opportunity to manage the care and treatment of that patient for the rest of their
natural life, thus dictating all testing and treatment options and consequently generating substantial
professional fees."  (Unger Report at 30).

Panel time also offered indirect benefits to cardiologists looking to develop or expand their practice.  According to Dr. Hattemer, TCH's chief of cardiology, panel time offered the opportunity to increase visibility and develop relationships with other physicians and patients.  (Hattemer at 46-47).  Dr. Snavely observed that panel time was particularly important "when you're new in practice" because interpreting the high volume of tests at the Heart Station helped to increase visibility and build relationships with primary care physicians and patients.  (Snavely at 19, 77-79).  Dr. Jenike characterized panel time as "a good marketing tool."  (Jenike at 73).

The fact that Heart Station panel time is valuable cannot be seriously contested. Numerous cardiologists testified that panel time was a financially important part of their practice.

- Dr. Whang explained that the testing performed at the Heart Station is the "bread and butter" of cardiology.  (Whang at 19).

- Dr. Toltzis called panel time the "prized plum" for cardiologists.  (Toltzis at 170).

- Dr. Jenike explained that "panel time is hugely important" from a "financial" perspective, and that panel time was "widely sought after."  (Jenike at 12, 80).

- Dr. Hattemer explained that "some people felt like panel was an important part of their practice financially."  (Hattemer at 66).  He noted that Dr. Herzog, Dr. Toltzis, Dr. Workman each had told him that they wanted panel time.  (Hattemer at 34).

- Dr. Desai testified that both he and Dr. Herzog wanted panel time.  (Desai at 11).

- Dr. Snavely confirmed that panel time was viewed by cardiologists as a "valuable commodity."  (Snavely at 52).

- Dr. Fry stated that "panel time in the heart station was valuable and coveted." (Fry at 111).  "It was lucrative and valuable."  (Fry at 114).

- Ohio Heart's Dr. Broderick explained, "Because it's a source of revenue, everyone would always like to have more panel time."  (Broderick Exh. 226, at 10).

36

- Susan Wietholter acknowledges on behalf of TCH that the Heart Station panel had become "a coveted position." (Croushore Exh. 2).

- Richard Seim, formerly TCH's Senior Executive Officer and THA's Vice President, acknowledged that "for some cardiologists . . . panel time was an important part of their practice . . . ." (Seim at 128).

It is especially noteworthy that, like any other commodity, Heart Station panel time had a cash value that could be bought and sold. For example, when UIMA purchased the practice of a retiring physician, it understood that "time at the Heart Station" was "part of what we were purchasing." (Snavely at 80-81).

As this Court has already acknowledged, "time is money" for physicians. (Order Denying Motions to Dismiss at 15). The evidence has shown that the Court's metaphor was correct. Heart Station panel time provided cardiologists with access to both money and patients. Thus, it is unquestionably valuable.

### 2. Defendants exchanged Heart Station panel time for referrals.

It is undisputed that Heart Station panel time was allocated on the basis of referrals to TCH by cardiologists, including Ohio Heart. TCH's CFO Phil Tempel developed the methodology in consultation with Dr. Abbottsmith. (Tempel at 15, 32). Each year prior to 2001, TCH calculated panel time for physicians based upon the prior year's volume statistics. (Tempel at 20-21). To get panel time, cardiologists had to generate volume for TCH by referring patients there. (Tempel at 22-23). If a cardiologist did not refer patients, he/she did not get panel time. (Toltzis at 200 ("[I]f I didn't refer patients to The Christ Hospital heart station I wouldn't have had panel time. So it's a – it's sort of a quid pro quo.")).

37

TCH's Susan Wietholter, documented how the allocation of panel time worked in her 1996 memo to TCH's senior executive officer, Claus Von Zychlin. Wietholter's description matches Tempel's:

> Internal Audit, utilizing an established formula, analyzes the revenue generated by individual physicians and communicates that information to Jerry Keller. The amount of time allocated to physicians is spread over the 52 weeks in the year **based on their percentage of contribution to revenue**. Therefore some physicians never make the cut. Dr. Abbottsmith prepares the yearly schedule based on direction regarding time allocations from Jerry.

(Croushore Exh. 2) (emphasis added).

Various documents created by Richard Seim, von Zychlin's successor, in 1999 and 2000 confirm the basic premise of TCH's methodology. Seim noted that the assignment of panel time was "linked to physician hospital volume" (Croushore Exh. 4, at TCH000006058; Fry Exh. 61, at TCH000006683), and was "predicated on revenue generation" (Croushore Exh. 5 at TCH000006082). This, of course, was "illegal." (Croushore Exh. 5 at TCH000006082).

When MDA began allocating panel time in 2001, the basic premise remained exactly the same. In fact, Dr. Broderick repeatedly stated in meetings and correspondence that nothing had changed. In a September 25, 2001 letter to MDA members, Broderick informed them that the methodology would be "the same as in the years past with CABG referrals and gross revenue to the hospital being the two criteria." (Wall Exh. 129). The minutes of the October 7, 2003 MDA meeting, at which panel time was being allocated for 2004, reflect that "[t]he premise will be the same as the previous years in that the main distribution of electrocardiogram and panel will occur according to the financial information with coronary artery bypass graft surgery [CABG] referral providing a cross check." (Broderick Exh. 233). As Dr. Toltzis explained: "[Broderick

said t]hat basically things will be done as they have been done in the past, that allocation of panel time was based on the parameters that had been established, which were how many patients were sent for bypass surgery, how many invasive procedures were performed.… **Nothing really changed**." (Toltzis at 79-80 (emphasis added)).

This evidence establishes that throughout the relevant time period, TCH and THA exchanged Heart Station panel time with cardiologists, including Ohio Heart, in return for these cardiologists' referrals of business to TCH. In other words, for over a decade, TCH, THA, and Ohio Heart exchanged something of value – panel time – for patient referrals within the meaning of the AKS. (Toltzis at 200, 208).

### 3. Ohio Heart solicited panel time.

Because, as described above, Ohio Heart "knowingly and willfully solicited" and "received" Heart Station panel time in exchange for referrals, it violated the AKS. See 42 U.S.C. §1320a-7b(b)(1). There is no requirement under this prong of the AKS for Ohio Heart "to induce" remuneration to violate the AKS. Ohio Heart is therefore, without more, guilty of an AKS violation. Because Ohio Heart falsely certified compliance with the AKS as a condition of the government's payment of its claims, summary judgment can be granted against Ohio Heart on this basis alone.

### 4. TCH/THA had a purpose to induce referrals.

In addition, the AKS makes it illegal to "knowingly and willfully offer[] or pay[] any remuneration . . . to induce" the referral of services. See 42 U.S.C. §1320a-7b(b)(2). In this case, there is clear evidence that THA and TCH violated the AKS by offering remuneration in order to induce the referral of services. 42 U.S.C. §1320a-7b(b)(2). "Courts strictly enforce the inducement prohibitions codified in the Anti-Kickback

Statute." U.S. ex rel. Jamison v. McKesson Corp., No. 2:08-CV-214, 2009 WL 3176168,

at *9 (N.D. Miss. Sept. 29, 2009) (citing United States v. Bay State Ambulance and

Hosp. Rental Serv., Inc., 874 F.2d 20, 30 (1st Cir. 1989)). "'Any amount of inducement

is illegal.'" Id. (quoting Bay State, 874 F.2d at 30). As a result, if even "one purpose" of

defendants' methodology was to induce referrals, then the element of inducement is

present. See United States v. McClatchey, 217 F.3d 823, 834-35 (10th Cir. 2000) ("[A]

person who offers or pays remuneration to another person violates the Act so long as one

purpose of the offer or payment is to induce Medicare or Medicaid patient referrals.")

(citing United States v. Davis, 132 F.3d 1092, 1094 (5th Cir. 1998); United States v.

Kats, 871 F.2d 105, 108 (9th Cir. 1989); United States v. Greber, 760 F.2d 68, 71-72 (3d

Cir. 1985) (all adopting the "one purpose" test)). In other words, an illegal arrangement

exists so long as remuneration was intended "in part" to induce referrals. OIG

Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858, 4864

(Jan. 31, 2005).

        THA and TCH's intent to induce can be discerned in every aspect of this kickback

arrangement. TCH's methodology was developed by its chief financial officer (Tempel

at 13), who testified that, for cardiologists who wanted Heart Station panel time, the

system encouraged cardiologists to generate volume for TCH. (Tempel at 22-23).

