# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* DR. HARRY F. FRY, | Case No. 1:03-cv-167 |
| Plaintiffs, | Judge S. Arthur Spiegel<br>Magistrate Judge Timothy S. Black |
| vs. | |
| THE HEALTH ALLIANCE OF GREATER CINCINNATI, *et al.*, | |
| Defendants. | |

## ORDER

This civil action is before the Court on Relator Harry F. Fry, M.D. ("Relator")'s motion to compel documents from The Christ Hospital ("TCH") (Doc. 195). Defendant TCH filed a memorandum in opposition (Doc. 218) and Relator has filed his reply (Doc. 253).

## I. BACKGROUND FACTS

Plaintiffs allege that Defendants unlawfully conspired to allocate valuable panel time in the Heart Station at TCH (operated by The Health Alliance of Greater Cincinnati ("THA")) in direct proportion to the volume of procedures the cardiologists referred to TCH. Defendants deny that they acted unlawfully.

In the instant motion, Relator moves for an order compelling TCH to produce three documents currently listed on its privilege log.

## II. ANALYSIS

Defendants carry the burden of establishing that the documents at issue are privileged. *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999). Thus, "it is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *In re Grand Jury Subpoena Dtd.*, 750 F.2d 223, 224 (2d Cir. 1984).

The traditional formulation of the attorney client privilege originates with Wigmore and provides that: "(1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived." *Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir. 1998) (citing *Fausek v. White*, 965 F.2d 126, 129 (6th Cir. 1992) (citing *United States v. Goldfarb*, 328 F.2d 280, 281 (6th Cir. 1964)); *see also* 8 J. Wigmore, Evidence § 2292 at 554 (McNaughton rev. 1961).

### A.     Document 238

The first document at issue contains notes taken by Debbie Hayes, a non-lawyer, regarding "operational matters" that she purportedly discussed with counsel at some subsequent time. Although the description provided in the privilege log suggests that Ms. Hayes may have been preparing for a meeting with counsel, the document produced by TCH suggests that the notes actually reflect a meeting with Mr. Morneault, another

non-lawyer.

Specifically, TCH claims that in August 2003, hospital administrators decided to seek legal advice regarding cardiology services provided at TCH. Accordingly, on August 16, 2003, Jeffery Morneault, former Vice President of the Cardiovascular Services Line at THA, and Debbie Hayes, Chief Nursing Officer for TCH, held a telephone conference. (Doc. 218, Ex. A at ¶¶ 2-3; Ex. B at 87). During the conference, they allegedly discussed, in confidence, the hospital's contract with Medical Diagnostic Associates ("MDA"), and potential issues about which to seek legal advice regarding the contract. (Ex. B at 88). TCH claims that Ms. Hayes recorded notes of the conversation reflecting these discussions in preparation for contacting the compliance department for legal advice. (Doc. 218, Ex. A at ¶¶ 3-4). Shortly after the discussion, Mr. Morneault allegedly sought legal advice from attorney Gary Harris, a THA compliance officer, regarding the issues he and Ms. Hayes had discussed.

In support of this position, TCH offers Ms. Hayes' declaration and Mr. Morneault's deposition testimony. However, Ms. Hayes' declaration simply states that she had a telephone conference with Mr. Morneault on August 16, 2003, that she took notes, and that a month later she was carbon-copied on an email seeking legal advice that Mr. Morneault sent to an attorney. (Doc. 218, Ex. A at ¶¶ 3-6). Mr. Morneault's deposition testimony states that during a conversation with Ms. Hayes (the date of which Mr. Morneault does not remember) he "became aware" of a compliance issue, and that he later consulted a compliance officer. (*Id*., Ex. B. at 88-89).

To be privileged, communications between non-attorney corporate employees must be made in order to secure legal advice from counsel. *Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981). *See also In re New York Renu with Moistureloc Product Liab. Litig.*, No. 2:06MN77777, 2008 WL 2338552, at *10 (D.S.C. May 6, 2008) ("communications among non-lawyer corporate personnel are protected if the *dominant intent* is to prepare the information in order to get legal advice from the lawyer").

Accordingly, TCH's arguments are insufficient to satisfy its burden of establishing privilege. Ms. Hayes' declaration merely establishes the temporal relationship between her conversation with Mr. Morneault and his later act of emailing counsel – it is entirely devoid of any indication that the two events were causally connected. Notably, Ms. Hayes does not even indicate that she was aware that counsel would ever be consulted or that the purpose of the August 16, 2003 meeting was to gather evidence to communicate to counsel. Nor does TCH argue that the notes themselves reflect any intent to seek advice from counsel. *See United States ex rel. Fry v. The Health Alliance of Greater Cincinnati*, No. 1:03-cv-167, 2009 U.S. Dist. LEXIS 61163, at *2 (S. D. Ohio 2002 July 7, 2009) (finding that an *in camera* review of Dr. Hattemer's notes revealed that the notes did not indicate that any statements originated from lawyers or were communicated to lawyers). Apparently, according to the record evidence, the first Ms. Hayes knew of Mr. Morneault's decision to consult counsel was when she was carbon copied on his email.