        When the legality of its scheme was publicly challenged and alternative

approaches proposed, TCH rejected, out of hand, the two alternative approaches that did

not incentivize referrals. (Croushore Exh. 5 at TCH000006082; Croushore Exh. 4, at

TCH000006058 (rejecting allocating panel time based on a lottery or by dividing time

equally among active staff)). Instead, TCH knowingly worked with and through MDA to

40

continue the same methodology, which required cardiologists, who may have little

experience with or interest in the Heart Station, to refer lucrative procedures to TCH in

order for their partners or practice groups to receive panel time.[41]  (See Croushore at 139

("The . . . heart station management team certainly knew that MDA was getting

information from the hospital and that assignment was based on volume . . . for panel.")).

Dr. Broderick explained this arrangement to the University Internal Medicine

Associates (UIMA) cardiologists, who had only recently begun practicing at TCH.[42]

Broderick drafted letters to Drs. Snavely and Suresh of UIMA in October 2001 to inform

them that because UIMA had "only recently begun coming to Christ and [did] a larger

volume of [its] practice elsewhere," that "it is likely that the assignment to [UIMA's]

Friday panel will be significantly reduced."  (Broderick Exhs. 237, 238).  In case the

UIMA cardiologists were wondering how to generate additional panel time, Broderick

told them: "[A]ssignments are done on an annual basis so that any decrement in

assignment can be made up for in the following year **based on utilization**."  (Id.)  In

other words, if UIMA wanted more panel time, it would have to perform more

procedures at TCH.  "I knew that I had to have more volume there to increase my panel

time," Snavely explained.  (Snavely at 62).  Broderick has put it even it more bluntly in

---

[41]     Defendants' methodology emphasized the performance of lucrative interventional procedures in the TCH cath lab.  Most interventional cardiologists spent little time in the Heart Station, leaving that area of practice to their non-invasive cardiologist partners.  (See Whang at 18-19, 27).  The methodology also emphasized the referral of lucrative CABG procedures to TCH, which resulted in panel time credit being given to large groups based on referrals from cardiologists who did not even practice at TCH.  (Croushore at 125; McDonald 50-51; Jenike 24-26).

[42]     In 2001, UIMA, which employed Drs. Snavely and Suresh, purchased Dr. Fry's practice.  (Fry at 181-85).  Included among the assets of the practice was Dr. Fry's panel time at TCH.  (Id. at 182). UIMA covered Dr. Fry's allotted panel slots for the rest of 2001.  (Suresh at 14).  Because they had just begun practicing at TCH and also performed a significant number of procedures at University Hospital, UIMA did not have a high volume of referrals or revenue at TCH in the financial data from 2001 that was used to allocate panel time for 2002.  (Broderick Exhs. 237, 238).

prior testimony: "the thought was that the physicians who regularly use [TCH] and bring business to the hospital should be rewarded."  (Broderick Exh. 226 at 22).

Because panel time was generally viewed as valuable (see Section III(C)(1), *supra*), TCH knew its offer to exchange panel time for referrals would be accepted by the cardiologists.  (See, e.g., Croushore Exh. 5 at TCH000006076 (Seim's notes characterizing EKGs as "incentives"); Croushore Exh. 2 (Wietholter's memo characterizing panel as "a coveted position")).  TCH's success at offering panel time as an inducement is evidenced by the fact that many cardiologists were in fact induced.  The participating cardiologists were well aware that they were being offered something of value for their referrals.  Dr. Toltzis testified:

> Q.        Have you ever asked The Christ Hospital for something in [sic]
>           value in exchange for treating patients there?
>
> Toltzis:  Well, panel time.
>
> Q.        Did you expressly – you expressly asked The Christ Hospital to
>           give you panel time in exchange for your referring patients?
>
> Toltzis:  No.  But that was the way it was done.

(Toltzis at 208).  Toltzis understood how the scheme worked:  "if I didn't refer patients to The Christ Hospital heart station I wouldn't have had panel time.  So it's a – **it's sort of a quid pro quo**."  (Toltzis at 200 (emphasis added)).

Dr. Desai confirmed that this methodology produced the desired effect of generating additional referrals to TCH.  According to him, "one of the reasons to send patients more to Christ Hospital than other hospitals" was because of  "how the panel work distribution was taking place."  (Desai at 25).  Because TCH was providing something of value in exchange for patient referrals, it made sense to send more patients to TCH.  As Dr. Desai explained, "there are other options available to me to go to other

42

hospitals, like I say, to Good Samaritan Hospital.  But eventually I felt that, you know, **if I send more patients to Christ Hospital that may help me get the panel work**." (Desai at 26 (emphasis added)).

Highlighting the fact that cardiologists were induced to bring business to TCH is the fact the participating cardiologists viewed their Heart Station panel time as something they had paid for and were entitled to receive.  For example, when Toltzis and Whang left Ohio Heart in 2000, they wanted to take their panel time with them.  On December 15, 2000, Toltzis wrote to Abbottsmith and Broderick:  "We understand that in 2001, OHHC is slated to have 31 weeks of ECG reading and 6 ½-day panel slots.  These allocations were made with our contributions apportioned to [Ohio Heart].  Now we have our own group and expect that we will receive fair and equal representation, *i.e.*, the relative percentages should change to reflect everyone's new status."  (McDonald Exh. 36).  Similarly, when Dr. Eli Roth left Ohio Heart earlier that year, he wanted to take his panel time with him, writing on May 15, 2000:  "I request return of my two weeks of EKG reading and ½ day noninvasive work at the Christ Hospital which I contributed when I joined Ohio Heart."  (McDonald Exh.  34).  Ohio Heart scribbled on his letter:  "To be analyzed."  (Id.).

TCH/THA will no doubt argue that the United States must establish that each cardiologist who referred patients to TCH was induced to do so by the methodology for allocating panel time.  But that is not what the law requires.  The AKS focuses on the purpose of the offeror, in this case TCH/THA.  See 42 U.S.C. §1320a-7b(b)(2)(A).  While the fact that the cardiologists were in fact induced is strong evidence of TCH's intent to induce, the fact that some cardiologists were not induced does not exculpate

TCH. Indeed, the perpetrator who offers bribes is no less culpable because some of his intended accomplices do not acquiesce in the illegal plan. For this reason, the AKS requires only that TCH had the purpose "to induce" and not that the inducement was accomplished in each and every case. Because at least "one purpose" of TCH/THA's methodology was to induce referrals – and indeed, the evidence suggests it was the only purpose – the AKS was violated. See McClatchey, 217 F.3d at 834-35 (collecting cases).

In light of the evidence that TCH intended to induce referrals, and the overwhelming evidence that the cardiologists knew that they were being induced to make referrals, any post hoc protestations by the defendants that they were not considering the possibility of inducing referrals simply is not credible and presents no question of fact for a jury. The evidence makes clear that cardiologists who wanted time in the Heart Station had to bring cardiac business to TCH. They had to pay to play. Geiger, 579 F.3d at 620 ("If the nonmoving party cannot provide enough evidence that a reasonable jury could find for it, the motion for summary judgment should be granted.").

### 5.    Defendants acted knowingly and willfully.

To establish a knowing and willful violation of the AKS, the United States must establish that the defendants acted with a "purpose to commit a wrongful act." (Order Denying Motions to Dismiss at 18 (citing McDonnell v. Cardiothoracic & Vascular Surgical Assoc., Inc., No. C2-03-79, 2004 WL 3733402, at *25 (S.D. Ohio July 28, 2004); see also United States v. Neufeld, 908 F. Supp. 491, 496 (S.D. Ohio 1995)). "Both the plain language of [the AKS], and respect for the traditional principle that ignorance of the law is no defense," require proof only that the defendant knew his

conduct was wrongful rather than illegal.  United States v. Jain, 93 F.3d 436, 441 (8th

Cir. 1996).

Here, however, the evidence shows that defendants not only knew that their

conduct was wrongful, they actually knew that it was illegal.  At various points, TCH's

senior executive officer, TCH's vice president of nursing, and TCH's chief of cardiology

all acknowledged the illegality of the scheme.  (See Croushore Exh. 5; Croushore Exh. 2;

Croushore Exh. 21).