Likewise, Mr. Morneault's deposition testimony does not establish a causal link

between the August 16 meeting and his email to counsel. To the contrary, his testimony indicates that he had no intent to seek counsel's advice at the time he spoke with Ms. Hayes. Mr. Morneault testified that Ms. Hayes initiated the call (Doc. 253, Ex. A at 22-23), and that the conversation was how he "became aware" of the facts underlying the relationship between TCH and MDA (*id*; *see also* Doc. 218, Ex. B at 87-88). Additionally, Mr. Morneault also did not email THA's compliance officer, Gary Harris, until one month after his conversation with Ms. Hayes.

TCH cannot shield an operational conversation between two non-attorneys by simply asserting that one of them subsequently contacted counsel. *Se. Pennsylvania Transp. Auth. v. Caremarkpcs Health*, 254 F.R.D. 253, 259 (E.D. Pa. 2008) ("What would otherwise be routine, non-privileged communications between corporate officers or employees . . . do not attain privileged status solely because in-house or outside counsel is 'copied in' on correspondence or memoranda").

Accordingly, the undersigned finds that TCH has failed to establish that document 238 is privileged and therefore it must be produced.

### B. Document 242

The second document at issue concerns notes taken by Ms. Hayes during a meeting with Mr. Morneault and TCH Senior Executive officer Susan Croushore, also a non-lawyer.

In October 2003, THA and TCH received legal advice from outside counsel regarding cardiology services at TCH. (*See also* Doc. 195, Ex. A at entry 240 (9/30/03

letter from counsel conveying confidential legal advice)). Thereafter, Mr. Morneault and Ms. Hayes held a conference with Ms. Croushore to allegedly discuss the advice. (Ex. A at ¶¶ 7-8). TCH claims that Ms. Hayes' notes from the conference reflected the group's discussion regarding the legal advice TCH had recently received. (Ex. A at ¶ 8). The meeting's participants allegedly understood that the conversation was confidential, and the notes were not shared with any third parties after the conference. (*Id.*)

The only evidence TCH offers in support of its position is Ms. Hayes' declaration. In it, Ms. Hayes states that an outside attorney provided legal advice to an unidentified member of The Health Alliance, and that approximately two weeks later she, Mr. Morneault, and Ms. Croushore met to discuss this advice. (Doc. 218, Ex. B at ¶¶ 7-8). Ms. Hayes' declaration is exactly the type of *ipse dixit* assertion that does not carry TCH's burden to establish the applicability of the privilege. *United States ex rel. Fry*, 2009 U.S. Dist. LEXIS 61163 at 1.

Accordingly, the undersigned finds that TCH has failed to establish that document 242 is privileged and therefore it must be produced.

### C. Document 289

The final document at issue is the minutes from the October 12, 2004 meeting of the TCH Section of Cardiology. TCH has redacted approximately one line from the minutes. The minutes reflect that Dr. Hattemer discussed legal advice TCH had received regarding the assignment of Heart Station panel time for 2005 with the attendees of the meeting, including three TCH administrators, two nurses, eight cardiologists, and two

non-cardiologist physicians listed as "guests." TCH's privilege log indicates that the minutes were sent to all of the members of the section of cardiology.

TCH alleges that after Dr. Hattemer became Chief of Cardiology, he knew that he "needed legal opinions" regarding the Heart Station panel (Doc. 218, Ex. D at 57), so he consulted with TCH personnel to receive that necessary legal advice. (Doc. 218, Ex. E at 71). Dr. Hattemer was not, however, a TCH administrator or board member, (*see* Doc. 195 at 8, citing Hattemer Aff. at ¶ 6), nor was he ever told he was free to divulge any communications from counsel to third parties (*see* Ex. D at 43-44).

As the minutes reflect, Dr. Hattemer explained that his communication was "per legal counsel" regarding "Panel 2005." This document is distinguishable from earlier documents before the Court, where Dr. Hattemer did not indicate that the information "recorded in the notes originated from lawyers." *United States ex. rel. Fry*, 2009 U.S. LEXIS 61163 at 9. TCH suggests that Dr. Hattemer's statement at the meeting "reflect[ed] communication with counsel" – Relator claims, however, that Dr. Hattemer previously testified that he "never received any information from Christ Hospital attorneys" (Doc. 218, Ex. D at 43) and that he does not recall receiving information from Mr. Morneault or Ms. Hayes that originated from counsel (*Id*. at 56).