The documented knowledge of illegality begins with Ms. Wietholter's memo in

1996.  (Croushore Exh. 2).  In it, following a detailed description of how Heart Station

panel time is allocated, she notes that this approach "potentially could put [TCH] at risk

legally."  (Id.)  Wietholter also offered, and then rejected, a legal alternative: "The only

way to avoid legal risk would be to open it to every cardiologist on staff which has been

an undesirable alternative."  (Id.)  The memo was sent to TCH's senior executive officer,

Claus von Zychlin, but nothing was done to change the system.

On May 14, 1999, a memorandum was circulated throughout the Health Alliance

about the AKS, warning that "Alliance Hospitals . . . may not offer, give, or pay *anything*

*of value* to physicians or others who refer (or who are in a position to refer) patients to

the . . . Alliance Hospitals . . . ."  (Tempel Exh. 225; emphasis in original).  Copies of this

document were circulated to dozens of THA and TCH employees, including Wietholter

and Seim.  (Id. at 5).

In late 1999 and early 2000, Dr. Fry began complaining that the methodology for

allocating panel time was "illegal" and needed to be changed.  (Fry at 132-33; Croushore

Exh. 8; Croushore Exh. 10; Wall Exh. 108; Fry Exh. 71; see also Seim at 37 ("Harry was

45

incessant with the use of the world legal.")).  Dr. Fry raised the issue of legality at section of cardiology meetings (Croushore Exh. 8) and drafted a letter to Seim that was sent to all members of the section of cardiology in which he characterized TCH's methodology as "probably illegal."  (Wall Exh. 108).

At the same time, Seim was conducting his own analysis of the issue.  In his handwritten notes, Seim wrote that panel time was "predicted on revenue generation," and that this was "illegal:"



(Croushore Exh. 5, at TCH000006082; Seim at 190 ("[T]hese were my words.")).  Despite this conclusion, Seim failed to contact the compliance department at THA. (Hanover at 41; 48; 50; 51-52; 55; 56; 57).  Seim could not recall specifics of any discussions with counsel about the legality of TCH's methodology and stated that he alone made the final decision on how to proceed.  (Seim at 197).  Seim also rebuffed Fry's pleas to bring a hospital lawyer to the meeting to address the legal issues.  (Fry Exh. 71).

Similarly, Ohio Heart's Dr. Broderick knew exactly what was happening. Broderick stated in an email that "Christ Hospital accepted the proposal from MDA to avoid Stark violation."  (Broderick Exh. 227).  The significance of this statement is unmistakable -- the defendants knew what they were doing was illegal, so they tried to cover it up.

46

The evidence also reveals that the RFP was a sham. After the responsibility to allocate panel time was nominally outsourced to MDA, nothing changed. The *day after the RFP was issued*, Broderick asked for TCH's data concerning physician referrals and revenues. (Wietholter at 45-46; Seim at 165). All of the defendants knew the legal risks associated with this exchange of information. Dr. Abbottsmith, who was then Ohio Heart's CEO, stated that it was "dangerous to ask for" this data in an effort to allocate panel time. (Croushore Exh. 10, at CH01300). Seim later admitted that it was "not appropriate" for TCH to have released this information. (Seim at 165).

MDA's records confirm that panel time was allocated each year based on the volume data received from TCH. (See McDonald Exh. 31 (2001 allocation); Wall Exh. 129 (2002 allocation); Wall Exh. 130 (2003 allocation); Broderick Exh. 233 (2004 allocation)). Seim's successor, Susan Croushore, admitted that TCH was aware of this fact: "The heart station team -- management team -- heart station management team certainly knew that MDA was getting information from the hospital and that assignment was based on volume . . . for panel." (Croushore at 139; see also Seim at 113-14; Croushore Exhs. 15, 16). TCH's knowledge of the data exchange continued throughout the relevant period. (Croushore at 140).

TCH's concern about the illegality of the system also continued throughout this period. On November 10, 2003, Dr. Hattemer met with Debbie Hayes[43] and Jeff Morneault[44] to discuss the allocation of panel time. (Croushore Exh. 21, TCH000173272 (GC00051)). During that conversation, the trio discussed reasons to terminate MDA's

---

[43]     Hayes was TCH's Chief Nursing Officer. (Croushore at 141).

[44]     Morneault was THA's Vice-President for the Cardiovascular Service Line. (Deposition of Jeffrey Morneault at 8).

47

contract to allocate panel time, including because the system was "illegal." (Id.)
Morneault also testified that when he learned that TCH was providing volume data to
MDA to allocate panel time, he became uncomfortable (Morneault at 22) and concerned
about a "compliance risk" (Morneault at 17-18).

Defendants' documents also illuminate why they chose to ignore the illegality of
their actions. Wietholter's memorandum in 1996 noted that opening the panel to all
active staff members -- a legal approach -- was "undesirable." (Croushore Exh. 2).
Seim's notes indicate he rejected two legal alternatives because they were unacceptable
to Ohio Heart. (Croushore Exh. 5).

Normally, intent to violate the law must be inferred from the defendants' actions.
See, e.g., 6th Circuit Criminal Jury Instructions § 2.08 ("Ordinarily, there is no way that a
defendant's state of mind can be proved directly, because no one can read another
person's mind and tell what that person is thinking."); Order Denying Motions to Dismiss
at 21 ("[T]he Court is of the opinion that the question of Defendants' intent is a factual
question properly within the province of the jury.") (citation omitted). But here, the
defendants actually documented what they were thinking -- that a methodology
"predicated on revenue generation" was "illegal." (Croushore Exh. 5). They chose to
continue their illegal scheme because doing so was mutually beneficial for TCH and
Ohio Heart and there was little risk they would be caught -- or so they thought. There is
no need to present the issue of scienter to the jury, when the evidence of knowledge is so
clear and there is no dispute of fact as to the evidence that establishes the defendants'
knowledge.

48

### D.   Defendants Violated the False Claims Act

It is a violation of the FCA to:  knowingly present, or cause to be presented, a false or fraudulent claim for payment, 31 U.S.C. § 3729(a)(1); knowingly make, use or cause to be made or used, a false statement to get a false or fraudulent claim paid or approved by the government, 31 U.S.C. § 3729(a)(2)[45]; or knowingly make, use, or cause to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money to the government.  31 U.S.C. § 3729(a)(7).  Defendants' conduct violated each of these provisions.

Each and every claim for a service or referral that was rewarded with Heart Station panel time during the years 1997 through 2004 was false because they were predicated on compliance with the AKS.  See United States v. Rogan, 517 F.3d 449, 452 (7th Cir. 2008); see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir.1997).  It is undisputed that these claims include the claims for services billed under the following 14 DRG codes: 104, 106, 107, 109, 111, 112, 115, 116, 117, 118, 124, 125, 517, and 518.  Because cardiologists who performed the procedures covered by those 14 DRGs at TCH or referred CABG procedures to TCH solicited or received remuneration in exchange for those referrals, TCH and THA

---

[45]      The Fraud Enforcement and Recovery Act, Pub. L. No. 111- 21, 123 Stat. 1617 (2009) (*FERA*). enacted May 20, 2009, amended the FCA.  Under FERA, former 31 U.S.C. § 3729(a)(2) has been renumbered (a)(1)(B) and amended to impose liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement *material* to a false or fraudulent claim." 31 U.S.C. 3729(a)(1)(B) (emphasis added).  Thus, under the revised section, the words "to get" have been replaced by the words "material to," and the final phrase, "paid or approved by the Government," has been deleted. Whether the defendants' conduct is analyzed under the former Section (a)(2) or the revised Section (a)(1)(B) is irrelevant for the purposes of this case.  The result is the same because defendants actually submitted claims to Medicare and Medicaid.  See Section III(D)(2), *infra*.

submitted false claims for payment, in violation of 31 U.S.C. § 3729(a)(1).[46] As knowing

participants in the scheme, Ohio Heart and MDA caused TCH and THA to submit false

claims for payment related to the procedures covered by those 14 DRGs, also in violation

of 31 U.S.C. § 3729(a)(1). See United States ex rel. Marcus v. Hess, 317 U.S. 537, 542-

45 (1943) (there is no statutory requirement of a "direct" presentation of a false claim to

the United States).