### 1. Whether Dr. Hattemer falls within the umbrella of TCH's attorney-client privilege

Relator argues that because of Dr. Hattemer's status as an independent contractor, the attorney-client privilege does not apply to him. *Export-Import bank of the U.S. v.*

*Asia Pulp & Paper Co.*, 232 F.R.D. 102, 112 (S.D.N.Y. 2005).[1]

However, the undersigned finds that Dr. Hattemer's status as an independent contractor is inapposite. "[T]he majority of case law" recognizes that an independent contractor serves "as a 'representative' of [the client] to the degree necessary to establish the attorney-client privilege." *Burlington Indus., Inc. v. Rossville Yarn, Inc.*, No. 4:95-cv-0401-H, 1997 WL 404319, at *3 (N.D. Ga. June 3, 1997).[2]

TCH asserts that Dr. Hattemer had "a role similar to that of an employee" and therefore that communications to him are privileged.[3] (Doc. 218 at 9). *See FTC v. Glaxosmithkline*, 294 F.3d 141 (D.C. Cir. 2002) (holding that communications with independent contractors hired to aid with public relations and government affairs maintained privilege where the independent contractors worked with the client's attorneys in the same manner as employees); *In re Bieter*, 16 F.3d 929, 937 (8th Cir. 1994) (noting that "it is inappropriate to distinguish between those on the client's payroll and those who are instead . . . employed as independent contractors"). As long as the independent

---

[1] *Export-Import* invented a construction of the attorney-client privilege which is "too restrictive" to be realistic in today's marketplace, where businesses frequently hire contractors and still expect to be able to seek legal advice. *Stafford Trading, Inc. v. Lovely*, 2007 U.S. Dist. LEXIS 13062, at *18 (N.D. Ill. Feb. 22, 2007) (explaining that "the rule in *Export- Import* is too restrictive").

[2] *See also In re Rieter*, 16 F.3d 929, 937 (8th Cir. 1994) (distinguishing between independent contractors and employees is inappropriate); *Jones v. Nissan N. Am., Inc.*, No. 3:07-0645, 2008 WL 4366055, at *7 (M.D. Tenn. Sept. 17, 2008) (holding that communications to company's medical director were privileged even though medical director was not an employee).

[3] The facts that Dr. Hattemer only worked at TCH 20 hours per month and that he had a full time position with a private cardiology group do not prevent him from also having a "role [at TCH as chief of cardiology] similar to that of an employee."

contractor has a role similar to that of an employee (such as an independent contractor physician who serves as the chief of cardiology), communications between the contractor and attorneys for the purpose of seeking legal advice are privileged. *In re Bieter*, 16 F.3d at 938-39.

### 2. Whether TCH waived the privilege

Relator argues that even if the information were privileged, TCH waived that privilege by not acting to prevent Dr. Hattemer from disclosing the information. (Doc. 195 at 9-10). Specifically, Relator claims that TCH had multiple opportunities to prevent Dr. Hattemer from disclosing the purportedly confidential information, yet failed to do so. Accordingly, Relator argues that THC has waived any claim of privilege that it may have had. Additionally, Relator claims that disclosing confidential information to the meeting attendees and to the Cardiology Section constitutes waiver because the information was disclosed to third parties not within the umbrella of TCH's attorney-client privilege.

First, Dr. Hattemer did not have the power to waive the privilege on behalf of TCH. Rather, "[t]he power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985).[4] Because Dr. Hattemer was not a corporate officer or board member, he could not waive the

---

[4] *See also U.S. v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (quoting *Weintraub* and holding that both a corporate employee and an ex-employee could not waive the privilege); *Stopka v. Alliance of Am. Insurers*, No. 95-C-7487, 1996 U.S. Dist. Lexis 5466, at *14-16 (N.D. Ill. Apr. 23, 1996) (holding that a company's former vice president could not waive the privilege).

privilege. In fact, Dr. Hattemer's services agreement with TCH *required* him to keep such communications confidential. (Doc. 218, Ex. D at 44). Additionally, no one from TCH instructed Dr. Hattemer to divulge any communication from counsel to third parties. (*Id.* at 43-44). Therefore, there is no waiver here.

Second, even if Dr. Hattemer could have waived the privilege, he did not do so here, as privileged communications may be conveyed to representatives of a corporation without the communications losing their privileged nature. As this Court previously held, "[t]he fact that communication about legal advice is between or among employees of the client does not deprive it of its privileged status." *Reckley v. City of Springfield*, No. 3:05-cv-249, 2008 U.S. Dist. LEXIS 103663, at *5 (S.D. Ohio Dec. 12, 2008); *see also Eutectic Corp. v. Metco, Inc.*, 61 F.R.D. 35, 37 (E.D.N.Y. 1973) (holding that privilege can apply to communications between non-attorneys). Dr. Hattemer made clear to the Cardiology Section Meeting attendees that he was disclosing legal advice "per legal counsel" to ensure they would keep the communication confidential.

Therefore, the redacted portion of document 289 is privileged.

### III. CONCLUSION

For the reasons stated above, Relator's motion to compel (Doc. 195) is **GRANTED IN PART** and **DENIED IN PART**. TCH shall produce unredacted copies of documents 238 and 242 **FORTHWITH**; TCH shall not be required to produce the redacted portion of document 289.

-10-

**IT IS SO ORDERED.**

DATE:  December 11, 2009                                                       s/ Timothy S. Black
                                                                                                                 Timothy S. Black
                                                                                                                 United States Magistrate Judge