In addition, cardiologists, including members of Ohio Heart, submitted claims for

payment to the Medicare and Medicaid programs that constituted part of the reward for

referring business to TCH in violation of the AKS, namely claims for tests performed in

the Heart Station. These claims for payment also violate the FCA. By rewarding

cardiologists who referred business to TCH, TCH and THA caused the cardiologists,

including members of Ohio Heart, to submit claims in violation of the FCA.

Accordingly, TCH, THA, Ohio Heart, and MDA are all liable under 31 U.S.C. §

3729(a)(1) for submitting false claims for payment to federal health care benefits

programs, or causing these claims to be submitted. Because the various certifications on

the cost reports submitted by TCH and THA, and the certifications submitted by Ohio

Heart, MDA and individual cardiologists who performed services, constituted false

statements with respect to compliance with the AKS, TCH, THA, Ohio Heart, and MDA

knowingly submitted or caused others to submit false statements in support of false

claims, in violation of 31 U.S.C. § 3729(a)(1)(B) / 31 U.S.C. § 3729(a)(2). Finally,

absent their false representations of compliance with the AKS, the federal government

would have been able to recoup the money previously paid on the Medicare and

---

[46] Similarly, by offering or providing remuneration to induce referrals from those 14 DRGs, TCH and THA submitted false claims for payment, in violation of 31 U.S.C. § 3729(a)(1).

Medicaid claims submitted by the defendants.  As a result, defendants used and caused to be used false statements and certifications of compliance with the AKS to conceal an obligation to repay the federal government for claims paid relating to Medicare and Medicaid services in violation of  31 U.S.C. § 3729(a)(7).[47]

### 1.    Section 3729(a)(1)

To establish a violation of section 3729(a)(1) of the FCA, the United States must show: (1) that the defendants submitted a claim for payment; (2) that the claim or statement was false or fraudulent; (3) that the defendants acted with actual knowledge of the information, or with deliberate ignorance or reckless disregard of the truth or falsity of the information; and (4) that false claim was material.  See  U.S. ex rel. Roby v. Boeing Co., 100 F.Supp.2d 619, 625 (S.D. Ohio 2000) (Spiegel, J.); U.S. ex rel. Schell v. Battle Creek Health System, 419 F.3d 535, 538 (6th Cir. 2005); United States ex rel., A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 445 (6th Cir. 2005) (defining "material" statements as those having "a natural tendency to influence the government to make payments").  In the context of an FCA claim based on a violation of the AKS, the United States must show: (1) the submission of claims to the government by a healthcare provider; (2) illegal remuneration paid to the provider in connection with these claims that violates the AKS and thereby renders these claims false; and (3) either actual knowledge, deliberate ignorance, or reckless disregard of the kickback scheme.

---

[47]      Defendants' clear violation of the FCA makes it unnecessary to separately brief the government's claims for payment by mistake of fact (Count V), unjust enrichment (Count VI), and disgorgement (Count VII).  But the facts that warrant a finding that defendants submitted false claims also support a finding in favor of the United States on its common law claims.  In short, the defendants were not entitled to payment of claims for services that were provided in violation of the AKS and these payments were paid by mistake, unjustly enriched defendants and should be disgorged and returned to the United States.

See <u>U.S. ex rel. Pogue v. Diabetes Treatment Centers of America</u>, 576 F.Supp.2d 128, 131 (D.D.C. 2008).

**a.     Defendants Submitted Claims to Medicare and Medicaid.**

It is undisputed that TCH and THA submitted numerous claims for payment to Medicare and Medicaid for cardiovascular services performed between 1997 and 2004 that were rewarded with Heart Station panel time.  (<u>See, e.g.</u>, Croushore at 165-69).  It is also undisputed that, during this same period, Ohio Heart and MDA submitted claims for payment to the Medicare and Medicaid programs for services, purchased with these referrals to TCH that were performed by MDA, including Ohio Heart cardiologists in the Heart Station.  This Court has already recognized that these claims for payment, which include Medicare cost reports, hospital claims for payment, and physician claims, are all actionable under the FCA.  (Order Denying Motions to Dismiss at 8-9 (citing, *inter alia*, <u>United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.</u>, 125 F.3d 899, 902 (5th Cir. 1997); <u>United States ex rel. Thomas v. Bailey</u>, No. 4:06-CV-00465, 2008 U.S. Dist. LEXIS 91221, at *39 (E.D. Ark. November 6, 2008)).

To establish evidence that the defendants submitted claims for payment to Medicare and Medicaid, a declaration from the individual who gathered and produced the claims data is sufficient for the purpose of summary judgment.  <u>See U.S. ex rel. Pogue v. Diabetes Treatment Centers of America</u>, 565 F.Supp.2d 153, 160-161 (D.D.C. 2008) (citing <u>U.S. v. Rogan</u>, 459 F.Supp.2d 692, 727 n. 17 (N.D. Ill. 2006), aff'd, 517 F.3d 449 (7th Cir. 2008)).  To satisfy this element of its case, the United States offers the declarations of Kenneth Affeldt ("Affeldt Decl." attached as Exhibit 2), Suzy Hartman ("Hartman Decl." attached as Exhibit 3), Christopher Turner ("Turner Decl." attached as

52

Exhibit 4), Michael Reynolds ("Reynolds Decl." attached as Exhibit 5), and Ruben Steck ("Steck Decl." attached as Exhibit 6)

In April 2009, Assistant U.S. Attorney Affeldt contacted Suzy Hartman of AdvanceMed and requested data pertaining to the defendants' Medicare claims from January 1, 1997 until April 2, 2009.  (Affeldt Decl. at ¶¶ 2-3; Hartman Decl. at ¶¶ 2-3).  AdvanceMed is a Medicare Program Safeguard Contractor.  (Hartman Decl. at 1; Turner Decl. at ¶ 1).  Ms. Hartman provided the request for data to Christopher Turner, an AdvanceMed programmer.  (Hartman Decl. at ¶ 4; Turner Decl. at ¶ 2).  Mr. Turner was responsible for obtaining the requested data from the Data Extract System of the National Claims History (NCH), which is a repository of all Medicare claims data.  (Turner Decl. at ¶ 3).  NCH provided the data to Mr. Turner, who copied it onto four CDs.  (Id. at ¶ 4).  Mr. Turner then provided the four CDs to Ruben Steck, a consultant retained by the United States to analyze the Medicare and Medicaid claims data at issue.  (Turner Decl. at ¶ 5; Steck Decl. at ¶¶ 2-3).

In March 2009, Assistant U.S. Attorney Affeldt contacted the Ohio Department of Job and Family Services (ODJFS) and requested data pertaining to the defendants' Medicaid claims submitted from January 1, 1997 until March 2009.  (Affeldt Decl. at ¶¶ 4-5; Reynolds Decl. at ¶¶ 2-3).  Michael Reynolds, an information technology manager at ODJFS, extracted the requested claims information from the electronic repository of Ohio's Medicaid data.  (Reynolds Decl. at ¶ 4).  Mr. Reynolds provided a hard drive containing this information to AUSA Affeldt (Reynolds Decl. at ¶ 5; Affeldt Decl. at ¶ 6), who sent the hard drive to Mr. Steck, the United States' claims consultant (Affeldt Decl. at ¶ 6; Steck Decl. at ¶ 4).

Upon receipt of the Medicare and Medicaid data, Mr. Steck verified and validated the data files to ensure that the files contained defendants' claims.  (Steck Decl. at ¶ 6). He then broke down the data into six categories:

(a)  All of TCH's Medicare and Medicaid Part A inpatient claims pertaining to certain DRGs[48];

(b)  All physician Medicare Part B claims associated with TCH's inpatient claims from (a)[49];

(c)  All physician Medicare Part B claims for which MDA was the billing entity (i.e. Heart Station claims)[50];

(d)  All of TCH's Medicare Part A claims for outpatient services associated with the Heart Station claims from (c)[51];

(e)  All of TCH's Medicare Part A outpatient claims pertaining to certain procedure codes associated with the TCH Cath Lab[52]; and

(f)  All physician Medicare Part B claims associated with TCH's outpatient claims from (e).

(Steck Decl. at ¶ 7).

From his analysis, Mr. Steck determined that TCH submitted 11,508 inpatient Medicare Part A claims, which totaled $149,248,738.[53]  He determined that TCH submitted 846 inpatient Part A claims to Medicaid, which totaled $10,879,640.

---

[48]  Initially, Mr. Steck limited these claims to a list of 67 DRGs.  (Steck Decl. at ¶ 8).  That data set was subsequently winnowed to 14 DRGs.  (Id. at ¶ 10).  Those 14 DRGs correspond to the 14 DRGs used by the defendants to allocate Heart Station panel time.

[49]  Mr. Steck selected the associated physician Medicare Part B claims by identifying those that had a matching inpatient Medicare Part A claim for the same patient and the same date.  (Steck Decl. at ¶ 9).

[50]  This list of claims was identified based on research regarding procedure codes relating to cardiac services.  (Steck Decl. at ¶ 12).

[51]  Mr. Steck selected the associated Medicare Part A claims for the Heart Station by identifying those that had a matching Heart Station Medicare Part B physician claim for the same patient on the same date.  (Steck Decl. at ¶ 13).

[52]  Mr. Steck limited these claims to the list of 14 DRGs.  (Steck Decl. at ¶ 16).
[53]  A summary of these claims is attached as Exhibit A to Mr. Steck's Declaration.  (Steck Decl. at ¶ 11).

54

(Steck Decl. at ¶ 18).[54]  He also determined that MDA submitted 178,374 Heart Station

Part B claims, which totaled $2,468,555.[55]  (Steck Decl. at ¶ 14).  All of the underlying

claims data, as well as Mr. Steck's damage calculations, summaries, and the supporting

data have been provided to the defendants.  (Affeldt Decl. at ¶ 10).

### b.      Defendants' claims were false or fraudulent.

"Falsely certifying compliance with the Stark or Anti-Kickback Acts in

connection with a claim submitted to a federally funded insurance program is actionable

under the FCA."  U.S. ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir.

2009) (citing United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 243 (3d

Cir.2004)); United States ex rel. McNutt v. Haleyville Medical Supplies, 423 F.3d 1256

(11th Cir. 2005); Thompson, 125 F.3d at 902; see also Rogan, 517 F.3d at 452.

Compliance with the AKS is a condition of payment for both Medicare and Medicaid.

(Order Denying Motions to Dismiss at 8-9; 26.)  See Rogan, 517 F.3d at 452; McNutt,

423 F.3d at 1259.

In each claim submitted to the government, the defendants expressly or impliedly

certified compliance with the AKS.  For example, TCH/THA submitted cost reports that

falsely certified that services were not "provided or procured through the payment

directly or indirectly of a kickback":

---

[54]      These Medicaid claims were limited to the same 14 DRGs.  (Steck Decl. at ¶ 18).  A summary of
these claims is attached as Exhibit C to Mr. Steck's Declaration.  (Id. at ¶ 19).

[55]      A summary of these claims is attached as Exhibit B to Mr. Steck's Declaration.  (Steck Decl. at ¶
15).

```
          ELECTRONICALLY FILED COST REPORT        DATE: 3/14/2005   TIME   1:46P
                    PART I - CERTIFICATION

   MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY
   CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW.  FURTHERMORE,
   IF SERVICES IDENTIFIED BY THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR
   INDIRECTLY OF A KICKBACK OR WHERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES
   AND/OR IMPRISONMENT MAY RESULT.

            CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

   I HEREBY CERTIFY THAT I HAVE READ THE ABOVE STATEMENT AND THAT I HAVE EXAMINED THE ACCOMPANYING ELECTRONICALLY FILED OR
   MANUALLY SUBMITTED COST REPORT AND THE BALANCE SHEET AND STATEMENT OF REVENUE AND EXPENSES PREPARED BY:
          THE CHRIST HOSPITAL                                36-0163
   FOR THE COST REPORTING PERIOD BEGINNING  7/ 1/2002 AND ENDING    6/30/2003 AND THAT TO THE BEST OF MY KNOWLEDGE AND
   BELIEF, IT IS A TRUE, CORRECT, AND COMPLETE STATEMENT PREPARED FROM THE BOOKS AND RECORDS OF THE PROVIDER IN ACCORDANCE
   WITH APPLICABLE INSTRUCTIONS, EXCEPT AS NOTED.  I FURTHER CERTIFY THAT I AM FAMILIAR WITH THE LAWS AND REGULATIONS
   REGARDING THE PROVISION OF HEALTH CARE SERVICES, AND THAT THE SERVICES IDENTIFIED IN THIS COST REPORT WERE PROVIDED IN
   COMPLIANCE WITH SUCH LAWS AND REGULATIONS.

   ------------------------------
   R ENCRYPTION INFORMATION            OFFICER OR ADMINISTRATOR OF PROVIDER(S)
   TE: 3/14/2005   TIME   1:46P        VP Finance
                                       -----------------------------
   fQnPfMKTj6OeYacAz5rL1vwSssU0        TITLE
   jSr0bOJODazgcLW3NHaP:.6E3ryc             3/15/05
   t510sYloo33i1t                      -----------------------------
   ------------------------------      DATE
   ENCRYPTION INFORMATION
```

(DOJ-006110).

Similarly, the physicians, including Ohio Heart, submitted forms requesting reimbursement from Medicare and Medicaid. (MDA-000056-57). By requesting reimbursement under the Medicare and Medicaid programs, a "physician impliedly certifies that the claim and the underlying transaction comply with the Anti-Kickback Statute." (Order Denying Motions to Dismiss at 9); see also United States ex rel. Augustine v. Century Health Services, Inc., 289 F.3d 409, 414-15 (6th Cir. 2002) (adopting false implied certification theory in context of submission of claims to CMS); United States ex rel. Bidani v. Lewis, 264 F. Supp. 2d 612, 615-16 (N.D. Ill. 2003). As detailed above, the defendants were not complying with the AKS from 1997-2004. Therefore, every claim submitted during this period is false or fraudulent within the meaning of the FCA.

### c.    Defendants acted with the requisite scienter.

To establish a violation of the FCA, the United States must show that the defendants acted with either "actual knowledge, deliberate ignorance, or reckless disregard" of the kickback scheme. 31 U.S.C. § 3729(b) (defining "knowing" and

"knowingly" to mean acting with actual knowledge, deliberate ignorance, or reckless disregard).  As set forth above in Section III(C)(4), *supra.*, the defendants' own documents reveal that the defendants were well aware that they were out of compliance with the AKS during the years in which they were certifying this very compliance.  The contemporaneous documents and testimony, far more reliable than any post hoc rationalization, do not reflect any ambiguity or confusion.  Instead, the defendants' own documents repeatedly characterize the methodology for allocating panel time based on the volume of referrals as "illegal."  As a result, the defendants' knowledge rises to the level of "actual knowledge" under the FCA.[56]

d.      **Defendants' certifications are material.**

This Court has already held that "violations of the Anti-Kickback Statute … are material as a matter of law."  (Order Denying Motions to Dismiss at 25-26 (citing <u>Rogan</u>, 517 F.3d 449, 452).)  Compliance with the AKS is a condition of payment for both Medicare and Medicaid.  (<u>Id.</u> at 8-9; 26.)  Therefore, "[a] certification of compliance with applicable regulations 'would have a natural tendency to influence the government to make payments, and therefore qualifies as material.'"  (<u>Id. at 25-26</u> (citing <u>United States</u>

---

[56]      Of course, the United States is not required to establish actual knowledge or a specific intent to defraud; establishing "deliberate ignorance" or "reckless disregard" will also suffice.  <u>See, e.g.</u>, <u>U.S. ex rel. Bledsoe v. Community Health Systems, Inc.</u>, 342 F.3d 634, 642 n.6 (6th Cir. 2003).  "Deliberate ignorance" "contemplates 'constructive knowledge' or 'what has become known as the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted.'"  <u>U.S. ex rel. Longhi v. Lithium Power Technologies, Inc.</u>, 513 F.Supp.2d 866, 875-76 (S.D. Tex. 2007) (citing S. Rep. 99-345, at 20, U.S.C.C.A.N. 5266, 5285).  "Reckless disregard" also includes situations in which the claimant has reason to believe that his or her claim is based on inaccurate information, but fails to investigate the accuracy of the representations to the government.  <u>See, e.g.</u>, <u>United States ex rel. Compton v. Midwest Specialties, Inc.</u>, 142 F.3d 296, 304 (6th Cir.1998).  Courts have recognized that Congress's intent in not requiring a specific intent to defraud was to reach "not just those who set out to defraud the government, but also those who ignore obvious warning signs."  <u>Crane Helicopter Servs., Inc. v. United States</u>, 45 Fed. Cl. 410, 433 (Fed. Cl. 1999).  For all of the reasons why the defendants' scienter rises to the level of willful and reckless under the AKS, their scienter meets the lower standards of "actual knowledge," "reckless disregard" and "deliberate ignorance" under the FCA.

57

ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 445 (6th Cir. 2005)).)  In holding that false certifications of compliance with the AKS and other federal healthcare regulations are material as a matter of law to the government's payment decision, this Court is squarely in line with numerous courts that have held that, as a matter of law, "information that a hospital has purchased patients by paying kickbacks" influences the government's payment decision.  Rogan, 517 F.3d at 452; see also Pogue, 565 F.Supp.2d at 159 ("[V]iolations of AKS and Stark can be pursued under the FCA, since they would influence the Government's decision of whether to reimburse Medicare claims."); United States ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F.Supp.2d 28, 33 (D.D.C. 2003) ("[C]ompliance with [AKS] and Stark laws would affect the government's decision to pay."); United States ex rel. Ortega v. Columbia Healthcare, Inc., 240 F.Supp.2d 8, 13 n. 5 (D.D.C. 2003) ("Compliance with these laws [AKS and Stark] is a condition for reimbursement under Medicare, and [defendants] impliedly certified compliance with these law[s] in submitting claims to Medicare.").  Because the defendants falsely certified compliance with federal healthcare laws, including, specifically, the AKS, their false certifications had a "natural tendency to influence" "the government's funding decision" and are therefore material within the meaning of the FCA.  A+ Homecare, Inc., 400 F.3d at 446.

### 2.     Section 3729(a)(1)(B) / 3729(a)(2).

In addition to violating FCA § 3729(a)(1), the defendants also violated FCA § 3729(a)(1)(B), which subjects to liability defendants who knowingly make, use or cause to be made or used, a false statement material to a false or fraudulent claim, 31 U.S.C. § 3729(a)(1)(B).  The FCA was amended by the Fraud Enforcement and Recovery Act,

PUB. L. NO. 111- 21, 123 Stat. 1617 (2009) (FERA), enacted May 20, 2009.  Under

FERA, former 31 U.S.C. § 3729(a)(2) has been renumbered (a)(1)(B) and amended to

impose liability on any person who "knowingly makes, uses, or causes to be made or

used, a false record or statement *material* to a false or fraudulent claim." 31 U.S.C. §

3729(a)(1)(B) (emphasis added)  Before the enactment of FERA, the section created

liability for anyone who "knowingly makes, uses, or causes to be made or used, a false

record or statement *to get* a false or fraudulent claim *paid or approved by the*

*Government*." Thus, under the revised section, the words "to get" have been replaced by

the words "material to," and the final phrase, "paid or approved by the Government," has

been deleted.  Whether the defendants' conduct is analyzed under former Section (a)(2)

or revised Section (a)(1)(B), the result is the same -- a contractor can be held liable under

the FCA for falsely certifying compliance with the AKS.[57]

The elements of a Section (a)(2)/(a)(1)(B) violation are the same as for Section

(a)(1), except that the former requires proof of an express false statement.  Under current

Section 3729(a)(1)(B), the false statement must be material.  As discussed above, courts

have held that a false statement is material if it had a "natural tendency" to affect the

Government's decision-making process.  See United States ex rel. A+ Homecare, Inc. v.

Medshares Mgmt. Group, Inc., 400 F.3d 428, 445 (6th Cir. 2005).   Under former section

3729(a)(2), the false statement must be used "to get" a false claim paid, which requires

---

[57]     FERA provides that the amendment to Section 3729(a)(2) "shall take effect as if enacted on June
7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or
after that date."  FERA § 4(f).  Two courts, including one in the Southern District of Ohio, have held that
the amendment is not retroactive.  See United States ex rel. Sanders v. Allison Engine, Inc., --- F. Supp. 2d
----, 2009 WL 3626773, at *4 (S.D. Ohio, Oct. 27, 2009); U.S. v. Science Applications Intern. Corp., ---
F.Supp.2d ----, 2009 WL 2929250, at *14 (D.D.C. Sept. 14, 2009).  The United States believes that these
cases were incorrectly decided.  However, this Court need not decide whether former Section (a)(2) or
current Section (a)(1)(B) applies here.  Defendants are liable under both.

proof that the defendant "intended that the false record or statement be material to the Government's decision to pay or approve the false claim." <u>Allison Engine Co. v. United States ex rel. Sanders</u>, 128 S. Ct. 2123, 2126 (2008).  It is well-established that a defendant intends the natural consequences of its actions.  <u>See, e.g.</u>, <u>Reno v. Bossier Parish School Bd.</u>, 520 U.S. 471, 487 (1997); ("people usually intend the natural consequences of their actions"); <u>Personnel Adm'r of Massachusetts v. Feeney</u>, 99 S.Ct. 2282, 2295 (1979); <u>In re Patch</u>, 526 F.3d 1176, 1182 (8th Cir. 2008).

As discussed, TCH/THA falsely certified that they complied with the AKS, and Ohio Heart and MDA caused these false certifications to be made by their complicity in the kickback scheme.  Because compliance with the AKS was a condition of payment, the natural consequence of these false statements was the payment of Medicare claims that were not entitled to be paid.  <u>Bossier</u>, 520 U.S. at 487.  For the same reason, these false certifications were material to the Government's payment decision.  <u>A+ Homecare</u>, 400 F.3d at 445.  Indeed, this Court has already held that "violations of the Anti-Kickback Statute … are material as a matter of law."  (Order Denying Motions to Dismiss at 25-26 (citing <u>Rogan</u>, 517 F.3d 449, 452)).  Accordingly, the defendants are liable for making or causing to be made false statements in support of false claims under either current Section (a)(1)(B) or former Section (a)(2).

### 3.    Defendants' conduct violates 31 U.S.C. §§ 3729(a)(7).

In addition to being liable under Sections (a)(1) and (a)(1)(B) of the FCA, the defendants also violated Section 3729(a)(7) of the FCA, which subjects to liability any person who: knowingly makes, uses, or causes to be made or used, a false record or

statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government. 31 U.S.C. § 3729(a)(7).

TCH and THA were legally obligated to repay the federal Medicare program for claims that were wrongfully paid as part of a year-end reconciliation through the filing of a cost report. (42 U.S.C. 1395(g); 42 C.F.R. § 413.20, 413.64). In connection with the submission of each cost report, TCH and THA represented that the information contained therein was truthful, correct and complete, and that it complied with the applicable laws and regulations, including the AKS, and that services provided were not linked to kickbacks. (See CMS Cost Report Certification). TCH and THA's false certification of compliance with the AKS constitutes a false statement used to conceal, avoid or decrease an obligation to repay the claims for services that were submitted in violation of the FCA. By their involvement in the kickback scheme, Ohio Heart and MDA caused those false statements to be used to conceal, avoid, or decrease an obligation to pay Medicare.

Similarly, the Medicaid program also involves a reconciliation process, only on a quarterly basis. As with the Medicare program, the Medicaid program uses interim payments to reimburse health care providers.[58] The state provides to CMS a quarterly report of actual expenditures. The amounts of any fraudulent claims the state paid during that quarter will be included in these reports. Based on the information in the quarterly reports, CMS determines -- and approves -- whether the provider claims that the state paid with federal funds were appropriate. If CMS determines that certain claims paid by the state were improper, CMS may recoup the amount of the erroneously expended funds

---

[58] The federal government establishes a continuing line of credit certified to the Secretary of the Treasury in favor of the state payee. 42 C.F.R. § 430.30(d)(3) & (4). The federal government authorizes the state payee "to draw Federal funds as needed to pay the Federal share of disbursements." 42 C.F.R. § 430.30(d)(3). The state can draw down on those funds only to pay the Medicaid claims of healthcare providers. 42 C.F.R. § 430.30(d).

by reducing the amount of money provided to the state during the next quarter.

Defendants thus made, or caused to be made, false representations of compliance with the

AKS that prevented the federal government from recovering monies wrongfully paid to

defendants under the Medicaid program.

### 4. Defendants conspired to submit false statements in violation of 31 U.S.C. § 3729(a)(3).

To establish a conspiracy under the FCA, the United States must prove: (1) there

was a single plan to get a false claim paid, (2) the alleged coconspirators shared in the

general conspiratorial objective to get a false claim paid, and (3) one or more conspirators

performed an overt act in furtherance of the conspiracy to get a false claim paid. U.S. ex

rel. Howard v. Lockheed Martin Corp., 499 F.Supp.2d 972, 980 (S.D. Ohio 2007); United

States v. Murphy, 937 F.2d 1032, 1038-39 (6th Cir. 1991). It is not necessary to establish

an express agreement among all the conspirators or that all of the conspirators knew all of

the details of or participants in the conspiracy. Murphy, 937 F.2d at 1039.

At every step, Abbottsmith and Broderick, acting on behalf of Ohio Heart, and

later through MDA, worked hand in hand with TCH and THA to allocate panel time as a

kickback for referrals and revenues. Dr. Abbottsmith assisted Tempel in his original

development of TCH's methodology (Tempel at 32), understood the methodology that

was used (id.), and, before MDA, posted the yearly schedule that was based on the prior

year's volume statistics (id. at 33). After Dr. Fry openly challenged that methodology,

Abbottsmith and Seim "mutually tried to work out the details of what it is that the

hospital would like to see in terms of provision of services" for the Heart Station.

62

(Broderick Exh. 226, at 32).[59]  Consequently, under MDA, the system continued just as it had when TCH was in charge.  (Toltzis at 79-80 ("[I]t was like it always was.  Nothing really changed.").[60]

Defendants' shared objectives and overt acts are borne out by their conduct following the RFP.  The day after the RFP was issued, and before it was accepted, Susan Wietholter documented MDA's request for volume data and conceded that it would be used: "to analyze the revenue generated by each physician/group to determine allocations for distrubtion [sic] of panel time and EKG reading."  (Croushore Exh. 16).  The following year, Wietholter again requested data on behalf of MDA.  (Wietholter Exh. 252).  The screenshot from the data request to THA indicates that "[t]he information was used for the physicians of Medical Diagnostics to allocate EKG reading panel and Stress Testing in the Heart Station."  (Id.)  This process continued for panel allocations for 2003 and 2004.  (Croushore at 140).

The documents suggest more than just an exchange of information and instead indicate a coordination of efforts that rises to the level of symbiosis.  Abbottsmith and Broderick, acting through MDA, requested categories of information -- "PTCAs, Cardiac Caths, EP procedures per physician with gross charges per case."  (Croushore Exh. 16).  TCH was responsible for selecting the specific DRGs (Broderick at 129), which

---

[59]    The defendants' business decisions are very hard to explain without reference to the mutual benefit that they received from engaging in this scheme.  For instance, Mark McDonald helped write the Heart Station RFP that benefited Ohio Heart while he was with THA; a few months later, Ohio Heart named him vice president and chief operating officer.  (McDonald at 32).

[60]    As the documents reflect, Ohio Heart's preferences drove TCH toward the RFP concept as the only possible alternative.  Ohio Heart had the power to do this because it was "a critical component of the success" of TCH's cardiovascular program (Hanover at 86-87) and was a very important source of revenue for the hospital (Hanover at 75).  Ohio Heart, in turn, controlled MDA.  Ohio Heart's "Dr. Abbottsmith was [MDA's] president in perpetuity," Toltzis explained, adding that he did not know how this came about.  (Toltzis at 38).  "That's just the way it was."  (Toltzis at 38).  Similarly, Ohio Heart's Dr. Broderick just assumed the position of business manager, which was first created in 1999.  (Broderick Exh. 226 at 7).

happened to be "highly reimbursed" (Croushore at 134). When Dr. Toltzis complained about the reliance on interventional procedures in allocating panel time, Dr. Broderick explained "that although this is true, **the invasive procedures also provide an important income source to the hospital** and helps to fund the activities of the institution." (Wall Exh. 130 (emphasis added)).[61] If he was acting solely on behalf of Ohio Heart or MDA, Dr. Broderick would have had no reason to value more lucrative procedures over those actually performed in the Heart Station. Instead, the message was clear:

> TCH had something valuable that cardiologists wanted -- namely, time in the Heart Station. The cardiologists had something that TCH wanted -- namely, the power to refer patients for the lucrative procedures that comprised a significant portion of the hospital's profit. TCH expected these referrals in exchange for time at the Heart Station.

(Unger Report at 31).

Through defendants' conspiracy, the methodology for allocating Heart Station panel time continued to benefit TCH and Ohio Heart, and Ohio Heart received the lion's share of the panel time.[62] "Ohio Heart and The Christ Hospital I believe were the people who were making the decisions." (Toltzis at 204). "[D]ecisions were stated at the meetings, this is the way it will be." (Toltzis at 204). "[W]ho got what and how much

---

[61]     This criteria did nothing to ensure competency in the Heart Station. As Dr. Toltzis explained, it made no sense to give Heart Station panel time to interventionalists who generally perform few if any procedures in the Heart Station. (Toltzis at 61-62; Wall Exh. 130; see also Whang at 18-19 ("I was an interventioner and invasive cardiologist so I spent very little, if any, time in the heart station. So it was almost of very little interest to me."). Diagnostic cardiologists like Dr. Toltzis do not perform PTCAs (angioplasty), therapeutic catheterization, or EP (electrophysiology) procedures. They do, however, serve as the primary readers of tests in the Heart Station.

[62]     In 2002, Ohio Heart received 75% of the EKG panel time. (Wietmarschen Exh. 171, at 3). In 2003, Ohio Heart received 73% of the EKG panel time. (Wietmarschen Exh. 178, at 6). By contrast, when the panel criteria was changed to cardiologists who were active staff members and had read 100 stress echocardiograms the prior year (Hayes Exh. 205 at TCH000000781), Ohio Heart received only 44.5% of the panel time in 2006. (Hayes Exh. 200).

people got, was predetermined before the meetings ever took place." (Toltzis at 204). Dr. Snavely agreed: "I think it was [TCH's] intention to give control to the way things ran to [Ohio Heart.]" (Snavely at 70).

The evidence produced in discovery establishes the elements of a conspiracy. See, e.g., Howard, 499 F.Supp.2d at 980 (requiring (1) a plan, (2) a shared conspiratorial objective to get a false claim paid, and (3) an overt act in furtherance of the conspiracy). The defendants had a plan -- to maximize revenue for TCH by rewarding lucrative cardiac procedures with Heart Station panel time while allowing Ohio Heart to maintain dominance over the panel. (See, e.g. Tempel at 22-23 (admitting that cardiologists who wanted panel time had to refer patients to TCH); Exh. 5 at TCH000006082 (rejecting legal alternatives as unacceptable to Ohio Heart)). They had a shared objective to get false claims paid -- recognizing the important income stream to TCH and THA. As the facts above show, Abbottsmith, Broderick, Wietholter, Seim and others responded to allegations that the allocation system was illegal by using MDA to continue the illegal kickback. And, they engaged in numerous overt acts in furtherance of the conspiracy -- Dr. Abbottsmith coordinated efforts with the TCH administration to assign panel time prior to 2001 and joined with Dr. Broderick to work with TCH to allocate panel time based on TCH's revenue data for 2001-2004. Consequently, the United States is entitled to summary judgment on Count III of the Complaint.

### E. The United States Is Entitled To Recover Damages

Under the FCA, the United States is entitled to collect damages "that arise because of the falsity of the claim, i.e., ... those damages that would not have come about if the defendant's misrepresentations had been true." United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d 196, 200 (D.C. Cir. 1995). This Court has already

found that "violations of the Anti-Kickback Statute … are material as a matter of law

(Order Denying Motions to Dismiss at 25-26 (citing Rogan, 517 F.3d at 452)) and that

compliance with the AKS is a condition of payment for both Medicare and Medicaid.

(Id. at 8-9; 26).  "But for" the defendants' false certifications of compliance with the

AKS in their claims for payment, the government would not have paid their claims.  U.S.

v. TDC Management Corp., Inc., 288 F.3d 421, 428 (D.C. Cir. 2002) (adopting "but for"

measure of damages for false certifications regarding conflicts of interest).  Therefore, the

United States is entitled to the full value of every claim submitted by the defendants to

the federal government for payment for the years 1997 through 2004.  United States ex

rel. Pogue v. American Healthcorp, Inc., 914 F. Supp. 1507, 1513 (M.D. Tenn. 1996)

(FCA damages include not only sums that the government did not intend to pay, but also

sums that were paid to claimants that the United States "did not intend to benefit.").

> ### 1. Defendants owe damages for all federal claims regardless of whether such claims were payable were it not for the AKS violation.

As the legislative history accompanying the FCA 1986 amendments makes clear,

"claims may be false even though the services are provided as claimed if, for example,

the claimant is ineligible to participate in the program."  S. Rep. No. 345, 99th Cong. 2d

Sess. 9 (1986).  Consistent with the language of the FCA and its legislative history, in the

context of FCA claims predicated on AKS violations, courts hold that a proper measure

of damages includes sums that were paid to defendants in violation of the AKS, even if

these sums would properly have been paid to another provider who was not in violation

of the AKS.  See Rogan, 517 F.3d at 453 (holding that the government's FCA damages

for Medicare and Medicaid claims that falsely certified compliance with the Stark and

Anti-Kickback Statutes were the entire amount paid on the claims regardless of whether

medical services were actually provided); <u>Pogue</u>, 914 F. Supp. at 1510; <u>see also</u> <u>United States ex rel. Longhi v. Lithium Power, Inc.</u>, 575 F.3d 458, 473 (5th Cir. 2009).

    In <u>Rogan</u>, the defendant argued that because the medical services provided were necessary and could have been properly billed in the absence of an AKS violation, that FCA damages were not appropriate.  <u>Rogan</u>, 517 F.3d at 453.  Rejecting this argument, the court held that because the defendant did not comply with the AKS, which is a condition of payment under the Medicare statute, no money was due the defendant.  <u>Id</u>. The fact that the United States might have paid for the patients' care had they gone elsewhere is irrelevant.  <u>Id.</u>  As a result, "the entire amount" that the defendant received due to its submission of claims, trebled, plus penalties, "must be paid back."  <u>Accord</u> <u>Pogue</u>, 914 F. Supp. at 1510 (damages include payments made for work that was actually performed and properly charged when the defendant violated the FCA by falsely certifying compliance with the AKS); <u>Longhi</u>, 575 F.3d at 473 (proper damages analysis is not whether the government "got what it paid for" but, because the government intends to benefit only eligible contractors, if the contractors falsely claim eligibility to participate in the program, the measure of damages includes the entire amount paid by the government).

    In the present case, it is not disputed that from 1997 through 2004 the defendants certified that they were in compliance with the AKS when submitting their claims for reimbursement to the United States under the Medicare and Medicaid programs.  (<u>E.g.</u> DOJ-006110; MDA-000056-57).  The defendants were not in compliance with the AKS at the time of the submission of these claims for reimbursement because of the kickback arrangement described above.  <u>See</u> <u>supra</u> part III.D.  As a result, each claim submitted by

67

the defendants during this time period was false within the meaning of the FCA  and the measure of single damages includes the entire amount paid to these ineligible defendants. Rogan, 517 F.3d at 453.  Longhi, 575 F.3d at 473.  Therefore, the value of these claims, trebled and accompanied by civil penalties, "must be paid back."  Rogan, 517 F.3d at 453.

### 2.    The United States seeks damages of $74,234,781.

Although the United States is permitted to recover damages for all claims submitted by the defendants while the defendants were in violation of the AKS, the United States, exercising its prosecutorial discretion, seeks damages only on a subset of this total amount, the subset of claims that caused the representations of compliance with the AKS to be false during the years 2001 through 2004.  Defendants concede, as they must, that Heart Station panel time was allocated based on the volume of CABG procedures and the revenues generated at the Cath Lab over the course of the prior year. TCH captured these statistics using 14 DRGs (104, 106, 107, 109, 111, 112, 115, 116, 117, 118, 124, 125, 517, and 518).  This is the same information TCH transmitted to MDA beginning in 2001 and which MDA used to schedule time in the Heart Station.

It is also uncontested that from 2001 through 2004, TCH and THA submitted at least 5,428 claims to the Medicare program for in-patient (Part A) procedures performed at TCH that were billed using one of the 14 DRG codes that was later used by TCH and MDA to allocate Heart Station panel time for which the Medicare program paid TCH and THA a total of $69,571,651.  (See Steck Decl., Exhibit A)  During this same time period, referring to the same 14 DRGs, TCH and THA submitted 567 Medicaid claims for in-patient procedures for which the Medicaid program paid TCH and THA a total of

68

$7,771,884.[63]  Each of these 5,995 claims, a small percentage of the total number of claims submitted by TCH and THA during the relevant time period, caused defendants' representations of compliance with the AKS to be false.[64]

In sum, despite the fact that the United States is entitled to damages and penalties on every claim submitted by defendants during the time period 1997 through 2004 that caused the certifications of compliance with the AKS to be false, the United States is seeking damages and penalties only for the Medicare and Medicaid Part A referrals that were rewarded with Heart Station panel time between 2001 and 2004.  These are the 5,995 claims TCH and THA submitted to the Medicare and Medicaid programs using the 14 DRGs for which they were reimbursed $74,234,781.00.  Pursuant to the FCA, the government is entitled to recover treble the amount of its damages, plus a per-claim penalty for the money paid to the defendants as a result of their false claims, 31 U.S.C. § 3729(a); Rogan, 517 F.3d at 453.

IV.    CONCLUSION

In its decision denying defendants' joint motion to dismiss, the Court "concluded, taking the allegations in the Complaint as true, that the Plaintiff has adequately alleged Defendants operated a cross-referral scheme to cause the government to pay out sums of

---

[63]    In Ohio, the federal government contributes, on average, 60 percent of the funds used by the Medicaid program.  Accordingly, the federal government's damages relating to these claims total $4,663,130.40.

[64]    For example, during the time period 1997 through 2000, the Medicare program reimbursed TCH and THA a total of $79,677,087 based on the submission of 6,080 claims and the Medicaid program reimbursed TCH and THA a total of $3,107,758 (consisting of a federal share of $1,864,654.80) based on the submission of 279 claims.  In addition, as a reward for referring the procedures represented by the 14 DRGs, cardiologists were given the exclusive right to perform billable services in TCH's Heart Station.  During the time period 1997 through 2004, cardiologists received $2,468,555 from the Medicare program (Part B) for the services they provided in the Heart Station based on the submission of 132, 631 claims.  The receipt of the Heart Station panel time in exchange for referrals causes any representations of compliance with the AKS to be false, see 42 U.S.C. §1320a-7b(b)(1), and the government's damages  could include these amounts.

69

money.  (Order Denying Motions to Dismiss at 16).  As demonstrated through the extensive evidence developed in this case, the Plaintiff's allegations are true.  As a result, the United States and the Relator are entitled to a summary judgment in their favor.  For the reasons set forth above, summary judgment should be granted.

Respectfully submitted,

/s/ Glenn V. Whitaker
Glenn V. Whitaker (0018169)
Victor A. Walton, Jr.
Michael J. Bronson
Patrick M. Hagan
VORYS, SATER, SEYMOUR, &
PEASE LLP
221 E. Fourth St.
Atrium Two, Suite 2000
Cincinnati, OH 45202
(513) 723-4000
Fax: (513) 723-4056
gvwhitaker@vorys.com
vawalton@vorys.com
mjbronson@vorys.com
pmhagan@vorys.com

*Attorneys for Relator Harry F. Fry, M.D.*

/s/ Kenneth F. Affeldt
Kenneth F. Affeldt (0052128)
Andrew M. Malek (0061442)
Assistant United States Attorney
303 Marconi Boulevard
Suite 200
Columbus, Ohio 43215
(614) 469-5715
Fax: (614) 469-2769
ken.affeldt@usdoj.gov
andrew.malek@usdoj.gov

Joyce R. Branda
Michael Granston
George C. Vitelli
Jennifer L. Cihon (0068404)
Evan C. Zoldan
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 514-6547
Fax: (202) 514-7361
george.vitelli@usdoj.gov
jennifer.cihon2@usdoj.gov
evan.zoldan@usdoj.gov

*Attorneys for Plaintiff the United States of America*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 24, 2009, a true and correct copy of the foregoing was electronically filed with the Clerk of the United States District Court for the Southern District of Ohio, Western Division, using the CM/ECF system, which will send notification of such filing to all counsel of record.


/s/ Kenneth F. Affeldt
Kenneth F. Affeldt

72